UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEON M. BROWN, Individually and on Behalf
of All Others Similarly Situated,

                            Plaintiff,

        v.

OPERA LIMITED, YAHUI ZHOU, FRODE
JACOBSEN, HONGYI ZHOU, and HAN
FANG,

                            Defendants.

Case No.

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

        Plaintiff Leon M. Brown ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against

Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's

own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

conducted by and through Plaintiff's attorneys, which included, among other things, a review of

the Defendants' public documents, conference calls and announcements made by Defendants,

United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press

releases published by and regarding Opera Limited ("Opera" or the "Company"), analysts' reports

and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff

believes that substantial evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## NATURE OF THE ACTION

        1.      This is a federal securities class action on behalf of a class consisting of all persons

and entities other than Defendants that purchased or otherwise acquired: (a) Opera American

depositary shares ("ADSs") pursuant and/or traceable to the Company's initial public offering commenced on or about July 27, 2018 (the "IPO" or "Offering"); and/or (b) Opera securities between July 27, 2018 and January 15, 2020, both dates inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Opera was founded in 1996 and is headquartered in Oslo, Norway.  The Company, through its subsidiaries, provides mobile and Personal Computer ("PC") web browser applications in Ireland, Russia, and internationally, under the Opera Mini, Opera for Android, Opera Touch, and Opera for Computers brand names.

3.      Opera has also increasingly invested in its fintech businesses, providing mobile loan and financing applications marketed to Kenya, Nigeria, and India, under the OKash, OPesa, CashBean, and OPay brand names, which are offered on Google LLC's ("Google") Play Store marketplace, as downloadable applications.

4.      On June 29, 2018, Opera filed a registration statement on Form F-1with the SEC in connection with the IPO (Registration No. 333-226017), which, after several amendments, was declared effective by the SEC on July 26, 2018 (the "Registration Statement").

5.      On July 27, 2018, Opera filed a prospectus for the IPO on Form 424B4 (the "Prospectus"), which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").  That same day, Opera's ADSs began publicly trading on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "OPRA" at the IPO price of $12.00 per ADS.

6.     On August 9, 2018, Opera completed its IPO, issuing 9,600,000 ADSs priced at $12.00 per share, raising approximately $115.2 million in proceeds before underwriting discounts and commissions, and other expenses.

7.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) Opera's sustainable growth and market opportunity for its browser applications was significantly overstated; (ii) Defendants' funded, owned, or otherwise controlled loan services applications and/or businesses relied on predatory lending practices; (iii) all the foregoing, once revealed, were reasonably likely to have a material negative impact on Opera's financial prospects, especially with respect to its lending applications' continued availability on the Google Play Store; and (iv) as a result, the Offering Documents and Defendants' statements were materially false and/or misleading and failed to state information required to be stated therein.

8.     On January 16, 2020, Hindenburg Research ("Hindenburg") published a report asserting that Hindenburg had "a 12-month price target of $2.60 on Opera, representing a 70% downside."  Among other issues, Hindenburg reported that Opera's "browser market share is declining rapidly, down ~30% since its IPO"; that Opera was involved in "predatory short-term loans in Africa and India, deploying deceptive 'bait and switch' tactics to lure in borrowers and charging egregious interest rates ranging from ~365-876%"; that Opera's lending business

applications, many of which are offered on Google's Play Store—particularly, OKash, OPesa, CashBean, and Opay—were "in black and white violation of numerous Google rules" aimed at "curtail[ing] predatory lending"; and that consequently, Opera's entire lending business was "at risk of disappearing or being severely curtailed when Google notices" Opera's alleged violation of its rules.

9.      On this news, Opera's ADS price fell $1.69 per share, or 18.74%, to close at $7.33 per share on January 16, 2020.

10.      As of the time this Complaint was filed, Opera ADSs continue to trade below the IPO price, damaging investors.

11.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Opera' securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Opera securities trade on the NASDAQ, located within this Judicial District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired Opera ADSs pursuant and/or traceable to the Offering Documents issued in connection with the Company's IPO, and/or purchased or otherwise acquired Opera securities at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Opera is a Cayman Islands corporation, with principal executive offices located at Gjerdrums vei 19, 0484 Oslo, Norway.  Opera securities trade in an efficient market on the NASDAQ under the ticker symbol "OPRA."

