UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEON M. BROWN, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>OPERA LIMITED, YAHUI ZHOU, FRODE JACOBSEN, HONGYI ZHOU, and HAN FANG,<br><br>          Defendants. | Case No. 1:20-cv-00674-JGK<br><br>**AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Leon M. Brown and Lead Plaintiff Lilian Lau (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Opera Limited ("Opera"), analysts' reports and advisories about Opera, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) American depositary shares ("ADSs") pursuant and/or traceable to Opera's initial public offering commenced on July 27, 2018 (the "IPO"); and/or (b) Opera securities between July 27, 2018 and January 15, 2020, both dates inclusive (the "Class Period"). Plaintiffs pursue claims against the Defendants under the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq*., (the "Securities Act") and the Securities

Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, (the "Exchange Act").

2.     Opera completed its initial public offering on August 9, 2018, issuing 9,600,000 ADSs priced at $12.00 per share, raising approximately $115.2 million in proceeds before underwriting discounts and commissions, and other expenses. Opera's Registration Statement and Prospectus portrayed itself to investors as an established and leading player in the web-browser application industry. Using software and technology that it had been developing since 1996, Opera represented that it had managed to become one of the "market leaders . . . in terms of market share" in "high growth regions such as South Asia, Southeast Asia and Africa." Investors who purchased Opera's ADSs did so on the belief that they were investing in a mature, established internet technology company.

3.     Contrary to Opera's statements in its Registration Statement and Prospectus, Opera had been losing market share worldwide and in the African and Asian regions for years. Moreover, instead of purchasing ADSs in a company focused on the web-browser application industry, Opera was in the midst of fundamentally transforming itself into a financial technology (fintech) business concentrated on microlending operations in developing countries, such as Kenya, Nigeria, and India.

4.     Opera's web-browser and microlending businesses posed materially different risks to investors. The former was the result of years of product development and "global brand" recognition which, although competitive, had a "long and proven track record" in terms of "core performance and functionality." The latter was a new enterprise subject to a variety of new, additional obstacles. These obstacles included, among others, increased capital needs to finance lending operations as well as increased regulatory risks and requirements. Moreover, given that Opera's microlending business was conducted through Android-based applications, it was heavily dependent upon its ability to utilize Alphabet Inc.'s Google Play marketplace ("Google Play"). Considering Google Play's rules and regulations against predatory lending practices, Opera's microlending business faced additional undisclosed risks arising from compliance with Google Play's policies.

5.      On January 16, 2020, Hindenburg Research published a report (the "Hindenburg Report") revealing that, among other issues, Opera's "browser market share is declining rapidly, down ~30% since its IPO"; that Opera was involved in "predatory short-term loans in Africa and India, deploying deceptive 'bait and switch' tactics to lure in borrowers and charging egregious interest rates ranging from ~365-876%"; that Opera's lending business applications, many of which are offered on Google Play were "in black and white violation of numerous Google rules" aimed at "curtail[ing] predatory lending"; and that consequently, Opera's entire lending business was "at risk of disappearing or being severely curtailed when Google notices" Opera's alleged violation of its rules.

6.      On this news, Opera's ADS price fell $1.69 per share, or 18.74%, to close at $7.33 per share on January 16, 2020. Opera's ADS price has not recovered since. To this day, Opera's ADS price continues to trade below the IPO price. As a result of the wrongful acts and omissions described herein, and the precipitous decline in the market value of Opera's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     BACKGROUND ALLEGATIONS

### A.     OPERA'S INITIAL PUBLIC OFFERING

7.      Opera is a limited liability holding company headquartered in Oslo, Norway. Kunhoo Software LLC ("Kunhoo Software"), a limited liability company incorporated under the laws of the Cayman Islands, created it to serve as a holding company for a group of other companies that it owned and/or controlled. Prior to the IPO, the existing members of Kunhoo Software exchanged their equity interests in Kunhoo Software for shares in Opera having substantially the same rights.

8.      On June 29, 2018, Opera filed a registration statement on Form F-1 with the SEC in connection with the IPO (Registration No. 333-226017), which, after several amendments, was declared effective by the SEC on July 26, 2018 (the "Registration Statement").

9.      On July 27, 2018, Opera filed a prospectus for the IPO on Form 424B4 (the "Prospectus"), which was incorporated into and formed part of the Registration Statement. That

same day, Opera's ADSs began publicly trading on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "OPRA" at the IPO price of $12.00 per ADS.

10.     On August 9, 2018, Opera completed its IPO, issuing 9,600,000 ADSs priced at $12.00 per share, raising approximately $115.2 million in proceeds before underwriting discounts and commissions, and other expenses. Opera's underwriters in the IPO also exercised their over-allotment option on the same day for the purchase of an additional 334,672 ADSs. In total, Opera received an aggregated net proceeds of approximately $110.8 million from the IPO.

## B.     WEB BROWSER OPERATIONS

11.     According to the Prospectus, Opera was "one of the world's leading browser providers and an influential player in the field of integrated AI-driven digital content discovery and recommendation platforms." Opera's products, according to the Prospectus, included mobile internet browsers, personal computer internet browsers, and AI-powered news and content. Opera's browser revenue as of December 31, 2017 represented 53% of overall revenue.

12.     Opera represented in the Prospectus that the number of its browser users had increased year-over-year. For example, the Prospectus stated that "[Opera] served 321.7 million average MAUs [monthly active users] in the three months ended March 31, 2018, of which 239.4 million were smartphone and PC users compared to 202.6 million smartphone and PC users during the same period in 2017."

13.     Opera also emphasized in the Prospectus the market demand for its browser in certain key regions. For example, the Prospectus stated that "[Opera's] mobile browsers, with a global user base of 264.3 million average MAUs in the three months ended March 31, 2018, of which 182.0 million were smartphone users, compared to 160.0 million smartphone users in the same period in 2017, are among the market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share . . . ."

14.     Absent from the Prospectus and the Registration Statement was the fact that Opera's user-base in terms of overall market share had been declining for a period of years. According to StatCounter, an independent, unbiased web analytics company that provides

information on internet usage trends and the company used by Opera for its market share statistics, in August 2015, Opera's user-base represented 6.57% of the market share worldwide. By the time of the IPO, Opera's worldwide market share had declined to 3.46%. In other words, while Opera's MAUs may have been increasing, they were increasing at a rate that was unable to preserve or protect Opera's share of the market.

15.     The following chart illustrates Opera's worldwide decline in browser market share:



16.     The decline of Opera's market share was especially significant in Africa, one of the key markets highlighted in the Prospectus. According to StatCounter, in August 2015, Opera's market share in Africa reached approximately 40%, but by July 2018 had fallen dramatically to 15.37%.

17.     The following chart illustrates Opera's decline in browser market share in Africa:



18.     The decline of Opera's market share in Asia, the other key market highlighted in the Prospectus, was also significant. According to StatCounter, in August 2015, Opera's market share in Asia reached 8.12%, but by July 2018 had fallen dramatically to 4.11%.

19.     The following chart illustrates Opera's decline in browser market share in Asia:



20.     Opera's decline in browser market share posed a significant problem, given the importance of browser revenue to its overall revenue. According to the Prospectus, Opera's browser revenue as of December 31, 2017 represented 53% of overall revenue.

## C.     FINTECH OPERATIONS

21.     Prior to the IPO, Opera began refocusing its effort and resources on fintech operations in developing countries. These fintech operations initially included microlending in Kenya and Nigeria, and later in India. Opera's Registration Statement and Prospectus did not disclose these fintech operations.

22.     On November 1, 2017, Opera entered into a services agreement with Opay Digital Services Limited (HK) ("Opay"). Opay was at all relevant times an online payment service provider targeting African users, and was controlled by Y. Zhou through a company named Balder Investment Inc. As of December 31, 2017, Opera held a 19.9% ownership share of Opay.

23.     On March 12, 2018, Opay launched "OKash" in Kenya. OKash was a stand-alone application downloadable from Google Play that allowed consumers to obtain short-term loans. In

the fourth quarter of 2018, OKash generated $1.7 million of revenue from 280,000 microloans, and held active licenses to provide similar microfinance products in four other countries. On December 19, 2018, Opera acquired OKash from Opay for $9.5 million.

24.     As of March 31, 2018, Opera employed 410 full-time employees. Of these 410 full-time employees, 51 worked for Opay. In other words, 12% of Opera's workforce was dedicated to Opera's microlending business.

25.     In July 2018, Opay launched an "agent-centric" money services product in Nigeria. By year-end, Opay had recruited 3,000 agents and December's average daily transaction volume was in excess of $1 million, with peak days exceeding $1.5 million, placing Opay among the top-tier mobile money providers in Nigeria less than one year after launch.

26.     As of December 31, 2018, Opera employed 464 full-time employees, 89 of which were dedicated to Opera's microlending operations. In the span of just nine months (*i.e.*, between March 31 and December 31, 2018), Opera's microlending employees increased by 75% (from 51 to 89) and went from 12% of Opera's total workforce to nearly 20%.