18.     Defendant Yahui Zhou ("Y. Zhou") has served as Opera's Chairman of the Board ("Chairman") and Chief Executive Officer ("CEO") at all relevant times.  Y. Zhou signed or authorized the signing of the Offering Documents filed with the SEC.

19.     Defendant Frode Jacobsen ("Jacobsen") has served as Opera's Chief Financial Officer at all relevant times.  Jacobsen signed or authorized the signing of the Offering Documents filed with the SEC.

20.     Defendants Y. Zhou and Jacobsen are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

21.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Opera's SEC filings, press releases, and other market communications.  The

Exchange Act Individual Defendants were provided with copies of Opera's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Opera, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Opera and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

23.     Defendant Hongyi Zhou ("H. Zhou") served as a Director of Opera at the time of the IPO.  H. Zhou signed or authorized the signing of the Offering Documents filed with the SEC.

24.     Defendant Han Fang ("Fang") served as a Director of Opera at the time of the IPO. Fang signed or authorized the signing of the Offering Documents filed with the SEC.

25.     The Exchange Act Individual Defendants and Defendants H. Zhou and Fang are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

26.     As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Opera ADSs in the IPO for their own benefit and the benefit of Opera.  The Securities Act Individual Defendants were key members of the IPO working group and executives of Opera who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

27.     The Exchange Act Defendants and the Securities Act Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Opera was founded in 1996 and is headquartered in Oslo, Norway.  The Company, through its subsidiaries, provides mobile and PC web browser applications in Ireland, Russia, and internationally, under the Opera Mini, Opera for Android, Opera Touch, and Opera for Computers brand names.

29.     Opera has also increasingly invested in its fintech businesses, providing mobile loan and financing applications marketed to Kenya, Nigeria, and India, under the OKash, OPesa, CashBean, and OPay brand names, which are offered on Google's Play Store marketplace as downloadable applications.  These applications are provided either through direct- or subsidiary-owned entities, or joint ventures with so-called "associates" controlled by the Company's CEO and Chairman, Defendant Y. Zhou, who the Company acknowledges in its SEC filings also controls Opera.

30.     On June 29, 2018, Opera filed the Registration Statement with the SEC, which was declared effective on July 26, 2018.

31.     On July 27, 2018, Opera filed the Prospectus with the SEC, which incorporated and formed part of the Registration Statement.  That same day, Opera's ADSs began publicly trading on the NASDAQ under the ticker symbol "OPRA" at the Offering price of $12.00 per ADS.

### Materially False and Misleading Statements Issued in the Offering Documents

32.      The Offering Documents widely touted both the market opportunity and the current user base for Opera's mobile and PC browsing applications.  Specifically, under the Prospectus's "Our Key Strengths" section, Defendants touted a variety of Opera's purported advantages in the mobile browsing markets, summarized in headings, including, *inter alia*, an

"***Established Global Internet Brand with a Massive User Base***," "***Innovative Products Propelling Robust Organic Growth***," and a "***Proven Monetization Model***" (all emphases in original).

33.     Under the first of these headings alone, the Prospectus made numerous claims purportedly evidencing Opera's strong position as a leading browsing applications provider, touting, *inter alia*, that "[Defendants] . . . believe we are the largest independent mobile browser provider worldwide in terms of user base"; "[w]e hold a commanding leadership in South Asia, Southeast Asia and Africa"; "[w]e . . . have one of the largest independent PC browsers worldwide, with a strong presence particularly in Europe"; that, "[i]n the first quarter of 2018, we served 321.7 million average [monthly average users ('MAUs')] with 264.3 million mobile average MAUs and 57.4 million PC average MAUs around the globe"; and that, according to a research firm, "Opera has ranked among the top 30 publishers in terms of app downloads on Google Play in each year from 2014 to 2017."

34.     In discussing the number of Opera's mobile browsing users, the Prospectus touted that the "Opera Mini and Opera for Android user base reached 264.3 million average MAUs in the first quarter of 2018, of which 182.0 million were smartphone users and 82.3 million were feature phone users," and that the Company's "smartphone user base continues to grow rapidly throughout the world."

35.     In discussing Opera's PC browsing users, the Prospectus represented that the Company has "a large and active global PC user base with 57.4 million average MAUs in the first quarter of 2018"; that the Company's "strongest PC region has been Europe, representing 70% of our user base"; and that the Company "ha[s] recently experienced significant growth in other geographies such as Asia and the Americas."