27.     Opera's fintech operations generate revenue primarily from origination fees and interest fees. These fees accounted for 1.0% of Opera's total revenue in 2018, jumping to 38.3% of its total revenue in 2019 (*i.e.*, $1.7 million in 2018 to $128.4 million in 2019). According to Opera's annual report for fiscal 2019, the increase in revenue was "primarily driven by the launch and subsequent scaling of our microlending offerings in Kenya in the fourth quarter of 2018 and India in the second quarter of 2019."

28.     As Opera scaled its microlending business, its expenses also increased significantly. Opera's cost of revenue increased to $74 million in 2019 from $20 million in 2018, primarily due to an increase in the costs of its microlending business from $0.4 million in 2018 to $29.8 million in 2019. Opera's cash flow also came under pressure due to the increase in its loan operations, reducing cash by $90 million in 2019 as Opera grew its microlending businesses.

**D.     GOOGLE PLAY REGULATIONS**

29.     Opera conducted its microlending business through consumer applications

available for download on Google Play as well as other platforms. Google Play, in particular, was important for Opera in terms of expanding its microlending operations. This was because Google's Android platform, as of December 2019, held over 84% market share in Kenya, over 94% market share in India, and over 79% market share in Nigeria, the three geographic regions where Opera operated its microlending businesses. Further, as Opera explained in its annual report for fiscal 2019, it benefited from "strong user reviews in Google Play."

30.     Google Play, however, maintained various policies with which application developers had to comply. Significantly, since at least 2011, Google Play has disallowed and/or prohibited the promotion or sale of applications that provide predatory lending products. For example, in February 2011, Google Play announced changes to its ads policy "to disallow ads that promote […] personal loans that include specific APR rates […], but don't prominently display information on the cost and associated fees of […] loans on the website." At first, this policy update affected the United Kingdom only, but it was extended to all countries in January 2012. Then, Google Play updated its ads policy "to prohibit short-term loans that don't include the following: [i]mplications of late payment, [i]mplications of non-payment, [and] [d]isclosure of fees including the annual percentage rate (APR)." These policies restricting deceptive promotional ads on personal loans show Google Play's oversight over and standing against predatory lending practices.

31.     In July 2016, Google Play further strengthened its policy "banning ads for payday loans … where repayment is due within 60 days of the date of issue." When announcing this update Google Play reaffirmed its standing against predatory lending. When announcing this update, Google Play stated: "This new policy addresses many of the longstanding concerns […] about predatory payday lending. These companies have long used slick advertising and aggressive marketing to trap consumers into outrageously high interest loans — often those least able to afford it." By strengthening its policy, Google Play sought "to better protect users from misleading and predatory offers."

32.     Google Play's policies restricting and banning ads for personal loans were extended

to all apps, demonstrating its longstanding position and concrete measures against predatory lending practices. On August 21, 2019—strengthening its policies against payday loans—Google Play announced its policy policy banning short-term loans apps.

33.     Google Play individually sent emails to all fintech businesses informing them of its new policy banning short-term loans. A screenshot of the notification is below. Upon information and belief, Opera received this notification:



34.     The policy was posted on Google Play's "Developer Policy Center" website provided, in pertinent part, as follows:

Personal loans

We define personal loans as lending money from one individual, organization, or entity to an individual consumer on a nonrecurring basis, not for the purpose of financing purchase of a fixed asset or education. Personal loan consumers require information about the quality, features, fees, risks, and benefits of loan products in order to make informed decisions about whether to undertake the loan.

Examples: Personal loans, payday loans, peer-to-peer loans, title loans

Not included: Mortgages, car loans, student loans, revolving lines of credit (such as credit cards, personal lines of credit)

Apps for personal loans must disclose the following information in the app metadata:

- Minimum and maximum period for repayment
- Maximum Annual Percentage Rate (APR), which generally includes interest rate plus fees and other costs for a year, or similar other rate calculated consistently with local law
- A representative example of the total cost of the loan, including all applicable fees

***We do not allow apps that promote personal loans which require repayment in full in 60 days or less from the date the loan is issued (we refer to these as "short-term personal loans"). This policy applies to apps which offer loans directly, lead generators, and those who connect consumers with third-party lenders.***

High APR personal loans

In the United States, we do not allow apps for personal loans where the Annual Percentage Rate (APR) is 36% or higher. Apps for personal loans in the United States must display their maximum APR, calculated consistently with the Truth in Lending Act (TILA).

This policy applies to apps which offer loans directly, lead generators, and those who connect consumers with third-party lenders.

Emphasis added.

35.     As a result, all applications offering loans with durations of 60 days or less were in violation of Google Play policies and banned from Google Play's platform. Google Play's policy banning short-term loans sought "to [further] protect users from deceptive and exploitative personal loan terms."

36.     Notwithstanding Google Play's ban, Opera continued to offer microloans exclusively for durations of less than 60 days until the end of the Class Period. Indeed, on August 22, 2019, during Opera's second quarter conference call, Jacobsen confirmed that Opera's loans were "never more than 30 days"; on September 5, 2019, during the Citi Global Technology Conference, Jacobsen said Opera's loans were "super-short duration, never more than 30 days"; on November 14, 2019, during an investor conference call, Jacobsen further confirmed that the company's average loan duration was "about 2 weeks"; Nueman, during the UBS Global TMT

Conference presentation on December 9, 2019, stated that Opera's loans "typically have a 2-week duration"; and then again on January 15, 2020 during the Needham Growth Conference presentation when Nueman said "[Opera's] typical loan duration is 2 weeks."

        **E.**     **THE HINDENBURG REPORT**

      37.     On January 16, 2020, Hindenburg Research published a report (the "Hindenburg Report") asserting that Opera's "browser market share is declining rapidly"; that Opera was involved in "predatory short-term loans in Africa and India, deploying deceptive 'bait and switch' tactics to lure in borrowers and charging egregious interest rates ranging from ~365-876%"; that Opera's lending apps, mainly downloadable on Google Play were "in black and white violation of numerous Google rules"; and that consequently, Opera's entire lending business was "at risk of disappearing or being severely curtailed when Google notices" Opera's alleged violation of its rules.

      38.     According to the Hindenburg Report, at the time of the IPO, in July 2018, "the browser and apps business was growing gross profit at 30-40%" and Opera "was generating positive cash flow" based largely on prospects for its core browser business. By January 2020, according to Hindenburg Research, Opera's prospects had a dramatic reversal. Opera's browser market share was declining rapidly, down ~30% since its IPO; its browser gross margins have collapsed by 22.6% in just one year; and its operating cash flow had "swung to negative $12 million in LTM […] compared to positive cash flow of $32 million for the comparable 2018 period."

      39.     Opera's fintech business and revenue heavily depend on Google Play uninterrupted services. In this regard, Hindenburg Research pointed out that Opera's four applications "collectively offer lending products in Kenya, India, and Nigeria, mostly through Google's Android operating system." According to the Hindenburg Report, "Google/Android has over 84% market share in Kenya, over 94% market share in India, and over 79% market share in Nigeria, making it the overwhelmingly dominant platform that individuals in these markets use for personal loan apps." Thus, Opera's continuous access to Google Play "is critical to the success of its

lending" business.

40.     Despite these facts, Hindenburg Research has found that "none of the loan products offered across Opera's apps appear to be in compliance with [Google's] policy." The investigation conducted by Hindenburg Research has shown that "Opera's entire microlending business provides *loans between 7 to 30 days*."

41.     Hindenburg also disclosed other violations of Google's policy by Opera's lending apps in relation to misrepresenting actual annual percentage rates ("APR"). As part of the investigation conducted, Hindenburg's investigators applied for loans on all four Opera's apps and they were charged APR of between 365% and 438% even though the descriptions of Opera's applications on Google Play offered a maximum APR of between 12% to 33%.

42.     On this news, Opera's ADS price fell from a closing price of $9.02 per ADS on January 15, 2020 to $7.33 per ADS on January 16, 2020, a decline of $1.69 per ADS (18.74%). Opera's ADS price continued to fall over the following days, closing at $7.06 per ADS on January 17, 2020 and $7.01 per ADS on January 21, 2020. Opera's ADS price has not recovered since. To this day, Opera's ADS price continues to trade below the IPO price.

III.    **SECURITIES ACT ALLEGATIONS**

   A.    **JURISDICTION AND VENUE**

43.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

44.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v(a)).

45.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v(a)). Opera securities trade on the NASDAQ, located within this Judicial District.

46.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities

markets.

### B. PARTIES

47.    Plaintiffs are Opera investors who purchased Opera ADSs pursuant and/or traceable to the IPO and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

48.    Defendant Opera is a Cayman Islands corporation, with principal executive offices located at Gjerdrums vei 19, 0484 Oslo, Norway. Opera maintains an agent for service of process in the United States, Cogency Global Inc., located at 10 East 40th Street, 10th Floor, New York, NY 10016. Opera securities trade in an efficient market on the NASDAQ under the ticker symbol "OPRA."

49.    Defendant Yahui Zhou ("Y. Zhou") has served as Opera's Chairman of the Board ("Chairman") and Chief Executive Officer ("CEO") at all relevant times. Y. Zhou signed or authorized the signing of the Registration Statement filed with the SEC. Y. Zhou was the majority shareholder and owned 61.5% of Opera's ordinary shares.