36.     With respect to product marketing and distribution, the Prospectus touted that Opera's "main source of marketing for [its] products and services is 'word-of-mouth' from our large user base,"  while noting that, "[d]uring the three months ended March 31, 2018, organic installs represented approximately 69.7% of [the Company's] new smartphone users."

37.     The Prospectus also downplayed Opera's competition from other large browsing application providers—including Google's Chrome browser, Apple Inc.'s Safari browser, and Microsoft Corporation's Internet Explorer and Edge browsers—by stressing how, "[u]nlike . . . other large competitors, we primarily focus on key growth markets outside North America, which enables us to integrate unique content to local Opera News users via our evolving algorithm," and touting the Company's particularly strong foothold in Africa, South Asia, Southeast Asia, and Europe.

38.     The Prospectus also provided only vague descriptions of Opera-affiliated entities providing financial services.  For example, with respect to Opesa, the Prospectus merely noted the existence of a subsidiary named Opesa South Africa (Pty) Limited, which is briefly described as "our wholly owned subsidiary established in South Africa on March 15, 2017, [which] is an operating entity that employs our staff in South Africa and engages in local collections and monetization."

39.     The Prospectus described Opay in a similar manner, referring to an entity called Opay Digital Services Limited (HK) ("Opay Digital").  With respect to its business relationship with, revenues from, and funding of Opay Digital, the Prospectus stated, in relevant part:

> Opay Digital Services Limited (HK), or Opay, is our equity investee which our chief executive officer and chairman controls through Balder Investment Inc., where certain of our other officers also have financial interests but no voting rights. Opay is an online payment service provider targeting African users. In 2017, we provided a loan of US$5.6 million to Opay in relation to its business expansion in Nigeria. In 2018, we provided a loan of US$0.4 million to Opay in relation to its

business expansion in Kenya. Both loans are interest-free for the first 60 days and are due and payable upon notice. We also provided professional services to Opay and recorded operating revenue of US$2.8 million in 2017. As of March 31, 2018, we had US$5.5 million of trade receivable and US$1.0 million loan receivable, due from Opay. Our investment in and relevant transactions with Opay are in line with our business growth strategy and we expect to continue investing in Opay as its business develops.

40.    The statements referenced in ¶¶ 32-39 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) Opera's sustainable growth and market opportunity for its browser applications was significantly overstated; (ii) Defendants' funded, owned, or otherwise controlled loan services applications and/or businesses relied on predatory lending practices; (iii) all the foregoing, once revealed, were reasonably likely to have a material negative impact on Opera's financial prospects, especially with respect to its lending applications' continued availability on the Google Play Store; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

### Materially False and Misleading Statements Issued During the Class Period

41.    The Class Period begins on July 27, 2018, when Opera securities began publicly trading on the NASDAQ.

42.    On August 9, 2018, Opera completed its IPO, issuing 9,600,000 ADSs priced at $12.00 per share, raising approximately $115.2 million in proceeds before underwriting discounts and commissions, and other expenses.

43.     On February 21, 2019, Opera issued a press release announcing its fourth quarter and full year 2018 financial results (the "4Q/FY18 Press Release"). That press release highlighted Opera's "[c]ontinuation of strong growth in the fourth quarter," which was purportedly "propelled by growing user adoption of . . . Opera mobile and PC browsers, with records across all [its] profitability metrics"; as well as touted that "[i]n the fourth quarter, Opera reached 208.0 million average smartphone MAUs, and 60.9 million average PC MAUs, both representing all-time highs."

44.     The 4Q/FY18 Press Release also quoted Defendant Jacobsen, who similarly emphasized Opera's continued rapid growth, representing that "[o]ver the past year, we added 33.6 million smartphone and PC users, representing a 14.3% user base growth which combined with strengthened monetization to deliver a 33.7% annual revenue growth and new levels of scale economics in our business model," and how "[i]n the fourth quarter, our sequential growth in search and advertising ARPU was 4.1% and 5.9%, respectively," which "was driven by [*inter alia*] our ability to grow users in well-monetized geographies."