50.    Defendant Frode Jacobsen ("Jacobsen") has served as Opera's Chief Financial Officer at all relevant times. Jacobsen signed or authorized the signing of the Registration Statement filed with the SEC.

51.    Defendant Hongyi Zhou ("H. Zhou") served as a Director of Opera at the time of the IPO. H. Zhou signed or authorized the signing of the Registration Statement filed with the SEC.

52.    Defendant Han Fang ("Fang") served as a Director of Opera at the time of the IPO. Fang signed or authorized the signing of the Registration Statement filed with the SEC.

53.    Lori Wheeler Næss ("Næss") served as a Director of Opera at the time of the IPO.

54.    Trond Riiber Knudsen ("Knudsen") served as a Director of Opera at the time of the IPO.

55.    Y. Zhou, Jacobsen, H. Zhou, Fang, Næss, and Knudsen are referred to herein as the "Individual Securities Act Defendants."

56.    As directors, executive officers and/or major shareholders of Opera, the Individual

Securities Act Defendants participated in the solicitation and sale of its ADSs in the IPO for their own benefit and the benefit of Opera. The Individual Securities Act Defendants were key members of the IPO working group and executives of Opera who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

57. Defendants China International Capital Corporation Hong Kong Securities Limited ("CICC"), Citigroup Global Markets Inc. ("Citigroup"), and Carnegie AS ("Carnegie") are investment banks that served as underwriters for the IPO, helping to draft and disseminate the Registration Statement and Prospectus and sharing more than $9 million in underwriting fees.

58. CICC, Citigroup, and Carnegie are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters for the IPO and were negligent in failing to ensure that the Registration Statement and Prospectus were prepared properly and accurately. The Underwriter Defendants' failure to conduct adequate due diligence was a substantial factor leading to the harm complained of herein.

## C. FALSE AND MATERIALLY MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT

### 1. Web Browser Operations

59. Opera's Registration Statement and Prospectus materially misrepresented its web browser business. Although the Prospectus emphasized the business's growth in terms of "monthly active users" (or MAUs) and claimed that it was a "market leader[]" in terms of "market share" in several key "high growth regions," Opera had in fact been steadily losing market share for a period of years prior to the IPO. Consequently, Opera materially misled investors by misstating market share information.

60. In pertinent part, the Prospectus stated as follows:

Our mobile browsers, with a global user base of 264.3 million average MAUs in the three months ended March 31, 2018, of which 182.0 million were smartphone users, compared to 160.0 million smartphone users in the same period in 2017, are

15

among the ***market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share***, according to StatCounter.

. . .

Our smartphone user base followed a ***positive growth trend across 2016, 2017 and the three months ended March 31, 2018***, adding 40.7 million MAUs over the period with seasonally highest growth in the third and fourth quarters.

Emphasis added.

61.     The above-referenced statements from the Prospectus and, in particular, the statements identified in emphasis, were false and/or materially misleading. Contrary to Opera's description of growth and strength within its web browser business, it had, according to StatCounter, been losing market share for a period of years prior to the IPO. In other words, Opera was experiencing a material decline in its web browser business.

62.     As previously discussed in ¶¶11-20, Opera's worldwide market share in August 2015 was 6.57%. By the time of the IPO in July 2018, Opera's market share had declined by approximately 50% to 3.46%. Moreover, Opera's loss of market share was especially significant in the key regions highlighted in the Prospectus. Opera's market share in Africa had fallen from almost 40% in August 2015 to 15.37% by July 2018. In Asia, Opera's market share fell from 8.12% in August 2015 to 4.11% by July 2018.

63.     Opera's loss of market share worldwide and in Africa and Asia in particular was material information that investors would have relied upon. Specifically, had Opera provided the market share information, investors would have been able to accurately assess the strength of and demand for Opera's web browser business overall.

64.     Opera was also required to provide the market share information pursuant to Item 303 of Regulation S-K. Item 303 of Regulation S-K, requires, in pertinent part, that a registrant "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2)

reasonably likely to have material effects on the registrant's financial condition or results of operation." Management's Discussion and Analysis of Financial Condition, Securities Act Release No. 6835 (May 18, 1989), Fed. Sec. L. Rep. (CCH) Par. 72,436, at 62,143, reprinted at Par. 73,193, at 62,842.

65.     As previously discussed in ¶¶11-20, Opera's market share worldwide and in key geographic regions (*i.e.*, Africa and Asia) had been declining since August 2015. This decline continued through the IPO. Specifically, worldwide market share in August 2015 was 6.57%, falling to 3.46% as of July 2018, and dropping even further to approximately 2.3% by the end of the Class Period. Likewise, in Africa and Asia, Opera's market share in August 2015 was 40% and 8.12%, falling to 15.37% and 4.11% as of July 2018, and continued to decline to approximately 10.52% and 2.29% by the end of the Class Period, respectively.

66.     Opera's loss in market share was reasonably likely to negatively impact its revenue and, for that reason, should have been disclosed pursuant to Item 303 of Regulation S-K.

### 2.     Microlending Businesses

67.     Item 101 (a) of Regulation S-K requires that a registrant "[d]escribe the general development of the business of the registrant [and] its subsidiaries . . . during the past five years" and "[i]n describing developments, information shall be given as to matters such as . . . ***any material changes in the mode of conducting business***." 17 C.F.R. §229.101(a) (emphasis added).

68.     Furthermore, Item 101(c)(1) of Regulation S-K requires that a registrant provide a detailed description of the material aspects of the registrant's business including the "business done and ***intended to be done***" and "to the extent material to an understanding of the registrant's business taken as a whole, the description of each such segment shall include the information specified in paragraphs (c)(1)(i) through (x) of this section." 17 C.F.R. §229.101(c)(1) (emphasis added). Subsection (ii), in particular, requires "[a] description of the status of a product or segment (e.g., whether in the planning stage, whether prototypes exist, the degree to which product design has progressed or whether further engineering is necessary), if there has been a public announcement of, or if the registrant otherwise has made public information about, a new product

or segment that would require the investment of a material amount of the assets of the registrant or that otherwise is material. . . . ." 17 C.F.R. §229.101(c)(1)(ii).

69.     In determining which information is required to be disclosed under Item 101(c), the instructions to Item 101 state:

> ***In determining what information about the segments is material to an understanding of the registrant's business taken as a whole and therefore required to be disclosed, pursuant to paragraph (c) of this Item, the registrant should take into account both quantitative and qualitative factors such as the significance of the matter to the registrant*** (e.g., whether a matter with a relatively minor impact on the registrant's business is represented by management to be important to its future profitability) ***the pervasiveness of the matter (e.g., whether it affects or may affect numerous items in the segment information), and the impact of the matter (e.g., whether it distorts the trends reflected in the segment information).*** Situations may arise when information should be disclosed about a segment, although the information in quantitative terms may not appear significant to the registrant's business taken as a whole.

Emphasis added.

70.     In violation of the Item 101's disclosure requirements, the Registration Statement and Prospectus did not disclose Opera's fintech segment and, in particular, the development of its microlending business.

71.     As of the date of the IPO, Opera had already commenced microlending operations and was focused on developing them into a significant source of revenue, as discussed previously in ¶¶21-28.

72.     Indeed, as of July 2018, Opera had already: invested $6 million in its microlending operations through a loan to Opay, which amounted to over 90% of Opera's net income from the previous year 2017; successfully launched OKash in Kenya and Nigeria; and focused 51 of its 410 full-time employees, or approximately 12% of its workforce, on developing its microlending operations.

73.     Opera's fintech segment results for the 2018 year further show that it was highly focused on developing its microlending business at the time of the IPO. OKash and Opay generated $1.7 million and $10.9 million in revenue for the year, respectively, which amounted to

approximately 35% of its fiscal net income. Further, the total number of Opera employees focused on microlending operations increased to 89 out of 464, or 20% of its workforce, up from 12% just a few months earlier as of March 31, 2018.

74.     Opera's efforts to scale its microlending business continued the following year. In 2019, fintech operations generated 38.3% of its overall revenue due to "the launch and subsequent scaling of [Opera's] microlending offerings in Kenya in the fourth quarter of 2018 and India in the second quarter of 2019." In addition to revenue, Opera's microlending operations also dynamically changed its expenses, cash flow, and capital needs. Opera's cost of revenue increased to $74 million in 2019 from $20 million in 2018. Opera's available cash also declined by $90 million in 2019, as it grew its microlending businesses.

75.     Opera's transition to microlending from web browser applications marked a stark turning point in the trajectory and overall strategy. The microlending business fundamentally changed Opera's underlying financial position as well as exposed investors to different and material risks related to fintech and lending. Notwithstanding the foregoing, Opera violated Item 101 of Regulation S-K by failing to provide any discussion of its microlending businesses in the Registration Statement and Prospectus.