45.     The 4Q/FY18 Press Release also discussed Opera's investments in the lending market. For example, it touted Opera's 19.9% ownership share in Opay, which had "launched an agent-centric operation in July as a means to reach the underserved population," and that "[b]y year-end, Opay had recruited 3,000 agents and December's average daily transaction volume was in excess of $1 million, with peak days exceeding $1.5 million, placing Opay among top-tier mobile money providers in Nigeria less than one year after launch."

46.     In this same regard, the 4Q/FY18 Press Release touted Opera's acquisition of the digital lending application Okash from Opay Digital, representing that "[b]y the fourth quarter, OKash generated $1.7 million of revenue from 280,000 microloans, and held active licenses to

provide similar microfinance products in four other countries"; that "[f]or Opera, the acquisition of the OKash business represents a new and profitable user-driven business opportunity that will benefit from Opera's existing reach and scale in relevant African and Asian markets, and of relevant demographics"; and that "[t]he acquired OKash business is tracking towards approximately $1.0 million of EBIT in the first quarter of 2019, and is expected to generate EBIT in excess of $6 million for the year as a whole, resulting in an expected acquisition multiple of below 1.6x 2019 EBIT."

47.    On April 17, 2019, Opera filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 20-F").  The 2018 20-F touted Opera's developing fintech business, largely repeating the Company's assertions from the 4Q/FY18 Press Release concerning its relationship with Opay Digital and the acquisition of OKash.  With regard to OKash, the 2018 20-F additionally touted that Opera's "microfinance apps have been consistently achieving download volumes amongst the top ten most downloaded free Android apps in Kenya," and that "[a]s of 2019, a new fintech revenue category will be included" in the Company's reporting of its revenue recognition, thereby indicating to investors that Opera's enthusiastic foray into the fintech and lending market would reap benefits for the Company and investors.

48.    Finally, the 2018 20-F contained merely generic, boilerplate representations concerning Opera's reliance on Google's Play Store to offer certain of its applications, stating, in relevant part:

> We rely upon a number of third party channels to provide products and services to our users. For example, we primarily rely on third party application distribution channels, such as the . . . Google Play Store, to allow users to download our applications and games. In addition, we work closely with key mobile manufacturers to pre-install Opera products on their mobile phones . . . . If any of these third party channel providers . . . refuses to continue to provide its services to

> us and our users for any reason, it may materially and adversely affect our business,
> financial condition and results of operations.

Plainly, this risk warning was a generic "catch-all" provision not tailored to Opera's actual known risks with respect to Google's rules governing lending applications on its Google Play Store marketplace.

49.      Appended as exhibits to the 2018 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Exchange Act Individual Defendants certified that "[t]he [2018 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2018 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

50.      The statements referenced in ¶¶ 43-49 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Opera's sustainable growth and market opportunity for its browser applications was significantly overstated; (ii) Defendants' funded, owned, or otherwise controlled loan services applications and/or businesses relied on predatory lending practices; (iii) all the foregoing, once revealed, were reasonably likely to have a material negative impact on Opera's financial prospects, especially with respect to its lending applications' continued availability on the Google Play Store; and (iv) as a result, the Exchange Act Defendants' public statements were materially false and misleading at all relevant times.

### **The Truth Begins to Emerge**

51.      On January 16, 2020, Hindenburg published a report asserting that Hindenburg had "a 12-month price target of $2.60 on Opera, representing a 70% downside."  Among other issues,

Hindenburg reported that Opera's "browser market share is declining rapidly, down ~30% since its IPO"; that Opera was involved in "predatory short-term loans in Africa and India, deploying deceptive 'bait and switch' tactics to lure in borrowers and charging egregious interest rates ranging from ~365-876%"; that Opera's lending business applications, many of which are offered on the Google Play Store—particularly, OKash, OPesa, CashBean, and Opay—were "in black and white violation of numerous Google rules" aimed at "curtail[ing] predatory lending"; and that consequently, Opera's entire lending business was "at risk of disappearing or being severely curtailed when Google notices" Opera's alleged violation of its rules.

52.     Specifically, with respect to market share, the Hindenburg report explained how "[w]ithin months of transitioning to new management, Opera's growth and profitability in the browser and mobile ad business began to decline rapidly"; that "Opera's global browser market share has dropped from 5%+ pre-acquisition to just over 2% most recently"; and that "[i]n Opera's strongest market, Africa, the declines were even more pronounced," falling from "highs of ~40%" to "below 12% as of the most recent period." The report further alleged that "Opera's browser share has quickly been squeezed out by Google on one side, and Safari on the other, as Android and Apple have both developed stronger footholds on the continent."