76.     Indeed, Opera's Registration Statement and Prospectus did not provide any substantive disclosure about fintech operations that existed at the time. Regarding Opay, the Prospectus disclosed that:

> Opay Digital Services Limited (HK), or Opay, is our equity investee which our chief executive officer and chairman controls through Balder Investment Inc., where certain of our other officers also have financial interests but no voting rights. ***Opay is an online payment service provider*** targeting African users. In 2017, we provided a loan of US$5.6 million to Opay in relation to its business expansion in Nigeria. In 2018, we provided a loan of US$0.4 million to Opay in relation to its business expansion in Kenya. Both loans are interest-free for the first 60 days and are due and payable upon notice. We also provided professional services to Opay and recorded operating revenue of US$2.8 million in 2017. As of March 31, 2018, we had US$5.5 million of trade receivable and US$1.0 million loan receivable, due from Opay. ***Our investment in*** and relevant transactions with ***Opay are in line with our business growth strategy*** and we expect to continue investing in Opay as its

business develops.

Emphasis added.

77. Although the Prospectus stated that Opera's investment in Opay was "in line with [its] business growth strategy," there was no description of the "business growth strategy" or reference to Opera's microlending operations discussed above in ¶¶21-28.

78. Opera's description of Opay as an "online payment service provider" also failed to adequately describe its microlending operations. Indeed, payment services and microlending are fundamentally different business, the latter being materially riskier than the former given the inherent risk of capital arising from non-performing loans. Microloans serve populations that have limited access to financial services, and these loans are not typically backed by any sort of collateral. In the event of defaults, a lender of microloans may expect little or nothing to be recovered. An online payment business, on the other hand, does not entail these risks, as no money lending is involved. An online payment platform serves to facilitate the payment of bills, utilities, airtime data, transportation, food delivery, air travel, and other services electronically. The platform is also used to send and receive money, but the user's own money. Opera does not place any of its own capital at risk when executing transactions with an online payment platform; its capital is directly at risk when it makes microloans.

79. Recent analyst reports, including for example China International Capital Corporation's May 21, 2020 report, explicitly highlight "repayment risks related to micro-lending business" as a risk to investing in Opera. Such risks were present to Opera's business in July 2018 but were not disclosed to investors in the Registration Statement or Prospectus.

80. Aside from the foregoing, the only other mention of Opay was in an exhibit to the initial registration statement on Form F-1 filed with the SEC on June 29, 2018. In particular, attached as Exhibit 10.7 was a "Service Agreement" dated November 1, 2017 between Opera Software AS and Opay, stating in pertinent part that:

> "[Opay] Products" means: (a) the "O-Pay" payment facilitation platform, including all websites and software applications associated therewith; (b) the "O-Kash" lending platform, including all websites and software applications associated

therewith; and (c) other similar financial technology products as may be developed by or for Company now or in the future.

81. This excerpt does not describe Opera's microlending operations in any substantive capacity. Notably, in addition to being buried in an attachment to the initial registration statement, it did not discuss the material aspects of Opera's fintech business segment or its overall business strategy, as required by Item 101 of Regulation S-K.

82. The only other mention within the Prospectus of any portion of Opera's business having to do with microlending was a brief disclosure about a subsidiary named Opesa South Africa (Pty) Limited. In particular, the Prospectus briefly described it as "our wholly owned subsidiary established in South Africa on March 15, 2017, [which] is an operating entity that employs our staff in South Africa and engages in local collections and monetization." This disclosure, like the disclosures identified in the immediately preceding paragraphs, does not describe Opera's microlending operations in any substantive capacity.

83. In addition to not disclosing its microlending businesses, Opera also failed to provide investors with a description of material risks related to the businesses. Item 105 of Regulation S-K requires registrants to, "[w]here appropriate, provide under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." 17 CFR § 229.105. Registrants must "not present risks that could apply generically to any registrant or any offering," but instead "[e]xplain how the risk affects the registrant or the securities being offered." *Id.*

84. Although Opera was actively engaged in and developing its microlending businesses, the Registration Statement and Prospectus provided investors with no related risk warnings. This is in sharp contrast to the risk warnings provided by Opera in, for example, its annual report for 2018, which warned investors explicitly that "[Opera's] ongoing investment in new businesses and new products, services and technologies [was] inherently risky" and addressed specific risks relating to microlending.

85.     To illustrate, Opera's Prospectus contained the following risk warning:

***Our ongoing investment in new businesses and new products, services and technologies is inherently risky and could disrupt our ongoing businesses.***

We have invested and expect to continue to invest in new businesses, products, services and technologies. Such endeavors may involve significant risks and uncertainties, including insufficient revenues from such investments to offset any new liabilities assumed and expenses associated with these new investments, inadequate return of capital on our investments, distraction of management from current operations and unidentified issues not discovered in our due diligence of such strategies and offerings that could cause us to fail to realize the anticipated benefits of such investments and incur unanticipated liabilities. Because these new ventures are inherently risky, no assurance can be given that such strategies and offerings will be successful and will not adversely affect our reputation, financial condition and operating results.

86.     In its 2018 annual report, Opera revised the risk warning as follows:

***Our ongoing investment in new businesses and new products, services and technologies is inherently risky and could disrupt our ongoing businesses.***

We have invested and expect to continue to invest in new businesses, products, services and technologies. For example, in November 2018 we invested in StarMaker, a fast-growing technology-driven social media company focused on music and entertainment, with a user base in emerging markets such as India, Indonesia and the Middle East. Likewise, in December 2018, we acquired a microfinance business which has launched in Kenya under the "OKash" brand and which we believe is a new user-driven business opportunity that will benefit from our existing reach and scale both in Kenya and in other emerging markets. Such endeavors may involve significant risks and uncertainties, including insufficient revenues from such investments to offset any new liabilities assumed and expenses associated with these new investments, inadequate return of capital on our investments, distraction of management from current operations and unidentified issues not discovered in our due diligence of such strategies and offerings that could cause us to fail to realize the anticipated benefits of such investments and incur unanticipated liabilities. For example, as we carry out our plans to expand our microfinance business and offer new loan products to an expanding borrower base, we may not be able to effectively manage the credit risks associated with the microfinance business. The delinquency rate of the loans we extend may increase in a manner that surpasses the benefits we derive, putting a significant portion of the funds that we lend at risk, which may adversely affect our financial position and results of operations. Because these new ventures are inherently risky, no assurance can be given that such strategies and offerings will be successful and will not adversely affect our reputation, financial condition and operating results.

87.     Notwithstanding that Opera was already engaged in microlending at the time of the IPO, the warnings that appeared in the 2018 annual report did *not* appear in Opera's Registration Statement and Prospectus. This included, in particular, omitting warnings concerning "effectively manag[ing] the credit risks associated with the microfinance business," the "delinquency rate of the loans," and the potential "adverse[] affect" on its "financial position."

88.     Opera's Registration Statement and Prospectus also failed to disclose additional risks, including those relating to Google Play's prohibitions against predatory lending tactics. As discussed previously in ¶¶29-36, Google Play had already banned "ads for payday loans . . . where repayment [was] due within 60 days" as of the IPO. Google Play strengthened this policy when, in August 2019, it banned all applications providing short-term loans with repayment durations of 60 days or less. Given that the duration of Opera's microloans was less than 60 days, it faced a particular risk in terms of compliance with Google Play policies. These risks, however, were not disclosed.

89.     Analysts and investors alike who were evaluating Opera at or around the time of the IPO were thus deprived of information. For example, S&P Capital IQ's research report dated September 6, 2018 entirely omitted any information relating to Opera's microlending business.

**D.     COUNT I: VIOLATION OF SECTION 11 AGAINST OPERA, THE INDIVIDUAL SECURITIES ACT DEFENDANTS, AND THE UNDERWRITER DEFENDANTS**

90.     Plaintiffs incorporate herein ¶¶7-89 by reference.

91.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against the Securities Act Defendants. For purposes of this Count, Plaintiffs affirmatively state that they do not claim that the Securities Act Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

92.     This count is asserted by Plaintiffs against the Securities Act Defendants by, and on behalf of, persons who acquired Opera's ADSs traceable to the Registration Statement issued in connection with its IPO.

93.     The Registration Statement for the IPO was defective and inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

94.     The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

95.     The Securities Act Defendants each caused the issuance of the Registration Statement and/or signed the Registration Statement, either personally or through an Attorney-in-Fact. The Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

96.     The Underwriter Defendants were each Underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the IPO and Opera's ADSs sold through the Registration Statement. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

97.     Plaintiffs purchased the Opera's ADSs in the IPO, or traceable thereto, in reliance upon the defective and misleading Registration Statement and without knowledge of the untruths and/or omissions alleged herein and have been damaged thereby.

98.     By reasons of the conduct herein alleged, each defendant named in this Count is liable under, and/or controlled a person who is liable under, Section 11 of the Securities Act.

99. This claim is brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and within three years of the effective date of the Registration Statement.