53.     With respect to Opera's owned and/or controlled lending applications, the Hindenburg report explained that "Opera has 4 apps that collectively offer lending products in Kenya, India, and Nigeria, mostly through Google's Android operating system"; and that "Google/Android has over 84% market share in Kenya, over 94% market share in India, and over 79% market share in Nigeria, making it the overwhelmingly dominant platform that individuals in these markets use for personal loan apps." However, the Hindenburg report further noted that Google's policy ***prohibits*** lending applications that "promote personal loans which require

repayment in full in 60 days or less from the date the loan is issued"; that Hindenburg had its consultants test Opera's lending applications, and found that "***none*** of the loan products offered across Opera's apps appear to be in compliance with [Google's] policy" because "Opera's entire microlending business provides loans between 7 to 30 days"; and that Defendants concealed their applications' noncompliance from Google by falsely attesting that each application was in compliance in their respective descriptions on the Google Play Store.

54.     The report also cited several other violations of Google's policy by these lending applications, including, but not limited to, misrepresenting actual annual percentage rates ("APR") by claiming to have a maximum APR of between 12% to 33% in the lending applications' Google Play Store descriptions, when in reality three such applications imposed an APR of 365%, and Opesa imposed an APR of 438%; and misrepresenting the typical loan and its total cost by employing "bait and switch" tactics, which consisted of "lur[ing] in users with low rates and long loan length terms" and, after the application is downloaded, "suggest[ing] users apply for a loan, showing a slightly longer loan length and terms that suggest a higher interest rate," and then "[o]nce the user inputs their personal information and applies," either "deny[ing] the borrower or grant[ing] a short-term loan with sky-high rates."

55.     On this news, Opera's ADS price fell $1.69 per share, or 18.74%, to close at $7.33 per share on January 16, 2020.

56.     As of the time this Complaint was filed, Opera ADSs continued to trade below the IPO price.

57.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Opera' securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Opera ADSs in the IPO or purchased Opera ADSs thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO; or (b) Opera securities during the Class Period; and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Opera securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Opera or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

{00358594;4 }

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Opera;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Opera to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Opera securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

64.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Opera securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Opera securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

65.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

66.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 11 of the Securities Act Against All Defendants)**

67.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

68.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

69.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

70.     Opera is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

71.     As issuer of the shares, Opera is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

72.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

73.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

74.     Plaintiff acquired Opera shares pursuant and/or traceable to the Offering Documents for the IPO.

75.     Plaintiff and the Class have sustained damages.  The value of Opera ADSs has declined substantially subsequent to and because of Defendants' violations.

## COUNT II

**(Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)**

76.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

77.     This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

78.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Opera within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Opera to engage in the acts described herein.

79.     The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

80.     By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)

81.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

82.     This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

83.     During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Opera securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Opera securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

84.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Opera securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Opera's finances and business prospects.

85.     By virtue of their positions at Opera, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

86.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.    As the senior managers and/or directors of Opera, the Exchange Act Individual Defendants had knowledge of the details of Opera's internal affairs.

87.    The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.    Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Opera.    As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Opera's businesses, operations, future financial condition and future prospects.    As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Opera securities was artificially inflated throughout the Class Period.    In ignorance of the adverse facts concerning Opera's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Opera securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

88.    During the Class Period, Opera securities were traded on an active and efficient market.    Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of Opera securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Opera securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Opera securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

89.     By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

90.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)

91.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Opera, and conducted and participated, directly and indirectly, in the conduct of Opera's business affairs.  Because of their senior positions, they knew the adverse

non-public information about Opera's misstatement of income and expenses and false financial statements.

93.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Opera's financial condition and results of operations, and to correct promptly any public statements issued by Opera which had become materially false or misleading.

94.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Opera disseminated in the marketplace during the Class Period concerning Opera's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Opera to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants therefore, were "controlling persons" of Opera within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Opera securities.

95.     Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Opera.  By reason of their senior management positions and/or being directors of Opera, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Opera to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Opera and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

96.     By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Opera.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  January 24, 2020                          Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181

{00358594;4 }

Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

{00358594;4 }