**E. COUNT II: VIOLATION OF SECTION 15 AGAINST INDIVIDUAL SECURITIES ACT DEFENDANTS**

100. Plaintiffs incorporate herein ¶¶7-99 by reference.

101. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Securities Act Defendants. For purposes of this Count, Plaintiffs affirmatively state that they do not claim that the Individual Securities Act Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

102. Each of the Individual Securities Act Defendants was a control person of Opera by virtue of his or her position as a director, senior officer, and/or authorized representative of Opera. By reason of their role(s) at Opera, as alleged above, the Individual Securities Act Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Opera to engage in the conduct complained of herein. In addition, the Individual Securities Act Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Opera. By reason of such conduct, the Individual Securities Act Defendants are liable pursuant to Section 15 of the Securities Act.

103. Each of the Individual Securities Act Defendants was a culpable participant in the violations of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the IPO to be successfully completed.

**IV. EXCHANGE ACT ALLEGATIONS**

**A. JURISDICTION AND VENUE**

104. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

SEC (17 C.F.R. § 240.10b-5).

105. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

106. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Opera securities trade on the NASDAQ, located within this Judicial District.

107. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**B.    PARTIES**

108. Plaintiffs purchased Opera ADSs during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

109. Defendant Opera is a Cayman Islands corporation, with principal executive offices located at Gjerdrums vei 19, 0484 Oslo, Norway. Opera maintains an agent for service of process in the United States, Cogency Global Inc., located at 10 East 40th Street, 10th Floor, New York, NY 10016. Opera securities trade in an efficient market on the NASDAQ under the ticker symbol "OPRA."

110. Defendant Y. Zhou has served as Opera's Chairman and CEO at all relevant times.

111. Defendant Jacobsen has served as Opera's Chief Financial Officer at all relevant times.

112. Defendant Lin Song ("Song") has served as Opera's Chief Operating Officer at all relevant times.

113. Defendant Derrick L. Nueman ("Nueman") has served as Opera's Vice President and head of Investor Relations since March 11, 2019.

114. Defendants Opera, Y. Zhou, Jacobsen, Song, and Nueman are referred to herein as

the "Exchange Act Defendants."

115. Defendants Y. Zhou, Jacobsen, Song, and Nueman are referred to herein as the "Individual Exchange Act Defendants."

116. The Individual Exchange Act Defendants possessed the power and authority to control the contents of Opera's SEC filings, press releases, and other market communications. The Individual Exchange Act Defendants were provided with copies of Opera's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Opera, and their access to material information available to them but not to the public, the Individual Exchange Act Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Exchange Act Defendants are liable for the false statements and omissions pleaded herein.

### C. FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS

#### 1. July 27, 2018: Prospectus

117. On July 27, 2018, Opera filed its Prospectus in connection with its IPO. Opera's Prospectus materially misrepresented its web browser business. While emphasizing the business's growth in terms of "monthly active users" (or MAUs) and claiming that it was a "market leader[]" in terms of "market share" in several key "high growth regions," Opera had in fact been steadily losing market share for a period of years prior to the IPO. Consequently, Opera materially misled investors by misstating market share information.

118. In pertinent part, the Prospectus stated as follows:

Our mobile browsers, with a global user base of 264.3 million average MAUs in the three months ended March 31, 2018, of which 182.0 million were smartphone users, compared to 160.0 million smartphone users in the same period in 2017, are among the ***market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share***, according to StatCounter.

. . .

> Our smartphone user base followed a ***positive growth trend across 2016, 2017 and the three months ended March 31, 2018***, adding 40.7 million MAUs over the period with seasonally highest growth in the third and fourth quarters.

Emphasis added.

119.     The above statements from the Prospectus and, in particular, the statements identified in emphasis, were false and/or materially misleading. Contrary to Opera's description of growth and strength within its web browser business, it had been losing market share for a period of years prior to the IPO. In other words, Opera was experiencing a material decline in its web browser business.

120.     As previously discussed in ¶¶11-20, Opera's worldwide market share in August 2015 was 6.57%. By the time of the IPO in July 2018, Opera's market share had declined by approximately 50% to 3.46%. Moreover, Opera's loss of market share was especially significant in the key regions highlighted in the Prospectus. Opera's market share in Africa had fallen from 40% in August 2015 to 15.37% by July 2018. In Asia, Opera's market share fell from 8.12% in August 2015 to 4.11% by July 2018.

121.     Opera's loss of market share worldwide and in Africa and Asia in particular was material information that investors would have relied upon. Specifically, had Opera provided accurate market share information, investors would have been able to accurately assess the strength of and demand for Opera's web browser business overall. Instead, the Prospectus materially misrepresented Opera's web browser business and its market share.

122.     Opera was also required to provide the market share information pursuant to Item 303 of Regulation S-K. 17 C.F.R. § 229.303(a)(3)(ii). Opera's market share worldwide and in key geographic regions (*i.e.*, Africa and Asia) had been declining since August 2015. This decline continued through the IPO. Specifically, worldwide market share in August 2015 was 6.57%, falling to 3.46% as of July 2018, and dropping even further to 2.3% by the end of the Class Period. Likewise, in Africa and Asia, Opera's market share in August 2015 was approximately 40% and 8%, falling to 15.37% and 4.11% as of July 2018, and continued to decline to 10.52% and 2.3%

by the end of the Class Period, respectively.

123. Opera also materially misrepresented and omitted information about its existing businesses and strategies for growth relating to fintech and microlending. Specifically, in violation of the Item 101 of Regulation S-K, Opera did not disclose its fintech operations and, in particular, the development of its microlending business. 17 C.F.R. §229.101(c)(1)(ii).

124. As of the date of the IPO, Opera had already commenced microlending operations and was focused on developing them into a significant source of revenue, as discussed previously in ¶¶21-28. Indeed, as of July 2018, Opera had already: invested $6 million in its microlending operations by loaning Opay $6 million, which amounted to over 90% of its net income from the previous year 2017; successfully launched OKash in Kenya and Nigeria; and focused 51 of its 410 full-time employees, or approximately 12% of its workforce, on developing its microlending operations.

125. Opera's fintech segment results for the 2018 year further show that it was highly focused on developing its microlending business at the time of the IPO. OKash and Opay generated $1.7 million and $10.9 million in revenue for the year, respectively, which amounted to approximately 35% of its fiscal net income. Further, the total number of Opera employees focused on microlending operations increased to 89 out of 464, or 20% of its total workforce, up from 12% just a few months earlier as of March 31, 2018.

126. Opera's efforts to scale its microlending business continued the following year. In 2019, fintech operations generated 38.3% of its overall revenue due to "the launch and subsequent scaling of [Opera's] microlending offerings in Kenya in the fourth quarter of 2018 and India in the second quarter of 2019." In addition to revenue, Opera's microlending operations also dynamically changed its expenses, cash flow, and capital needs. Opera's cost of revenue increased to $74 million in 2019 from $20 million in 2018. Opera's available cash also declined by $90 million in 2019, as it grew its microlending businesses.

127. Opera's transition to microlending from web browser applications marked a stark turning point in the trajectory and overall strategy. The microlending business fundamentally

changed Opera's underlying financial position as well as exposed investors to different and material risks related to fintech and lending. Notwithstanding the foregoing, Opera violated Item 101 of Regulation S-K by failing to provide any discussion of its microlending businesses in the Registration Statement and Prospectus.

128. Indeed, Opera's Registration Statement and Prospectus did not provide any substantive disclosure about fintech operations that existed at the time. Regarding Opay, the Prospectus disclosed that:

> Opay Digital Services Limited (HK), or Opay, is our equity investee which our chief executive officer and chairman controls through Balder Investment Inc., where certain of our other officers also have financial interests but no voting rights. Opay is an online payment service provider targeting African users. In 2017, we provided a loan of US$5.6 million to Opay in relation to its business expansion in Nigeria. In 2018, we provided a loan of US$0.4 million to Opay in relation to its business expansion in Kenya. Both loans are interest-free for the first 60 days and are due and payable upon notice. We also provided professional services to Opay and recorded operating revenue of US$2.8 million in 2017. As of March 31, 2018, we had US$5.5 million of trade receivable and US$1.0 million loan receivable, due from Opay. Our investment in and relevant transactions with Opay are in line with our business growth strategy and we expect to continue investing in Opay as its business develops.

129. Although the Prospectus stated that Opera's investment in Opay was "in line with [its] business growth strategy," there was no description of the "business growth strategy" or reference to Opera's microlending operations discussed above in ¶¶21-28.

130. Opera's description of Opay as an "online payment service provider" also failed to adequately describe its microlending operations. Indeed, payment services and microlending are fundamentally different business, the latter being materially riskier than the former given the inherent risk of capital arising from non-performing loans. Microloans serve populations that have limited access to financial services, and these loans are not typically backed by any sort of collateral. In the event of defaults, a lender of microloans may expect little or nothing to be recovered. An online payment business, on the other hand, does not entail these risks, as no money lending is involved. An online payment platform serves to facilitate the payment of bills, utilities,

airtime data, transportation, food delivery, air travel, and other services electronically. The platform is also used to send and receive money, but the user's own money. Opera does not place any of its own capital at risk when executing transactions with an online payment platform; its capital is directly at risk when it makes microloans.

131.　Recent analyst reports, including for example China International Capital Corporation's May 21, 2020 report, explicitly highlight "repayment risks related to micro-lending business" as a risk to investing in Opera. Such risks were present to Opera's business in July 2018 but were not disclosed to investors in the Registration Statement or Prospectus.

132.　Aside from the foregoing, the only other mention of Opay was in an exhibit to the initial registration statement on Form F-1 filed with the SEC on June 29, 2018. In particular, attached as Exhibit 10.7 was a "Service Agreement" dated November 1, 2017 between Opera Software AS and Opay, stating in pertinent part that:

> "[Opay] Products" means: (a) the "O-Pay" payment facilitation platform, including all websites and software applications associated therewith; (b) the "O-Kash" lending platform, including all websites and software applications associated therewith; and (c) other similar financial technology products as may be developed by or for Company now or in the future.

133.　This excerpt does not describe Opera's microlending operations in any substantive capacity. Notably, in addition to being buried in an attachment to the initial registration statement, it did not discuss the material aspects of Opera's fintech business segment or its overall business strategy, as required by Item 101 of Regulation S-K.

134.　The only other mention within the Prospectus of any portion of Opera's business having to do with microlending was a brief disclosure about a subsidiary named Opesa South Africa (Pty) Limited. In particular, the Prospectus briefly described it as "our wholly owned subsidiary established in South Africa on March 15, 2017, [which] is an operating entity that employs our staff in South Africa and engages in local collections and monetization." This disclosure, like the disclosures identified in the immediately preceding paragraphs, does not describe Opera's microlending operations in any substantive capacity.

135.	In addition to not disclosing its microlending businesses, Opera also failed to provide investors with a description of material risks related to the businesses pursuant to Item 105 of Regulation S-K. 17 CFR § 229.105. Although Opera was actively engaged in and developing its microlending businesses, the Prospectus provided investors with no related risk warnings. This is in sharp contrast to the risk warnings provided by Opera in, for example, its annual report for 2018, which warned investors explicitly that "[Opera's] ongoing investment in new businesses and new products, services and technologies [was] inherently risky" and addressed specific risks relating to microlending, such as those concerning "effectively manag[ing] the credit risks associated with the microfinance business," "delinquency rate of the loans," and the potential "adverse[] affect" on its "financial position."

136.	The Exchange Act Defendants misled analysts and investors who were evaluating Opera at or around the time of the IPO because the Prospectus omitted and/or concealed its microlending businesses. For example, S&P Capital IQ's research report dated September 6, 2018 entirely omitted any information relating to Opera's microlending business. As such, the public was deprived of material information.

## 2.	April 17, 2019: 2018 Annual Report

137.	On April 17, 2019, Opera filed its annual report for the fiscal year ended December 31, 2018. The annual report provided investors with financial information about Opera's operations and finances for the year 2018. The annual report was signed by Y. Zhou.

138.	In pertinent part, the annual report stated as follows:

We believe consumers opt to use our browsers because we provide a better-targeted solution versus their needs. Our browsers are available globally. We believe users in Africa and Asia are attracted to our mobile browsers predominantly because of their efficient design and usability, and that users across North America and Europe choose our mobile and PC browsers predominantly because of their unique features. ***Our mobile browsers, with a global user base of 326.7 million average MAUs in 2018,*** of which 192.6 million were smartphone users, compared to 168.1 million smartphone users in 2017, ***are among the market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share***, according to StatCounter. Our PC browsers, available for both Windows and macOS platforms, also had a substantial user base of 58.5 million average MAUs

in 2018, compared to 48.1 million in 2017.

. . .

*Our smartphone browser user base followed a positive growth trend across 2016, 2017 and 2018*, adding 47.2 million MAUs over that period with seasonally highest growth in the third and fourth quarters. As we oriented our marketing and distribution efforts around the new dedicated Opera News app during 2018, our overall smartphone user base grew faster than the browser subset, adding a total of 27.6 million in 2018 alone.

Emphasis added.

139.    Opera's above statements identified in emphasis were false and/or materially misleading. Opera's browser market size continued to decline after the IPO. According to StatCounter, from July 2018 until the date of the annual report, Opera's overall market share had decreased from 3.46% to 2.65%. Opera's market share in Africa also declined; it decreased from 15.37% to 12.71%. Therefore, Opera made materially false statements when making these statements and left investors with the false impression that Opera's global browser user base was seeing positive trends in the last three years and was likely to continue to grow. By concealing the truth about Opera's market share, investors were deprived of the ability to properly and adequately assess the true risks associated with purchasing Opera ADSs.

### 3.    September 20, 2019: Prospectus

140.    On September 20, 2019, Opera completed a secondary offering of ADSs to the public (the "Secondary Offering"). Opera sold 8,625,000 ADSs in the Secondary Offering (including shares sold to underwriters via an over-allotment option) for net proceeds of $82.6 million for Opera. The price per ADS sold to the public was $10.00 per ADS.

141.    Opera's prospectus for the Secondary Offering materially misled investors with respect to the market demand for its browser products. While describing Opera's "Competitive Strengths," the prospectus stated in pertinent part that:

We have a massive user base of over 350 million monthly active users in the quarter ended June 30, 2019 that we believe provides us with the scale and global reach necessary to capitalize on market opportunities and expand our offerings. Our global smartphone user base was 227 million MAUs, on average, in the quarter ended June 30, 2019, compared to 182 million MAUs in the second quarter of 2018.

Our mobile browser user base reached 256 million average MAU in 2018, of which 181 million were smartphone users. ***Opera is among the market leaders in high growth mobile-first regions such as Africa and Asia in terms of market share, according to web traffic analyst StatCounter***. Our PC products also had a substantial user base of 65 million average MAUs in the quarter ended June 30, 2019, compared to 57 million in the second quarter of 2018.

Emphasis added.

142. The above statement, including in particular the portion identified in emphasis, was false and/or materially misleading. The prospectus represented to investors that its monthly active users were increasing year-over-year and claimed that Opera "[was] among the market leaders in high mobile-first regions such as Africa and Asia in terms of market share." These statements created the false impression that Opera's increase in monthly active users translated to an increase in market share when, to the contrary, Opera's market share had been declining before and after the IPO and was continuing to decline as of the date of the Secondary Offering.

143. According to StatCounter, worldwide, Opera's market share was 6.57% in August 2015. By September 2019, Opera's market share had fallen to approximately 2.58%. In Africa, one of the two regions highlighted by Opera in the prospectus, Opera's market share had declined from 40% to 12% in the same timeframe. Similarly, in Asia, the other key region highlighted by Opera in the prospectus, Opera's market share had declined from 8.12% to 2.67%. Opera concealed this material information from investors and, as a result, led investors to falsely believe that market demand for its browser was materially greater than it truly was.

144. In addition, Opera was required to disclose the negative trend it was experiencing in terms of market share pursuant to Item 303 of Regulation S-K. 17 C.F.R. § 229.303(a)(3)(ii). Opera's market share worldwide and in key geographic regions (*i.e.*, Africa and Asia) had been declining since August 2015. This decline continued through the IPO and the Secondary Offering. Specifically, worldwide market share in August 2015 was 6.57%, falling to 3.46% as of July 2018, and dropping even further to approximately 2.3% by the end of the Class Period. Likewise, in Africa and Asia, Opera's market share in August 2015 was 40% and 8.12%, falling to 15.37% and 4.11% as of July 2018, and continued to decline to 10.5% and 2.29% by the end of the Class

Period, respectively.

### 4.    December 9, 2019: Conference Call

145.    On December 9, 2019, Opera participated in the UBS Global TMT Conference. During the conference call, Nueman responded to inquiries from financial analysts in relation to Opera's present and prospective operations and finances.

146.    In pertinent part, the conference call transcripts state as follows:

Unidentified Analyst

Yes, yes. No, that makes sense. Well, look, you've touched on the supply of the platform. Give us a sense of the health of the user base. What is the type of user base? What are they looking for? And I imagine that it's going to be pretty different between different parts of the world.

Derrick L. Nueman - Opera Limited - VP of IR

Very, very different on geographies. Our overall user base grew 10% year-over-year in Q3, and that was driven by growth across all products. I mean, news was the fastest-growing product. But as I said earlier, browser grew as well. Seeing growth in all regions. Europe tends to be a higher-end consumer, somebody who's pretty tech-savvy, who opt into our browser again because they wanted privacy and security or they like our gaming browser.
. . .

I mean, look, Africa by far is our best region. Our brand is everywhere. We have big market share in some of these countries. ***Like a place, for example, like Nigeria, we have close to 50% browser market share.*** We have multiple products, you see Opera everywhere. And many Internet users haven't used anything other than Opera. They view Opera as the Internet. Versus in Europe, we have a ton of users, but there's also a ton of Google users, a ton of Facebook users. And our brand isn't as strong, but we still have opportunities. And a place like Asia is super competitive. And we tend to say we're going to compete more organically versus, say, marketing and distribution.

Emphasis added.

147.    The above statements identified in emphasis were false and/or materially misleading. When asked about "the health of the user base," Nueman falsely misrepresented that Opera had "close to 50% browser market share" in Nigeria. Contrary to Nueman's statement, as of the date of the conference call, Opera's market share in Nigeria was 31.43%, according to

StatCounter. This is materially less than 50% and especially misleading given that Opera's worldwide market share by December 2019 had been progressively decreasing to 2.33% with market share in Africa in particular declining to 11.23%.

148.    Nueman materially misled investors when making these statements because they were untrue and left investors with the false impression that Opera's browser dominated almost half of the market in Nigeria. By misrepresenting the true size of Opera's market share in Nigeria while concealing that Opera's market share was declining not only in Nigeria, but also in Africa and worldwide, investors were unfairly deprived of the ability to properly and adequately evaluate Opera's web browser business and assess the true risks associated with purchasing Opera ADSs.

### 5.    January 15, 2020: Conference Call

149.    On January 15, 2020, Opera participated in the Needham Growth Conference. During the conference call, Opera provided investors with information about its operations and finances and responded to inquiries from financial analysts. Nueman was present at the conference call on behalf of Opera.

150.    In pertinent part, the conference call transcripts state as follows:

Derrick L. Nueman - Opera Limited - VP of IR

I want to go back here to some of the stats that I referenced earlier. You can see that we've grown both on mobile and PC. Interesting enough, mobile, we're very strong in emerging markets, Africa and Asia. And PC, we're very strong in Europe. Obviously, in a place like Africa and Asia, there aren't a lot of PC users given some of the bandwidth constraints. We have very good brand awareness in a couple of key markets **in Africa. As an example, in Nigeria, we have close to 50% market share.** And that's important as we launch new products.

Emphasis added.

151.    The above statements identified in emphasis were false and/or materially misleading. Contrary to Nueman's statements, Opera did not have "in Nigeria … close to 50% market share." Instead Opera's market share in Nigeria at the time of the conference call was 29.6%, according to StatCounter. This is materially less than 50% and especially misleading given that worldwide market share had been progressively decreasing to 2.3% with market share in

Africa in particular declining to 10.52%, as discussed above in ¶¶11-20.

152. Nueman materially misled investors when making this statement because it was untrue and left investors with the false impression that Opera's browser dominated almost half of the market in Nigeria. By misrepresenting the true size of Opera's market share in Nigeria while concealing that Opera's market share was declining not only in Nigeria, but also in Africa and worldwide, investors were unfairly deprived of the ability to properly and adequately evaluate Opera's web browser business and assess the true risks associated with purchasing Opera ADSs.

### D. LOSS CAUSATION/ECONOMIC LOSS

153. On January 16, 2020, Hindenburg Research published the Hindenburg Report. The Hindenburg Report revealed that, among other issues: Opera's "browser market share is declining rapidly, down ~30% since its IPO"; that Opera was involved in "predatory short-term loans in Africa and India, deploying deceptive 'bait and switch' tactics to lure in borrowers and charging egregious interest rates ranging from ~365-876%"; that Opera's lending business applications, many of which are offered on the Google Play were "in black and white violation of numerous Google rules" aimed at "curtail[ing] predatory lending"; and that consequently, Opera's entire lending business was "at risk of disappearing or being severely curtailed when Google notices" Opera's alleged violation of its rules.

154. Specifically, with respect to market share, the Hindenburg Report explained how "[w]ithin months of transitioning to new management, Opera's growth and profitability in the browser and mobile ad business began to decline rapidly"; that "Opera's global browser market share has dropped from 5%+ pre-acquisition to just over 2% most recently"; and that "[i]n Opera's strongest market, Africa, the declines were even more pronounced," falling from "highs of ~40%" to "below 12% as of the most recent period." The report further alleged that "Opera's browser share has quickly been squeezed out by Google on one side, and Safari on the other, as Android and Apple have both developed stronger footholds on the continent."

155. With respect to Opera's owned and/or controlled lending applications, the Hindenburg Report explained that "Opera has 4 apps that collectively offer lending products in

Kenya, India, and Nigeria, mostly through Google's Android operating system"; and that "Google/Android has over 84% market share in Kenya, over 94% market share in India, and over 79% market share in Nigeria, making it the overwhelmingly dominant platform that individuals in these markets use for personal loan apps." However, the Hindenburg Report further noted that Google's policy **prohibits** lending applications that "promote personal loans which require repayment in full in 60 days or less from the date the loan is issued"; that Hindenburg had its consultants test Opera's lending applications, and found that "**none** of the loan products offered across Opera's apps appear to be in compliance with [Google's] policy" because "Opera's entire microlending business provides loans between 7 to 30 days"; and that Defendants concealed their applications' noncompliance from Google by falsely attesting that each application was in compliance in their respective descriptions on the Google Play Store.

156. On this news, Opera's ADS price fell from a closing price of $9.02 per ADS on January 15, 2020 to $7.33 per ADS on January 16, 2020, a decline of $1.69 per ADS (18.74%). Opera's ADS price continued to fall over the following days, closing at $7.06 per ADS on January 17, 2020 and $7.01 per ADS on January 21, 2020.

157. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Opera ADSs and operated as a fraud or deceit on Class Period purchasers of Opera ADSs by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Opera ADSs fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Opera ADSs during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

158. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Opera's business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused Opera ADSs to trade at artificially inflated levels throughout the Class Period, reaching as high as $14.62 per share on

September 5, 2019, before falling to $7.33 per share on January 16, 2020 – a decline of approximately 50%.

159.     The precipitous decline in the price of Opera ADSs was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the price of Opera ADSs negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Opera ADSs and the subsequent significant decline in the value of Opera ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

E.     **ADDITIONAL SCIENTER ALLEGATIONS**

1.     **Declining Market Share**

160.     The Exchange Act Defendants knew or deliberately disregarded the fact that Opera had been losing, and was continuing to lose, market share worldwide and in the key geographic regions of Africa and Asia. Notwithstanding, the Exchange Act Defendants omitted and/or concealed this information when making the misrepresentations identified above in ¶¶118, 122, 138, 141, 141-45, 150.

161.     Opera's web browser business historically generated the majority of its overall business. In 2018, Opera's "Browser and News" segment was responsible for 80.4% of overall revenue ($138.4 million out of $172.2 million overall). In 2019, the "Browser and News" segment provided Opera with 46.3% of overall revenue ($154.9 million out of $334.8 million overall). Thus, the web browser business was of particular importance.

162.     Given the relative importance of the web browser business to Opera, the Exchange Act Defendants monitored its performance closely. Indeed, Opera "regularly review[ed] metrics, including our MAUs, to evaluate growth trends, measure our performance and make strategic decisions," as explained by Opera in its annual reports.

163.     Opera relied on StatCounter to review its web browser metrics and, in particular, to monitor its market share. In its Prospectus for the IPO, 2018 annual report, and prospectus for the Secondary Offering, Opera cited StatCounter as the source for its statements about market share (*e.g.*, ". . . among the market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share, ***according to StatCounter***.")

164.     StatCounter, however, shows that Opera has been steadily losing market share since 2015, as explained above in ¶¶11-20. Thus, when reviewing StatCounter, the Exchange Act Defendants saw or deliberately disregarded this data and, therefore, acted with scienter when making the misrepresentations identified above in ¶¶118, 122, 138, 141, 141-45, 150.

## 2.     Predatory Lending Violations

165.     Qudian Inc. ("Qudian"), founded in 2014, is a Cayman Islands company based in Beijing, China, that owns operating companies that provide online small consumer credit products in the People's Republic of China, including online cash short-term unsecured credit products (cash loans) and online merchandise credit products (installment loans). Qudian has American depositary receipts that trade on the New York Stock Exchange under the ticker "QD".

166.     Y. Zhou was a member of Qudian's Board of Directors from February 2016 to February 2017. Through entities controlled by Y. Zhou, he sold 588,225 Class A ordinary shares in the Qudian's initial public offering on October 18, 2017 for proceeds of over $13.3 million. Y. Zhou retained 37,294,934 Class A ordinary shares as of December 31, 2018, which represented 12.6% of Qudian's overall Class A ordinary shares.

167.     On May 18, 2018, two months before Opera's IPO, a class of Qudian shareholders sued Y. Zhou (among others) for making false and/or materially misleading representations in Qudian's offering documents for its initial public offering. *See In re Qudian Inc. Securities Litigation*, Master File No. 1:17-cv-09741-JMF (S.D.N.Y.) (Dkt. Nos. 109, 134). According to the lawsuit, Qudian's offering documents misrepresented its active, then-existing business operations by concealing the fact that it was lending money to college students, a practice that was illegal under Chinese law. The lawsuit also alleged that Qudian told investors it was using compliant

loan collection methods when, in fact, it was using illegal collection practices such as contacting the borrower's teachers, parents, and spouses to exert pressure on and humiliate the borrower.

168. In addition, Quidian's offering documents also concealed the fact that it was actively in the process of launching a new, capital-intensive, low-margin business called Dabai Auto. Dabai Auto, which Qudian launched in November 2017, immediately after its initial public offering, sold vehicles through a financial leasing model. The Dabai Auto business model was materially different than Qudian's traditional consumer microlending business that featured in its offering documents. Despite the fact that Quidian had planned for Dabai Auto's launch prior to its initial public and was well along the development path at the time, Quidian did not disclose Dabai Auto in its offering documents.

169. Y. Zhou's alleged wrongdoing in this action in relation to Quidian's initial public offering strongly resembles the wrongdoing that occurred in connection with Opera's IPO. Thus, upon information and belief, Y. Zhou's efforts to conceal Opera's microlending business in the Registration Statement and Prospectus were intentional and in furtherance of a scheme that he had executed previously. Given Y. Zhou's intentional conduct, he acted with scienter when making the false and/or materially misleading statements identified in ¶¶123, 127, 129, 130, 133-36.

### 3. **Financial Motive**

170. Opera raised over $190 million in net proceeds between the IPO and the Secondary Offering. These proceeds were, according to the prospectuses, to be used for "general corporate purposes." As Opera's filings reveal, however, a substantial portion of these proceeds was used to subsidize and enrich private companies owned and/or controlled by Y. Zhou and H. Zhou. This was done at the expense of Opera's public shareholders.

171.     In 2018, Opera engaged in the following transactions, each of which resulted in a significant financial benefit to Y. Zhou and/or H. Zhou, as demonstrated in the table below:

| Entity | Related Party[1] | Description (provided by Opera) | Amount Paid/Owed (as of Dec. 31, 2018) |
|---|---|---|---|
| 360 Mobile Security Limited | Controlled by H. Zhou and Y. Zhou | "Professional services" | $17.9 million |
| nHorizon Innovation (Beijing) Software Ltd.[2] | 19% interest held by Y. Zhou; 6% interest held by H. Zhou | "Professional services" | $1 million |
| Powerbets Holdings Limited[3] | 33% interest held by Y. Zhou; 11% interest held by H. Zhou | "Credit facility" and sale of "online gaming platform" | $4.1 million |
| Opay Digital Services Limited (HK) | Controlled by Y. Zhou | Purchased TenSpot Pesa Limited (parent company of OKash) | $9.5 million |
| StarMaker Inc. | Controlled by Y. Zhou | "Investment" | $30 million |
| Beijing Kunlun Tech Co., Ltd. | 26% interest held by Y. Zhou | "Office facilities" | $1 million |

*Total:*     *$63.5 million*
*Percent of IPO Proceeds:*     *57%*

172.     Y. Zhou and H. Zhou continued to siphon money from Opera the following year in 2019. The following table identifies the various transactions they used to enrich themselves at the expense of public shareholders:

| Entity | Related Party[4] | Description (provided by Opera) | Amount Paid/Owed (as of Dec. 31, 2019) |
|---|---|---|---|
| Powerbets Holdings Limited[5] | 30% interest held by Y. Zhou; 10% interest held by H. Zhou | "Credit facility" | $3 million |
| OPay Limited[6] | Controlled by Y. Zhou; 8% interest held by Y. Zhou | "Investment" | $12.1 million |

---

[1] As of December 31, 2018, Y. Zhou and H. Zhou owned and/or controlled 65.1% and 21.2% of Opera's ordinary shares, respectively.
[2] Opera held a 29.1% equity interest in nHorizon.
[3] Opera held a 50.1% equity interest in Powerbets.
[4] As of December 31, 2019, Y. Zhou and H. Zhou owned and/or controlled 60.2% and 19.6% of Opera's ordinary shares, respectively.
[5] Opera held a 50.1% equity interest in Powerbets.
[6] Opera held a 13.1% interest in OPay Limited.

| | | | |
|---|---|---|---|
| Mobimagic Digital Technology Ltd[7] | Controlled by Y. Zhou | "Service agreements" | $41.1 million |
| Beijing Kunlun Tech Co., Ltd. | 26% interest held by Y. Zhou | "Office facilities" | $1.5 million |

*Total:* **$57.7 million**
*Percent of Secondary Offering Proceeds:* **70%**

173. As the foregoing demonstrates, Y. Zhou used various transactions and agreements to divert $121.2 million from Opera to companies he owned and/or controlled. This was public shareholder money that Opera raised through its IPO and Secondary Offering, each of which was facilitated and accompanied by false and/or materially misleading statements. The personal financial benefit enjoyed by Y. Zhou evidences his motive to commit fraud and scienter when making the misrepresentations identified above in Section IV.C., *supra*.

**F.    PRESUMPTION OF RELIANCE**

174. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

   a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b.    the omissions and misrepresentations were material;

   c.    Opera's ADSs traded in an efficient market;

   d.    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Opera's ADSs; and

   e.    Plaintiffs and the other members of the Class purchased Opera ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

175. At all relevant times, the market for Opera ADSs was an efficient market for the following reasons, among others:

   a.    Opera ADSs met the requirements for listing, and were listed and actively

---

[7] Formerly known as 360 Mobile Security Limited.

traded on the NASDAQ, a highly efficient and automated market;

b.      as a regulated issuer, Opera filed periodic public reports with the SEC and the NASDAQ;

c.      Opera regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.      Opera was followed by securities analysts employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

176.      As a result of the foregoing, the market for Opera ADSs promptly digested current information regarding Opera from all publicly available sources and reflected such information in the prices of Opera's ADSs. Under these circumstances, all purchasers of Opera ADSs during the Class Period suffered similar injury through their purchase of Opera ADSs at artificially inflated prices and a presumption of reliance applies.

177.      A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Opera's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

178.      Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate,

distinct basis for finding the applicability of a presumption of reliance.

### G. SAFE HARBOR INAPPLICABLE

179.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Opera who knew that those statements were false when made.

### H. COUNT III: VIOLATIONS OF SECTION 10(b) AND RULE 10b-5 AGAINST THE EXCHANGE ACT DEFENDANTS

180.     Plaintiffs incorporate herein ¶¶7-42 and ¶¶104-79 by reference.

181.     During the Class Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.     The Exchange Act Defendants violated §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Opera's ADSs during the Class Period.

183.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity

of the market, they paid artificially inflated prices for Opera ADSs. Plaintiffs and the Class would not have purchased Opera ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements and/or omissions.

184.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Opera ADSs during the Class Period.

I.    COUNT IV: VIOLATIONS OF SECTION 20(a) AGAINST THE INDIVIDUAL EXCHANGE ACT DEFENDANTS

185.    Plaintiffs incorporate herein ¶¶7-42 and ¶¶104-84 by reference.

186.    The Individual Exchange Act Defendants acted as controlling persons of Opera within the meaning of §20(a) of the Exchange Act, as alleged herein. By reason of their high-level positions with Opera, their ownership of Opera ADSs, their participation in and/or awareness of Opera's operations and/or intimate knowledge of the false and materially misleading statements filed with the SEC and disseminated to the investing public, the Individual Exchange Act Defendants had the power to influence and control (and did influence and control), directly or indirectly, Opera's decision-making, and caused Opera to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Exchange Act Defendants were provided with or had access to: Opera reports, press releases, public filings and other information and statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Exchange Act Defendants had direct and supervisory involvement in the day-to-day operations of Opera and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

187.    As set forth above, the Individual Exchange Act Defendants violated §10(b) and

Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Moreover, by virtue of their positions as controlling persons, the Individual Exchange Act Defendants had the power and authority to, and did, cause Opera to engage in the wrongful conduct alleged. As a direct and proximate result of the Individual Exchange Act Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Opera's ADSs during the Class Period. By reason of such conduct, the Individual Exchange Act Defendants are liable pursuant to §20(a) of the Exchange Act.

## V.     CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Opera ADSs between July 27, 2018 and January 15, 2020, inclusive, and were damaged thereby, seeking to pursue remedies under the Exchange Act, as well as on behalf of all those who purchased or otherwise acquired Opera ADSs pursuant and/or traceable to the IPO, and were damaged thereby, seeking to pursue remedies under the Securities Act (the "Class"). Excluded from the Class are Defendants, members of the immediate families of each Defendant, Opera and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

189.    The members of the Class are so numerous that joinder of all members is impracticable. Opera sold 9,600,000 shares (in the form of ADSs) in the IPO (plus an additional 334,672 ADSs to its underwriters) and Opera ADSs were actively traded on the NASDAQ throughout the Class Period. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. In addition, the names and addresses of the Class members can be ascertained from records maintained by Opera or its transfer agent. Notice of the pendency of this action can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used

in class actions arising under the federal securities laws.

190.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by Defendants' conduct in violation of federal law that is complained of herein. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

191.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

192.    Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.    whether Defendants misrepresented and/or omitted material facts about Opera and its business;

    c.    whether the price of opera ADSs was artificially inflated during the Class Period; and

    d.    to what extent the members of the Class have sustained damages and the appropriate measure of damages.

193.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

    A.    Determining that the instant action may be maintained as a class action under Rule

23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## VII.   **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated:  June 18, 2020

Respectfully submitted,

LEVI & KORSINSKY, LLP

/s/ Adam M. Apton
Nicholas I. Porritt
Adam M. Apton
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171

*Counsel for Lead Plaintiff Lilian Lau,
Plaintiff Leon M. Brown, and Lead Counsel
for Class*