## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LEON M. BROWN, Individually and on Behalf of
All Others Similarly Situated,

                Plaintiffs,

    v.

OPERA LIMITED, YAHUI ZHOU, FRODE
JACOBSEN, HONGYI ZHOU, and HAN FANG,

                Defendants.

Case No. 1:20-cv-00674-JGK

**ORAL ARGUMENT
REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF OPERA LIMITED'S, DERRICK NUEMAN'S, AND CITIGROUP GLOBAL MARKETS INC.'S <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................ 4

    A.    Opera's Browser & News Business ........................................................................ 5

    B.    At All Relevant Times, Opera and OPay Were Separate Companies in Separate Businesses ............................................................................................... 6

    C.    Opera Did Not Enter the Fintech and Microlending Businesses Until December 2018, When It Acquired OKash from OPay ......................................... 7

    D.    The Hindenburg Report ......................................................................................... 8

    E.    Alleged Misstatements and Omissions .................................................................. 9

ARGUMENT ........................................................................................................................... 10

I.    THE SECTION 11 AND SECTION 10(b) CLAIMS SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION ................................................................................ 10

    A.    Allegations Concerning Opera's Alleged Failure to Disclose a Decline in Market Share of the Web Browser Business Are Inadequately Pled ................... 10

    B.    Allegations Concerning Opera's Alleged Failure to Disclose Entry Into the Fintech and Microlending Businesses Fail Because There Are No Allegations That Opera Actually Entered Into Those Businesses at the Time of the IPO ........................................................................................................ 13

        1.    Plaintiffs Conflate Opera and OPay and Item 101 of Regulation S-K Does Not Require Disclosures About Non-Subsidiaries ..................... 13

        2.    Opera Had No Duty to Disclose at the Time of the IPO Events That Occurred *After* the IPO .................................................................. 15

    C.    The Alleged Misstatements and/or Omissions About Opera's Market Position and MAUs Are Immaterial as a Matter of Law Because the Alleged "Truth" Was Publicly Available at the Time of the Alleged Misstatements and/or Omissions ........................................................................ 17

    D.    Expressions of Corporate Optimism, Opinions, and Puffery are Nonactionable ...................................................................................................... 19

II.    THE SECTION 11 CLAIMS ARE TIME-BARRED UNDER THE SECURITIES ACT'S ONE-YEAR LIMITATIONS PERIOD ................................................................. 20

III.    LEAD PLAINTIFF'S SECTION 11 CLAIM SHOULD BE DISMISSED FOR LACK OF STANDING .............................................................................................. 21

IV.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER ....................... 22

A.   Plaintiffs Fail to Adequately Plead Scienter with Respect to Opera's Alleged Declining Market Share in the Web Browser Business .......................... 23

B.   Plaintiffs Fail to Adequately Plead Scienter with Respect to Yahui Zhou's Involvement in the Qudian Litigation.................................... 24

C.   Plaintiffs Fail to Adequately Plead Scienter with Respect to Yahui Zhou's and Hongyi Zhou's Ownership or Control of Separate Entities .......................... 25

D.   Plaintiffs Fail to Adequately Plead Scienter with Respect to Derrick Nueman and the Two Analyst Calls ..................................... 27

V.   PLAINTIFFS' CLAIMS ALSO FAIL ON CAUSATION GROUNDS .......................... 27

A.   Opera's Alleged Decline in Market Share for Its Web Browser Business Was in the Public Domain Well Before the Alleged Corrective Disclosure ........ 28

B.   Opera's Post-IPO Involvement in Fintech/Microlending Activities Was Disclosed Well Before the Alleged Corrective Disclosure.................................. 29

C.   Because the Alleged "Truth" of the Purported Misstatements and Omissions Was Revealed Well Before Opera's Share Price Declined Below the Offering Price, Plaintiffs' Section 11 Claims Fail as Well.................. 30

CONCLUSION.................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995).......................................................................................................16

*In re Alcatel Sec. Litig.*,
   382 F. Supp. 2d 513 (S.D.N.Y. 2005).....................................................................................21

*Amorosa v. AOL Time Warner Inc.*,
   409 F. App'x 412 (2d Cir. 2011) ............................................................................................30

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013).....................................................................................17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................................10

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...........................................................................30

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014).....................................................................................................28

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
   543 F. App'x. 72 (2d Cir. 2013) ..............................................................................................29

*Colbert v. Rio Tinto PLC*,
   392 F. Supp. 3d 329 (S.D.N.Y. 2019).....................................................................................19

*In re Cosi Sec. Litig.*,
   379 F. Supp. 2d 580 (S.D.N.Y. 2005).....................................................................................16

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).................................................................................................................28

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...............................................................................20, 22, 23, 26

*Fila v. Pingtan Marine Enter. Ltd.*,
   195 F. Supp. 3d 489 (S.D.N.Y. 2016).....................................................................................28

*In re GeoPharma, Inc. Sec. Litig.*,
   399 F. Supp. 2d 432 (S.D.N.Y. 2005).....................................................................................24

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)....................................................................27

*Glaser v. The9 Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................26

*Holbrook v. Trivago N.V.*,
    2019 WL 948809 (S.D.N.Y. Feb. 26, 2019)..........................................................12

*In re IAC/InterActiveCorp Sec. Litig.*,
    695 F. Supp. 2d 109 (S.D.N.Y. 2010)....................................................................19

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)....................................................................................23

*Lasker v. N.Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996)......................................................................................20

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)..................................................................................10

*In re Lehman Bros. Sec. Litig.*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010)....................................................................22

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..................................................................................27

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014)...............................................................10, 21

*McClain v. Iradimed Corp.*,
    111 F. Supp. 3d 1293 (S.D. Fla. 2015)..................................................................20

*Monroe Cnty. Emps. Ret. System v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)......................................................................18

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)..................................................................................10

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)....................................................................20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)........................................................................16, 23, 26

*In re Omnicom Grp. Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)..............................................................................28, 29

*In re Pfizer, Inc. Sec. Litig.*,
  538 F. Supp. 2d 621 (S.D.N.Y. 2008)..................................................................24

*In re Qudian Inc. Sec. Litig.*,
  2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019).......................................................25

*In re Worldcom, Inc. Sec. Litig.*,
  2005 WL 375314 (S.D.N.Y. Feb. 17, 2005)...........................................................30

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir.2004)...................................................................................20

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009)...................................................................24

*Rubenstein* v. *Credit Suisse Grp. AG*,
  2020 WL 2036850 (S.D.N.Y. Apr. 28, 2020)........................................................19

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009)....................................................................................22

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)....................................................................................24

*Stadnick v. Vivint Solar, Inc.*,
  861 F.3d 31 (2d Cir. 2017)....................................................................................13

*Stein v. Tangoe, Inc.*,
  2014 WL 12767210 (D. Conn. Sept. 30, 2014).....................................................25

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008)..................................................................................23

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006)..........................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................................22

*White v. H&R Block, Inc.*,
  2004 WL 1698628 (S.D.N.Y. July 28, 2004).........................................................18

*Wilson v. Dalene*,
  699 F. Supp. 2d 534 (E.D.N.Y. 2010) ..................................................................27

**Statutes**

15 U.S.C. § 77m.....................................................................................................20

15 U.S.C. § 78u–4(b)(2) ...................................................................................22

**Rules**

Fed. R. of Civ. P. 9(b)...................................................................................10

Fed. R. Evid. 404(b)(1)...................................................................................25

**Regulations**

17 C.F.R. § 229.101(a)...................................................................................14

17 C.F.R. § 240.12b–2...................................................................................14

**Other Authorities**

*Subsidiary Corporation*, Black's Law Dictionary (11th ed. 2019) ...............................14

Defendants Opera Limited ("Opera" or the "Company"), Derrick Nueman, and Citigroup Global Markets Inc. (collectively, "Defendants"), by and through their attorneys, respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint for Violation of Federal Securities Laws (the "Complaint").

## PRELIMINARY STATEMENT

On January 16, 2020, an anonymous short-seller, using the moniker "Hindenburg Research," issued a "short report" about Opera (the "Hindenburg Report"), a Norway-based web browsing and software application provider. That report made allegations that were quickly refuted by the Company. But the short-seller obtained the desired result: Opera's share priced declined following the report, although it has since more than recovered.

In an attempt to construct a claim where none exists, and in reliance on the short-seller's allegations in the Hindenburg Report, Plaintiffs have asserted claims under Section 10(b) of the Securities Exchange Act and Section 11 of the Securities Act. But Plaintiffs' claims lack foundation in both fact and law, which results in pleading deficiencies that require dismissal.

As discussed more fully below, Plaintiffs essentially assert two sets of claims. The first alleges that statements about Opera's number of "monthly active users" ("MAUs") of its web browser and that Opera was "among the market leaders" in market share for certain regions were misleading. Plaintiffs do not, and cannot, allege that these statements were false. Rather, Plaintiffs claim that these statements were somehow misleading because Opera failed to disclose that its overall web browser *market share* had been decreasing. But a declining market share does not render these statements—some of which are objective facts that are not challenged by Plaintiffs— misleading. Indeed, Opera was and is a leader in the web browser market, and Plaintiffs do not allege otherwise. As the documents incorporated into the Complaint show, even though Opera's browser market share may have been decreasing, the total number of its browser users, and the

1

revenue it derives from those users, both significantly ***increased*** following Opera's July 2018 initial public offering ("IPO").   In addition, Plaintiffs' allegations that Opera's statements concerning its web browser market share were misleading are all based on ***publicly available*** market share data—they thus fail to state a claim under Section 11 and Section 10(b) as it is well-settled that when the "truth" of alleged misstatements is publicly available in an "efficient market" (as Plaintiffs allege here), the alleged misstatements are immaterial as a matter of law.   Plaintiffs' claim that Opera's statements that it was a "market leader" were misleading also fails as a matter of law because they are non-actionable statements of corporate optimism, opinions, and puffery.

Plaintiffs' second set of claims fairs no better.   In another attempt to construct a claim where none exists, Plaintiffs conflate Opera's operations with that of an entity in which it was a minority investor.   Specifically, Plaintiffs allege that Opera failed to disclose in the Registration Statement and Prospectus for its IPO (the "Offering Documents") that Opera had purportedly entered into the "microlending" business.   But Plaintiffs' allegations ignore that Opera's public filings make clear that it ***had not entered into the microlending business at the time of its IPO***. Rather, at the time of the IPO, Opera had entered into a handful of transactions—all of which Opera fully disclosed to investors—with an entirely ***separate*** company called OPay Digital Services Limited (HK) ("OPay").   ***OPay (not Opera)*** had a microlending business (among many other businesses).   Plaintiffs improperly conflate Opera and OPay in the Complaint.   The reality is, however, that at the time of the IPO, Opera had only a minority equity interest in OPay.   And although Plaintiffs point to the fact that Opera provided certain loans to OPay, and a small minority of Opera employees provided certain services to OPay through a disclosed "service agreement," such arrangements are fully consistent with the two companies being entirely separate entities.

Thus, a review of the Complaint makes clear that none of the Defendants had any obligation to disclose information regarding a microlending business in which Opera was not engaged.

In addition, Plaintiffs' claims under Section 11—all of which relate to the July 2018 IPO—are time-barred under the Securities Act's one-year limitations period.  Plaintiffs' claim that the IPO Offering Documents were rendered misleading by Defendants' failure to disclose Opera's declining market share is based on information from the StatCounter website, which is publicly available and referenced in the very statements that Plaintiffs claim were misleading.  Similarly, Plaintiffs' claims that Opera was in the microlending business before the IPO—while incorrect—rely on disclosures in the relevant offering materials.  As a result, even if these allegations state a claim (they do not), Plaintiffs were required to file such a claim by no later than July 2019.  But this action was not commenced until January 2020, more than six months later, rendering Plaintiffs' claims barred by the statute of limitations.

Plaintiffs' Section 10(b) arguments fail for additional reasons.  Importantly, and assuming counterfactually that any Defendant made a misstatement or omission, Plaintiffs have failed to plead facts satisfying their burden of showing a strong inference of scienter, as is required to state a claim under Section 10(b).  Plaintiffs contend that Opera had the requisite scienter because it purportedly disregarded market data showing a decline in browser market share when making statements about its status as a market leader and monthly active users.  But this market data was all publicly available and, as such, Plaintiffs fail as a matter of law to adequately plead scienter.  Plaintiffs also attempt to plead scienter because one of Opera's directors was a defendant in a *separate* litigation against a *different* company, with allegedly similar allegations as those Plaintiffs make here.  But the Second Circuit has consistently held that such allegations are to be given little weight.  Plaintiffs also cite several related-party transactions that certain of Opera's

directors and officers participated in over the course of two years (all of which Opera disclosed) as purportedly showing motive and opportunity to make alleged misstatements. But Plaintiffs fail to allege that the transactions had any connection to the purported misstatements or even that the transactions were in any way harmful to Opera's shareholders.

Finally, Plaintiffs' claims also fail to plead facts showing that any alleged misstatement caused their supposed loss. The only alleged corrective disclosure is the Hindenburg Report. But that report did not reveal any new information relevant to the alleged misstatements and omissions that form the basis of Plaintiffs' claims. To take just one example, Plaintiffs allege that the Hindenburg Report made a corrective disclosure concerning Opera's alleged decline in market share in its web browsing business, citing to data from the StatCounter website. But that StatCounter data was publicly available long before the Hindenburg Report came out. Indeed, it was a website that the Company itself directed investors to so they could view certain data for themselves. Further, all of the alleged "truths" about the alleged misstatements and omissions in the Offering Documents were disclosed by no later than February 21, 2019, and after that date, Opera's share price traded *above* the IPO price. As such, the declines that eventually brought the share price below the IPO price cannot have been caused by the alleged misstatements/omissions.

Accordingly, as discussed below, the Complaint should be dismissed in its entirety.

## BACKGROUND

Opera is an internet company that is headquartered in Norway. It focuses primarily on enabling internet users to discover and access digital content through Opera's software applications, including web browsers and other applications. *See* Ex. B, Prospectus at 3.[1] On July

---

[1] Unless otherwise specified, "Ex. __" refers to exhibits to the Declaration of Andrea G. Hood, dated August 24, 2020, filed herewith. "¶ __" refers to paragraphs in the Complaint.

27, 2018, Opera went public through its offering of American Depository Shares ("ADS").  (¶ 9.)
In the IPO, Opera offered 9,600,000 ADSs at $12.00 each.  *Id*.  These ADSs are currently trading
on NASDAQ under the ticker OPRA.

The IPO was conducted pursuant to a registration statement (the "Registration Statement")
and prospectus (the "Prospectus") filed with the SEC in June and July 2018, respectively.  (¶¶ 8-
9.)

### A.    Opera's Browser & News Business

Opera disclosed in its Prospectus that the internet markets in which Opera's mobile web
browser products compete (largely in Southeast Asia, South Asia and Africa) had experienced and
were expected to continue to experience significant growth.  At the time of its IPO, these markets
were "still underpenetrated in terms of internet and mobile broadband connections," the "internet
infrastructure in these regions continues to develop," and the "number of internet and mobile
internet users is also expected to increase and bring substantial growth to the internet economy."
*See* Ex. B, Prospectus at 87.

Opera also disclosed the nature of the competition that its browsers face, particularly in
light of the fact that some browsers are bundled with other consumer products (*e.g.*, the "Safari"
browser on Apple products and the "Chrome" browser on Google and Android products).  As
explained in the Prospectus, Opera provides a third-party web browser that must be downloaded
on PCs and mobile devices, but a majority of consumers simply use the default browser that is
already pre-packaged on their PCs or mobile devices.  Only a minority of users choose to use a
third-party browser, such as Opera's.  *See id*. at 87.  Opera thus made clear in the Prospectus that
it does not compete for market share among *all* browser users, but rather the minority of users who
elect to use a third-party browser.

Opera's revenue steadily increased from 2018 to 2019, both overall ($172.27 million to $334.85 million) and with respect to its Browser & News business ($138.44 million to $154.96 million).  *See* Ex. I, Press Release, *Opera Limited Announces Fourth Quarter and Full-year 2019 Financial Results* (Feb. 25, 2020), at 1, 9.  **Indeed, since 2018, Opera has experienced a 100% increase in overall revenue, and an approximately 65% increase in net income**.  *See* Ex. J, 2019 Annual Report at 49, 54.  Likewise, the revenue generated from its content services has seen consistent year-over-year increases.  *See id.* at 49.  This revenue increase—which Plaintiffs do not allege to be incorrect, and which neither the Company nor its auditors has ever restated or withdrawn—was due, at least in part, to the fact that the number of active users of Opera's software applications grew during that same period:  average MAUs for Opera News grew 21% to 163 million; average MAUs for the Opera News app grew 97% to 39 million; average MAUs using an Opera product on a smartphone grew 9% to 227 million; and average MAUs using such a product on their PC grew 11% to 68 million.  *See* Ex. I, Press Release, *Opera Limited Announces Fourth Quarter and Full-year 2019 Financial Results* (Feb. 25, 2020), at 2.  Thus, even though Opera's market share in the *overall* browser market declined prior to the IPO and at certain times thereafter, its user base and revenue grew notably.  *See* Ex. J, 2019 Annual Report at 49, 54.

**B.**     **At All Relevant Times, Opera and OPay Were Separate Companies in Separate Businesses**

Although the Complaint attempts to conflate the two, at the time of the IPO, and at all relevant times thereafter, Opera and OPay were separate companies that were in separate lines of business.  Opera was in the digital content business, while OPay was a mobile money service provider, largely in Nigeria, and which, among other things, had launched a microlending operation in Kenya only months before Opera's IPO.  *See* Ex. D, 2018 Annual Report at 32; Ex. J, 2019 Annual Report at F-60.  At the time of the IPO, Opera held a 19.9% minority ownership

interest in OPay and had provided certain loans to OPay.  *See* Ex. B, Prospectus at 116, F-48.  Each

of these facts was disclosed in the Prospectus.  Also disclosed was the fact that Opera provided

certain "professional services" to OPay in 2017 and 2018 pursuant to a service agreement between

Opera and OPay, a copy of which was attached to the Registration Statement.  *Id.* at 116; Ex. A,

Registration Statement at Exhibit 10.7.

### C. Opera Did Not Enter the Fintech and Microlending Businesses Until December 2018, When It Acquired OKash from OPay

In March 2018, OPay—***not Opera***—launched a microlending application in Kenya called

OKash, which enables consumers to obtain short-term loans.  *See* Ex. D, 2018 Annual Report at

42, F-56; ¶ 23.  Six months after Opera's IPO, in December 2018, Opera first entered the fintech

and microlending business when it acquired OKash from OPay.  *See id.* at 42, Ex. 4.11 (Share

Purchase Agreement, dated Dec. 19, 2018).  Opera disclosed its acquisition of the OKash business

shortly thereafter in February 2019, stating: "For Opera, the acquisition of the OKash business

represents a ***new*** and profitable user-driven business opportunity . . . .  We plan to report the OKash

business as a ***separate segment*** as of 2019."  Ex. C, Press Release, *Opera Limited Announces*

*Fourth Quarter and Full Year 2018 Financial Results* (Feb. 21, 2019), at 3 (emphasis added).

Consistent with its acquisition of OKash in December 2018, Opera's 2018 Annual Report

disclosed this new line of business and the associated risks.  Specifically, Opera disclosed that it

had "acquired a ***microfinance*** business which was launched in Kenya under the 'OKash' brand,"

and that the business "may involve significant risks and uncertainties."  *See* Ex. D, 2018 Annual

Report at 14, 42 (emphasis added).

In connection with a secondary public offering that Opera conducted in September 2019

(the "SPO"), Opera again disclosed its recent entry into the microfinance business and attendant

risks: "[W]e ***entered the fintech business with the acquisition of OKash***. . . .  [A]dding new

products and services subjects us to additional competition and new competitors."  *See* Ex. F, SPO

Prospectus Supplement (Sept. 20, 2019), at S-20.  The "Risk Factors" in Opera's September 20,

2019 SPO Prospectus Supplement also stated that Opera's "***fintech business may not be***

***successful***. . .  The operation of our fintech business involves significant risks and uncertainties

and may not achieve expected results."  *Id.* at S-25 (emphasis in original).  Among other risks,

Opera disclosed "credit risks," "the risk of fraudulent activity associated with borrowers," Opera's

"ability to collect payments," "competitors," "new and evolving" regulatory regimes, and "credit

cycles associated with the volatility of the general economy in the [generally developing] markets

in which [we] operate our fintech business."  *Id.* at S-26.  Opera also noted its prior "limited

experience in most aspects of the operations of [its] microfinance business, which ma[de] it

difficult to evaluate [its] future prospects."  *Id.*

### D.    The Hindenburg Report

Plaintiffs' allegations rest, in large part, on the Hindenburg Report by Hindenburg

Research, an anonymous person or persons that had taken a short position in Opera ADSs.  The

Hindenburg Report contained a number of negative allegations concerning Opera's web browsing

and microlending business.

Hindenburg Research claimed that Opera's "'browser market share is declining rapidly'"

and Opera was purportedly involved in "'predatory short-term loans in Africa and India.'"  (¶ 37

(quoting Hindenburg Report at 1).)    The Hindenburg Report further claimed that Opera's

microlending applications, certain of which were offered on "Google Play," were purportedly in

"'black and white violation of numerous Google rules'" aimed at "'curtail[ing] predatory lending'"

and that, as a result, Opera's lending business was purportedly "at risk of disappearing or being

severely curtailed when Google notices" Opera's alleged violation of its rules.  *Id.* (quoting

Hindenburg Report at 1).  The Hindenburg Report made clear, however, that Google Play's

policies concerning short-term lending were not even in existence until ***August 2019—i.e., over a year after the IPO***—when Google Play updated its policies to restrict distribution via Google Play of applications that provide short-term loans requiring repayment in full within 60 days or less, and that, prior to August 2019, Google Play's policies on short-term lending were "vague."  Ex. H, Hindenburg Report at 8; (¶¶ 32, 88).

### E.   Alleged Misstatements and Omissions

Plaintiffs' allegations fall into two categories.   *First*, Plaintiffs allege that Opera's statements in the Prospectus for its IPO, its 2018 Annual Report, and the Prospectus Supplement for its SPO concerning the performance of Opera's web browser business were misleading.   In particular, Plaintiffs allege that statements regarding the number of MAUs of Opera's web browser and statements that Opera was "among" the "market leaders" in the web browsing business (in certain markets) were misleading because Opera purportedly had lost market share over a period of years prior to and after the IPO.   (¶¶ 60-66, 117-18, 122, 138-39, 142, 144.)   Plaintiffs also allege that Opera's head of investor relations, Derrick Nueman, made misstatements during two analyst calls—one on December 9, 2019, and the other on January 15, 2020—when he stated that Opera's web browsing market share in Nigeria was "close to 50%."   (¶¶ 147-48, 151-52.)

*Second*, Plaintiffs allege that the Registration Statement and Prospectus for Opera's IPO were misleading because they failed to disclose that Opera had supposedly entered into the microlending business and the associated risks.   (¶¶ 70, 75, 77-78, 81, 84, 123, 127, 129-30, 133-35.)

As explained below, none of these alleged misstatements or omissions state a claim, and the Complaint should be dismissed.

**ARGUMENT**

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court need not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 289 (S.D.N.Y. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Plaintiffs' Section 10(b) claims are also subject to the heightened pleading standards, discussed below, set forth by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

**I.     THE SECTION 11 AND SECTION 10(b) CLAIMS SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION**

**A.     Allegations Concerning Opera's Alleged Failure to Disclose a Decline in Market Share of the Web Browser Business Are Inadequately Pled**

To state a claim under either Section 11 or Section 10(b), a plaintiff must adequately allege an actionable misstatement or omission.  *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007) ("To state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege that [the Defendant] . . . made misstatements or omissions of material fact[.]") (internal quotations and citation omitted); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) ("In many cases—including this one—two issues are central to claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful omission; and (2) materiality."). Here, Plaintiffs allege that the following statements in the IPO Prospectus were materially misleading:

> Our mobile browsers, with a global user base of 264.3 million average MAUs in the three months ended March 31, 2018, of which 182.0 million were smartphone users, compared to 160.0 million smartphone users in the same period in 2017, are among the market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share, according to StatCounter.

and

> Our smartphone user base followed a positive growth trend across 2016, 2017 and
> the three months ended March 31, 2018, adding 40.7 million MAUs over the period
> with seasonably highest growth in the third and fourth quarters.

¶¶ 60-61; Ex. B, Prospectus at 58, 86.

Plaintiffs do not allege that any of the statements concerning the number of MAUs were inaccurate (indeed, they were and are entirely true). Rather, Plaintiffs claim that these statements were false and misleading because Opera's browsers "had, according to StatCounter, been losing market share for a period of years prior to the IPO." (¶ 61.) Plaintiffs then leap to the illogical conclusion that, as a result, "Opera was experiencing a material decline in its web browser business." (¶ 61.)

But Plaintiffs have alleged no facts supporting this conclusory allegation. And, in fact, Plaintiffs' allegations rely on "apples-to-oranges" comparisons in an attempt to claim a misstatement where none exists. Plaintiffs completely ignore that there was no representation made about market share decline or growth. Opera could be *and was* a "market leader" in terms of high-growth areas while at the same time experiencing a decline in its overall market share. For example, if there is a growing market with an increased number of providers entering the market, a company could of course still be a "leader" despite declining share in the overall market. Plaintiffs offer no requirement that an issuer characterize its change in market share when it discloses its actual number of users. Moreover, as Opera made clear in its Prospectus for the IPO, the web browsing business was in fact growing at the time of the IPO, particularly in Asia and Africa:

> The last decade has seen rapid developments in internet and mobile internet
> infrastructure, with regions such as North America and Europe being the most well-
> developed. Meanwhile, regions including Southeast Asia, South Asia and Africa
> are still underpenetrated in terms of internet and mobile broadband connections.
> As internet infrastructure in these regions continues to develop, the number of

internet and mobile internet uses is also expected to increase and bring substantial growth to the internet economy.

Ex. B, Prospectus at 87.

Thus, Plaintiffs offer no factual basis for their conclusory allegation that Opera "was experiencing a material decline in its web browser business." (¶ 61.)   And, in fact, the contrary was true: documents incorporated into the Complaint make clear that Opera's annual "browser and news revenue" increased from $138.4 million to $154.97 million from 2018 to 2019, and the number of users of Opera's browser also increased.  *See* Ex. J, 2019 Annual Report at 49; *see also* Ex. I, *Opera Limited Announces Fourth Quarter and Full-year 2019 Financial Results* (Feb. 25, 2020), at 2.

Plaintiffs' contention that Opera was required to disclose a decline in market share pursuant to Item 303 of Regulation S-K is likewise baseless.  Item 303 requires disclosure of "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." (¶ 64, quoting 17 C.F.R. § 229.303(a)(3)(ii).)  Here, Plaintiffs allege that the loss of market share was "reasonably likely to negatively impact its revenue and, for that reason, should have been disclosed pursuant to Item 303 of Regulation S-K."  (¶ 66.)  But again, loss of market share does not mean that revenue will be negatively impacted (*e.g.*, in a growing market it may not be), and the ***Complaint is devoid of any allegation regarding revenue during the relevant period, let alone a decline in revenue***.  *See Holbrook v. Trivago*, *N.V.*, 2019 WL 948809, at *12-14 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) (finding no Item 303 violation where plaintiff did not adequately plead that omitted facts would have a material impact on revenue).  And again, Opera's revenue during the relevant time period had actually

*increased*—completely undermining Plaintiffs' bald "prediction" that loss of overall market share was "likely" to reduce revenue. *See supra* at 5-6.

In addition, the alleged decline in market share was not a "known trend" under Item 303. Disclosure of a "known trend" is required only when the trend is "both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017). Here, the alleged decline in market share was not a known trend because it was not likely to have a material effect on Opera's revenue or financial condition. Thus, no disclosure was required. *See id.* (finding that a decline in the portion of product installations in a particular region was not evidence of an overall decrease in revenues and thus was not a known trend that required disclosure under Item 303).

**B.    Allegations Concerning Opera's Alleged Failure to Disclose Entry Into the Fintech and Microlending Businesses Fail Because There Are No Allegations That Opera Actually Entered Into Those Businesses at the Time of the IPO**

Plaintiffs also allege that Opera violated Items 101 and 105 of Regulation S-K because the Offering Documents "did not disclose Opera's development of its microlending business" and failed to disclose the risks associated therewith. (*See, e.g.*, ¶¶ 67, 70, 83-84.) But Plaintiffs have failed to plead any facts showing that Opera had entered into the microlending business at the time of the IPO (it had not), or that OPay was an Opera "subsidiary" within the meaning of Regulation S-K. In fact, Opera did not enter the microlending business until *after* the IPO, when it acquired OKash. Likewise, the Google Play policies that Plaintiffs point to were not even in existence until over a year *after* the IPO. As such, there was nothing for Opera to disclose about microlending or its risks at the time of the IPO, under Items 101 or 105 or otherwise.

**1.    Plaintiffs Conflate Opera and OPay and Item 101 of Regulation S-K Does Not Require Disclosures About Non-Subsidiaries**

In the Complaint, Plaintiffs conflate Opera and OPay (which was not a subsidiary of Opera)

and ignore that Item 101 of Regulation S-K does not require disclosure of non-subsidiaries.  Item 101(a) of Regulation S-K requires a company to "[d]escribe the general development of the business of the registrants, ***its subsidiaries*** and any predecessor(s) during the past five years."  17 C.F.R. § 229.101(a) (emphasis added).  Item 101(a) further provides that "[i]n describing developments, information shall be given as to matters such as . . . any material changes in the mode of conducting the business."  *Id.* § 229.101(a)(1).  None of Plaintiffs' allegations support a plausible inference that OPay was one of Opera's "subsidiaries," that Opera had entered into the microlending business at the time of the IPO, or that Opera's arm's-length transactions with OPay (a separate entity) were a "material change" in how Opera conducted its business.

The sum of Plaintiffs' allegations that Opera was in the microlending business at the time of the IPO is that (i) Opera held a minority ownership interest (of 19.9%) in OPay, (ii) OPay conducted microlending business (through an application called OKash), and (iii) Opera provided services to OPay through a publicly disclosed services agreement.  (¶¶ 22-25.)  But simply because Opera held a minority equity investment (of only 19.9%) in a separate entity that had a nascent microlending business, and had entered into other transactions with that separate entity, does not mean that OPay was one of Opera's "subsidiaries" or that Opera otherwise itself was in the microlending business.  *See, e.g.*, *Subsidiary Corporation*, Black's Law Dictionary (11th ed. 2019) (defining a "subsidiary corporation" as "[a] corporation in which a parent corporation has a ***controlling share***. — Often shortened to *subsidiary*; *sub*.") (emphasis added); 17 C.F.R. § 240.12b–2 (Exchange Act Rule 12b-2 defining "subsidiary" as "an affiliate ***controlled*** by such person directly, or indirectly through one or more intermediaries") (emphasis added); *see also id.* § 229.601 (Item 601 (Exhibits) of Regulation S-K stating that the "term subsidiary has the meaning

given the term in Exchange Act Rule 12b–2").[2]  Plaintiffs plead no facts that support that Opera "controlled" OPay.  As a result, Item 101 imposed no obligation on Opera to disclose anything about the operations of OPay or the risks of microlending.[3]

Moreover, one of the very allegations that Plaintiffs rely on in attempting to conflate Opera and OPay actually undermines Plaintiffs' theory.  Plaintiffs point to the fact that Opera employees were providing services to OPay.  (¶ 24.)  But Plaintiffs acknowledge—as they must because it was fully disclosed—that the services were provided pursuant to a services agreement executed by these two different companies.  (¶ 22.)

### 2.     Opera Had No Duty to Disclose at the Time of the IPO Events That Occurred *After* the IPO

The other facts Plaintiffs seek to rely on to show that Opera was in the microlending business at the time of the IPO also undermine Plaintiffs' allegations, as they all relate to events that occurred ***after*** the IPO.  For example, Plaintiffs point to the percentage of Opera employees purportedly dedicated to "microlending operations" as of December 31, 2018, the percentage of Opera's total revenue that was generated from "origination fees and interest fees" in 2019, and an increase in Opera's cost of revenue from 2018 to 2019, which purportedly was "primarily due to

---

[2] In addition, under relevant accounting standards, the fact that a company holds a minority interest in another company does not render the latter company a "subsidiary" for purposes of financial reporting.  *See, e.g.*, *See* Ex. P, *FASB Accounting Standards Codification 810-10-20* (defining "subsidiary" as "[a]n entity, including an unincorporated entity such as a partnership or trust, in which another entity, known as its parent, holds a controlling financial interest"); *IASB International Financial Reporting Standard 10, App. A*, at A548, https://ranierociani.com/wp-content/uploads/2019/10/ifrs10_116.pdf (defining "subsidiary" as "an entity that is controlled by another entity").

[3] Indeed, it would have been potentially misleading for Opera to disclose that it was in the microlending business by virtue of its minority equity investment in OPay: simple logic dictates that merely investing in a company in a given business line does not mean that the investor is engaged in that business.

an increase in the cost of its microlending business." (*See, e.g.*, ¶¶ 26-28.)  Because all of these alleged events occurred after the IPO, they are irrelevant as a matter of law to Plaintiffs' Section 11 and 10(b) claims, both of which are based solely on alleged misstatements or omissions in the Offering Documents for the IPO.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (holding that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud"); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[M]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud[.]").

Plaintiffs also allege that the Offering Documents were misleading because they failed to disclose the purported risks associated with microlending, including in particular the risks "relating to Google Play's prohibitions against predatory lending tactics" and, namely, Google Play's new policies relating to Google's distribution of applications that provide short-term loans which require repayment in full within 60 days or less.  (*See, e.g.*, ¶ 88.)  But as Plaintiffs acknowledge in the Complaint, the relevant Google Play policies did not even exist until August 2019—*i.e.*, over a year after the IPO.  (¶¶ 32, 88.)  And it is axiomatic that Opera had no duty to disclose risks associated with the business of microlending at the time of the IPO since it was not in that business at that time, and Plaintiffs fail to adequately allege otherwise.  *See In re Cosi Sec. Litig.*, 379 F. Supp. 2d 580, 586-88 (S.D.N.Y. 2005) (holding that plaintiffs failed to allege facts establishing that a company was required to disclose a potential business plan they had not yet implemented).[4]

---

[4] Of course, Opera did disclose its investment in OPay, *see* Ex. B, Prospectus at 116, and, while ignored by Plaintiffs, the Prospectus for the IPO included a number of risk disclosures concerning Opera's "ongoing investment in new businesses and new products, services and technologies."  *See id.* at 21.  Among other things, Opera disclosed that

Finally, with respect to Google's policy change for lending apps distributed via Google Play, that policy change did not occur until August 2019. So here, too, there was nothing for Opera to disclose at the time of the IPO. The Hindenburg Report itself makes clear (and the Complaint acknowledges, *see* ¶¶ 32, 88) that Google Play did not publish its policies for distributing short-term lending applications until August 2019—and those policies did not even go into effect until September 2019—*i.e.*, over a year after the IPO. *See* Ex. H, Hindenburg Report at 8; *see also* ¶ 33. Indeed, the Hindenburg Report acknowledges that Google Play's policies concerning lending practices were "vague" prior to the policy update announced in August 2019. *See* Ex. H, Hindenburg Report at 8. As such, at the time of the IPO, there were no risks related to Google Play's policy preferences that Opera had any duty to disclose. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 580 (S.D.N.Y. 2013) (holding that there was no duty to specifically disclose risks concerning a potential lawsuit where the actual lawsuit had not been filed and the company could not determine that it would in fact be filed).

### C. The Alleged Misstatements and/or Omissions About Opera's Market Position and MAUs Are Immaterial as a Matter of Law Because the Alleged "Truth" Was Publicly Available at the Time of the Alleged Misstatements and/or Omissions

As discussed above, Plaintiffs allege that statements in the Offering Documents about Opera's market position (*i.e.*, that it was "among the market leaders" in certain regions) and about

---

such investments may involve "significant risks and uncertainties," including "insufficient revenues from such investments to offset any new liabilities," and "unidentified issues not discovered in our due diligence . . . that could cause us to . . . incur unanticipated liabilities." *Id.* Opera also disclosed as a risk factor its reliance on third-party distribution channels, including the Google Play Store. *Id.* ("If any of these third party channel providers . . . refuses to continue to provide its services to us and our users for any reason, it may materially and adversely affect our business, financial condition and results of operations.").

Opera's MAUs were misleading because "according to StatCounter," Opera had "been losing market share for a period of years prior to the IPO." (*See* ¶ 61.) Similarly, Plaintiffs attribute two alleged misstatements to Defendant Derrick L. Nueman, Opera's Vice President and Head of Investor Relations—namely, statements Nueman made during two analyst calls concerning Opera's percentage of market share in Nigeria. (*See* ¶¶ 113, 146, 150.) Again, Plaintiffs' basis for alleging that these statements were false is information obtained from "StatCounter." (*See* ¶¶ 147, 151.) In other words, Plaintiffs' sole basis for alleging that these statements were false is publicly available data.

Courts have long recognized that when the "truth" about an alleged misstatement is publicly available, the "law renders . . . purported misstatements immaterial." *White v. H&R Block, Inc.*, 2004 WL 1698628, at * 12 (S.D.N.Y. July 28, 2004). That is because, when a market is "efficient"—as Plaintiffs have repeatedly alleged here (¶¶ 48, 174, 175)—the price of the relevant security reflects all publicly available information.[5] *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at *6 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008). The "truth" about the alleged misstatements about market share in Nigeria was available to the public—and indeed, contained in sources referenced by Plaintiffs. As such, the alleged misstatements are immaterial and cannot form the basis of a claim under Section 11 or Section 10(b).[6] *See Monroe Cnty. Emps. Ret. Syst. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336,

---

[5] As they must, Defendants accept Plaintiffs allegations of market efficiency as true solely for the purposes of this motion.

[6] In addition, as made clear from public documents referenced in the Complaint, Mr. Nueman's statements on two analyst calls that Opera's market share in Nigeria was "close to 50%" were not false or inaccurate. Opera consistently made clear in its public disclosures, including in its analyst calls, that its relevant market in Africa is ***mobile*** users.

355–56 (S.D.N.Y. 2014) (dismissing Section 10(b) claim where "[m]any of [the] alleged omissions were either fully disclosed or matters of public knowledge," as well as "not sufficiently related to the subject matter of the statements to render those statements misleading"); *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118, 122 (S.D.N.Y. 2010) (dismissing claims under Sections 11 and 10(b) after determining that "[t]he omission of publicly available information . . . is not material because it is already part of the total mix of information available to investors"); *Rubenstein* v. *Credit Suisse Grp. AG*, 2020 WL 2036850, at *6 (S.D.N.Y. Apr. 28, 2020) (dismissing Section 11 claim where the alleged concealed information was already in the public domain); *Colbert v. Rio Tinto PLC*, 392 F. Supp. 3d 329, 339–40 (S.D.N.Y. 2019) (alleged misrepresentation was immaterial where the alleged concealed facts had already been publicly disclosed).

### D.    Expressions of Corporate Optimism, Opinions, and Puffery are Nonactionable

In addition to Plaintiffs' complete failure to adequately allege any false or misleading statements or material omissions, Opera's statements that it was "among" the "market leaders" in the web browsing business in certain "high growth regions" in "terms of market share" are not

---

*See, e.g.*, Ex. D, 2018 Annual Report at 33, 36; Ex. G, January 15, 2020 Needham Growth Conference Opera Company Conference Presentation Transcript at 4-5.  In the fourth quarter of 2019, Opera's market share of mobile users in Nigeria was 43.4%, and in August 2019, September 2019 and October 2019, it was 48.29%, 46.52%, and 46.9%, respectively—all of which were "close to 50%."  Ex. L, StatCounter Nigeria Mobile Browser Share Fourth Quarter; Ex. M, StatCounter Nigeria Mobile Monthly Browser Share August 2019-October 2019.  Plaintiffs allege the market share in Nigeria at the time of the two analyst calls was 31.43% and 29.6%, respectively.  But in another apples-to-oranges comparison, the StatCounter data Plaintiffs rely on includes not only the market share for mobile users, but mobile *and* PC users, and ignores Opera's public disclosures that its key market in Africa was mobile users.  Ex. N, StatCounter Nigeria Desktop & Mobile Monthly Browser Share December 2019-January 2020.

actionable because they are merely statements of corporate optimism, opinions, and puffery. *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (statements that are "too general to cause a reasonable investor to rely upon them" or that are "merely generalizations regarding [a company]'s business practices" are not actionable); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (same); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("Up to a point, companies must be permitted to operate with a hopeful outlook."). Claiming to be among the market leaders in the web browsing business is not actionable as a matter of law. *See e.g.*, *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395-97 (S.D.N.Y. 2006) (holding that a company's optimistic statements about its growth and market share were not actionable); *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1305 (S.D. Fla. 2015) (holding that a company's description of itself as a "market leader" was a "generalized, non-verifiable, [and] vaguely optimistic" statement that courts have deemed not actionable).

## II.   THE SECTION 11 CLAIMS ARE TIME-BARRED UNDER THE SECURITIES ACT'S ONE-YEAR LIMITATIONS PERIOD

Claims under Section 11 of the Securities Act must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . ." 15 U.S.C. § 77m. Here, even if otherwise actionable, Plaintiffs' Section 11 claims would be time-barred, as they are based on facts known and/or available at the time of the IPO, and in some cases, on facts disclosed in the Offering Documents themselves.

Plaintiffs claim that Opera's statements about its MAUs and its leadership position in certain markets were misleading because Opera "had, according to StatCounter, been losing market share for a period of years prior to the IPO." (¶¶ 60-61.) In support of this claim, Plaintiffs

cite to a number of statistics provided by StatCounter, a publicly available website.  (¶¶ 11-20.)  But that information was available to Plaintiffs at the time of the IPO.  Indeed, as Plaintiffs' allegations make clear, the Offering Documents specifically pointed investors to the StatCounter website when discussing Opera's market positions.  (¶ 60.)  Thus, to the extent that Plaintiffs have a claim based on these allegations—and they do not—they could have asserted that claim as early as July 2018.  This action was commenced in January 2020, more than one year later, and is thus untimely.

Also untimely is Plaintiffs' claim that the Offering Documents failed to disclose that Opera was engaged in microlending.  In support of their allegation that "[a]s of the date of the IPO, Opera had already commenced microlending operations and was focused on developing them into a significant source of revenue," Plaintiffs cite to and rely upon a litany of information first disclosed *in 2018*.  (¶ 71 (citing to allegations from ¶¶ 21-28).)  For example, Plaintiffs cite to the fact that Opera entered into a services agreement with OPay and held a 19.9% ownership share of OPay (¶ 22)—all of this was disclosed in the June 2018 Registration Statement and July 2018 Prospectus.  *See* Ex. A, Registration Statement at Exhibit 10.7; Ex. B, Prospectus at F-48.  Thus, the latest that this claim could have been brought was in 2019.  And because it was not brought until 2020, it is time-barred.

## III.   LEAD PLAINTIFF'S SECTION 11 CLAIM SHOULD BE DISMISSED FOR LACK OF STANDING

To have standing to assert a claim under Section 11, a plaintiff must have purchased shares pursuant to or traceable to the offering documents issued in connection with an initial public offering.  *See In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 529 n.7 (S.D.N.Y. 2005) (plaintiffs who purchased shares "pursuant or traceable to the IPO" have standing to bring a Section 11 claim); *Magnum Hunter*, 26 F. Supp. 3d at 303 (plaintiffs in original complaint lacked standing to

bring Section 11 claims because they did not allege stock purchases in or traceable to an IPO).

Here, Lead Plaintiff Lau did not purchase any shares of Opera until November 12, 2019, after

Opera's secondary offering in September 2019 and over a year after Opera's IPO in July 2018.

*See Brown, et al. v. Opera Limited, et al.*, 20-cv-00674, Cert. of Plf. Pursuant to Securities Laws,

at 3, Mar. 24, 2020 (ECF No. 27-1).  As such, Plaintiff Lau lacks standing as a matter of law to

assert a Section 11 claim and her claim should be dismissed.  *See In re Lehman Bros. Sec. Litig.*,

684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010) (dismissing Section 11 claims arising from offerings

where none of the plaintiffs alleged injury traceable to the certificates issued in those offerings).

## IV.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER

Under the PSLRA, a plaintiff must plead with particularity facts giving rise to a "strong

inference" of scienter, *i.e.*, an intent to "deceive, manipulate, or defraud," with respect to each

alleged act or omission.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007);

*see also* 15 U.S.C. § 78u–4(b)(2).  A strong inference of scienter must be "more than merely

plausible or reasonable—it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  A plaintiff can satisfy this heightened pleading

standard only by pleading specific facts showing "either (1) that defendants had the motive and

opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or

recklessness."  *ECA*, 553 F.3d at 198 (citations omitted).

Motive requires a showing of "the concrete benefits that could be realized" from one or

more of the allegedly misleading statements or nondisclosures; opportunity requires alleging "the

means" used and the "likely prospect of achieving concrete benefits by the means alleged."  *S.

Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Shields v.

Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).   Conscious misbehavior

"encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak*, 216 F.3d at 308 (internal citations omitted). Recklessness is "at the least . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 553 F.3d at 198 (omissions in original) (citation and quotation marks omitted). Where a defendant is a corporation, plaintiffs must plead facts that give rise to "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (internal quotations omitted).

Here, Plaintiffs fail to allege any particularized facts that show that Opera or any of the other Section 10(b) Defendants had "motive and opportunity to commit fraud" or exhibited any "conscious misbehavior or recklessness." Plaintiffs' Section 10(b) claims fail for this independent reason.

### A.    Plaintiffs Fail to Adequately Plead Scienter with Respect to Opera's Alleged Declining Market Share in the Web Browser Business

In an attempt to claim that Opera and the individual defendants acted with scienter in making statements regarding Opera's market share, Plaintiffs allege that Opera "knew or deliberately disregarded" data on StatCounter concerning its alleged declining market share in the web browser business. (*See* ¶¶ 160-64.) This is insufficient to adequately plead that Opera or any other Defendant acted with scienter.

An allegation of recklessness based on supposed access to contrary facts "must specifically identify the reports or statements containing this information" (*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309)) and the reports must contain "***non-public*** information contradicting [Defendants'] public

statements." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (emphasis added); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 452 (S.D.N.Y. 2005) ("Cases in this Circuit assume that the contradictory information in question must be non-public."). Here, the Complaint makes clear that the StatCounter data is public, strongly undermining any inference of scienter. As courts have regularly recognized, "[t]hat the information was publicly available when the allegedly misleading statements were made weakens any inference that defendants intended to defraud the market." *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008).

But not only was the information in question public, it was specifically referenced in the offering documents. Far from trying to hide the StatCounter data, Opera expressly called investors' attention to the website that contained that information. The far more compelling inference from these allegations is that Defendants believed the StatCounter data as to market share did not bear on any of the allegedly false and misleading statements (regarding Opera's increased MAUs and "market leading" position). *See supra* Section I.A.

### B. Plaintiffs Fail to Adequately Plead Scienter with Respect to Yahui Zhou's Involvement in the Qudian Litigation

In an attempt to bolster their virtually non-existent scienter allegations, Plaintiffs point to the fact that Defendant Y. Zhou, Opera's CEO, was a director of a separate company ("Qudian"), and that Qudian shareholders sued Y. Zhou (and others) for allegedly failing to disclose in offering documents that Qudian was entering into a new "materially different" business line. (*See* ¶¶ 165-69.) Plaintiffs further allege that the allegations in the Qudian litigation "strongly resemble[]" the alleged "efforts to conceal Opera's microlending business in the Registration Statement and Prospectus" here, purportedly showing Y. Zhou acted with scienter. (*See* ¶ 169.)

As an initial matter, these unproven allegations carry little weight, and certainly do not support a compelling inference of scienter. *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382,

403 (S.D.N.Y. 2009) (striking portions of complaint and exhibits referencing complaints filed in actions that had not resulted in an adjudication on the merits or permissible findings of fact), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).  Here, the vast majority of the claims in the *Qudian* litigation were dismissed on the defendants' motion to dismiss—and those that remain should be given little weight because there has not yet been any adjudication on the merits.  *See In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019).

Moreover, the mere involvement of Opera's CEO in separate litigation against a ***different company*** involving unproven allegations that may have "resembled" the alleged wrongdoing here is insufficient as a matter of law to adequately plead scienter.  Such allegations neither show a motive and opportunity to commit fraud nor constitute strong circumstantial evidence of conscious misbehavior or recklessness with respect to anyone.  *See Stein v. Tangoe, Inc.*, 2014 WL 12767210, at *20 (D. Conn. Sept. 30, 2014) (past proceeding involving same individual defendants, but different corporate defendant, was "not sufficiently identical to permit the [p]laintiff's use of the past proceeding as circumstantial evidence of conscious misbehavior or recklessness in the present case"); *see also* Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

### C.     Plaintiffs Fail to Adequately Plead Scienter with Respect to Yahui Zhou's and Hongyi Zhou's Ownership or Control of Separate Entities

In an attempt to plead motive, Plaintiffs allege that a substantial portion of the IPO and SPO proceeds were subsequently used by Opera in transactions with entities that allegedly were controlled by Y. Zhou and H. Zhou, a member of Opera's Board of Directors, or in which those two individuals had an ownership interest.  (*See* ¶¶ 170-73.)  However, to successfully plead scienter based on "motive," Plaintiffs must allege that Defendants "benefitted in some concrete

and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08.  Moreover, the "concrete

and personal" benefit must ***flow from*** the purported fraud.  *See ECA*, 553 F.3d at 201 & n.6

(plaintiffs must allege a "unique connection between the fraud and the [benefit]"); *Glaser v. The9*

*Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011) ("[T]he particular fraud alleged must specifically

enable the schemes or business plans plaintiffs contend conferred concrete and personal benefits

on the defendants.").  A plaintiff cannot, as here, simply allege that a defendant received a benefit

without linking that benefit to the alleged fraud.  *See Glaser*, 772 F. Supp. 2d at 592 (rejecting

argument that allegations of "related party transactions" create an inference of scienter because the

plaintiffs "merely list[] the transactions without articulating any connection [with the fraud]

whatsoever").

Plaintiffs do not allege that the supposed false and misleading statements somehow enabled

the transactions referenced in the Complaint.  To the contrary, some of these transactions occurred

***before*** Opera's IPO and were ***disclosed*** in the Prospectus.  *See* Ex. B, Prospectus at 115-16.  And

Plaintiffs do not challenge the sufficiency of Opera's disclosures concerning related-party

transactions.  Nor do Plaintiffs allege that those transactions were in any way illegal, improper, or

otherwise harmful to shareholders—for example, that the terms of the transactions were

unfavorable to Opera.  (¶¶ 170-73.)  Thus, the Complaint is completely devoid of factual

allegations supporting the conclusory allegation that Y. Zhou and H. Zhou "enrich[ed] themselves

at the expense of public shareholders."[7]

---

[7] Nor are there any allegations of insider sales by any Defendant, which also undermines any allegation of motive to

commit fraud.  Indeed, for significant portions of the proposed class period, many of the Defendants were the subject

of "lock-up" agreements that prevented them from selling their shares for certain periods of time after the IPO and

SPO.  *See* Ex. B, Prospectus at 9-10, 136, 148-49; Ex. E, SPO Prospectus Supplement (Sept. 16, 2019) at S-14, S-59;

### D. Plaintiffs Fail to Adequately Plead Scienter with Respect to Derrick Nueman and the Two Analyst Calls

Plaintiffs also fail to adequately plead scienter with respect to the two alleged misstatements Mr. Nueman supposedly made during two analyst calls concerning Opera's percentage of market share in Nigeria. (*See* ¶¶ 113, 146, 150.) The Complaint contains no allegations whatsoever showing that Nueman acted with scienter when he made those statements. There are no allegations of motive. There are no allegations of conscious misbehavior. And there are no allegations that would support a compelling inference of recklessness. Thus, Plaintiffs have failed to satisfy their pleading burden, and the Section 10(b) claims against Nueman and Opera that are premised on the two analyst calls must be dismissed. *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009) ("Plaintiffs' allegations fail to plead any, let alone sufficient, facts supporting a finding of scienter. . . ."); *see also Wilson v. Dalene*, 699 F. Supp. 2d 534, 559 (E.D.N.Y. 2010) (dismissing complaint that was "completely devoid of any allegations that raise a strong inference that the [defendants] acted with scienter").

## V. PLAINTIFFS' CLAIMS ALSO FAIL ON CAUSATION GROUNDS

An additional ground on which the Complaint fails to state a Section 10(b) claim is its failure to adequately plead loss causation—*i.e.*, "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation and quotation marks omitted). To plead loss causation, Plaintiffs must allege that "the defendant's misrepresentation (or other fraudulent conduct)

---

Ex. F, SPO Prospectus Supplement (Sept. 20, 2019) at S-14, S-59. In addition, Y. Zhou and H. Zhou held *shares* of Opera, not *ADSs*—as such, even after the lock-up period, they were not trading ADSs in Opera. *See* Ex. B, Prospectus at 113; Ex. D, 2018 Annual Report at 77; Ex. J, 2019 Annual Report at 66.

proximately caused the plaintiff's economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This may be accomplished by allegations that "the market reacted negatively to a corrective disclosure of the fraud," or that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (citation and quotation marks omitted). Importantly, "loss causation" allegations fail as a matter of law if the "truth" was disclosed to the market prior to the alleged "corrective disclosure." *See In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010) (plaintiff failed to establish loss causation under a corrective disclosure theory where the pertinent information in the alleged corrective disclosure was already available to the public); *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489 (S.D.N.Y. 2016) (dismissing securities fraud claim where plaintiffs attempted to establish loss causation with an article that "added nothing to the public's knowledge").

Here, the Complaint identifies only one alleged "corrective" disclosure: the Hindenburg Report. (*See* ¶¶ 153-59.) But all of the alleged "truths" revealed in the Hindenburg Report were revealed to the market well before the Report was published. Accordingly, Plaintiffs fail to adequately plead loss causation.

### A. Opera's Alleged Decline in Market Share for Its Web Browser Business Was in the Public Domain Well Before the Alleged Corrective Disclosure

Plaintiffs allege that the Hindenburg Report made a corrective disclosure concerning Opera's alleged decline in market share in its web browser business, ***citing to data from the StatCounter website***. (*See, e.g.*, ¶¶ 153-54.) But, as noted above, the data concerning Opera's web browser market share was publicly available on StatCounter prior to the issuance of the Hindenburg Report, and thus was already in the public domain by the time of the alleged corrective disclosure—in fact, it was already in the public domain at the time of each of the alleged

28

misrepresentations.  *See* Ex. K, StatCounter data concerning Opera's market share as of July 27, 2018 (Prospectus), April 17, 2019 (2018 Annual Report), September 16, 2019 (Prospectus Supplement), December 9, 2019 (UBS Global TMT Conference Call), and January 15, 2020 (Needham Growth Conference Call).  Because the alleged "negative" information that purportedly was first revealed to the market in the Hindenburg Report was, in fact, in the public domain before the alleged corrective disclosure, Plaintiffs' loss causation allegations fail as a matter of law.  *See Omnicom*, 597 F.3d at 511-12; *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x. 72, 74 (2d Cir. 2013) (holding that third-party articles based on information that was already publicly available was not "corrective" for the purpose of pleading loss causation).

### B.    Opera's Post-IPO Involvement in Fintech/Microlending Activities Was Disclosed Well Before the Alleged Corrective Disclosure

Plaintiffs also allege that the Hindenburg Report made a corrective disclosure concerning Opera's alleged entry into the fintech/microlending business and the attendant risks thereof. (¶¶ 153, 155.)  But Opera's entry into the microlending business was disclosed at least as early as February 2019, when Opera disclosed its acquisition of the OKash business in a press release with its financial results for the fourth quarter of 2018 and fiscal year 2018.  Ex. C, Press Release, *Opera Limited Announces Fourth Quarter and Full Year 2018 Financial Results* (Feb. 21, 2019), at 3. Because the alleged "corrective" information concerning Opera's entry into microfinance was already in the public domain prior to the Hindenburg Report, Plaintiffs also fail to adequately allege loss causation with respect to Opera's alleged failure to disclose its entry into this business. *Omnicom*, 597 F.3d at 511-12; *Cent. States*, 543 Fed. Appx. at 74.

**C.**     **Because the Alleged "Truth" of the Purported Misstatements and Omissions Was Revealed Well Before Opera's Share Price Declined Below the Offering Price, Plaintiffs' Section 11 Claims Fail as Well**

Courts recognize that the "loss causation" element of Section 10(b) claims and the "negative loss causation" affirmative defense to Section 11 claims are "mirror images." *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005). Accordingly, because Plaintiffs have failed to adequately plead loss causation with respect to their Section 10(b) claim, their Section 11 claim also should be dismissed based on a negative causation defense. *See Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416–17 (2d Cir. 2011) (affirming dismissal of a Section 11 claim when the lack of loss causation was "apparent from the face of the complaint").

Furthermore, as discussed immediately above, all of the alleged "truths" about the alleged misstatements and omissions in the Offering Documents were disclosed by no later than February 21, 2019. After that date, Opera's ADS price traded on or above the IPO price. *See, e.g.*, Ex. O (closing price on or above $12 per share on May 28, May 30, and August 22 through September 17, 2019). And since the "corrective" information was already known by the market at that point, the declines that brought the ADS price below the $12.00 IPO price cannot have been caused by the alleged misstatements/omissions. *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010) (defendants established negative causation where the company disclosed updated information regarding the alleged misstatements from the prospectus during the class period and the stock continued to trade above the IPO price).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated:   August 24, 2020
         New York, New York

**MILBANK LLP**

By:     */s/ Scott A. Edelman*
        Scott A. Edelman
        James G. Cavoli
        Jed M. Schwartz
        Andrea G. Hood
        55 Hudson Yards
        New York, NY 10001
        Tel.: 212-530-5000
        Fax: 212-530-5219
        sedelman@milbank.com
        jcavoli@milbank.com
        jschwartz@milbank.com
        ahood@milbank.com

        *Attorneys for Defendants Opera Limited and Derrick Nueman*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:     */s/ Audra J. Soloway*
        Susanna M. Buergel
        Audra J. Soloway
        1285 Avenue of the Americas
        New York, NY 10019
        Tel.: 212-373-3289
        Fax: 212-492-0289
        sbuergel@paulweiss.com
        asoloway@paulweiss.com

        *Attorneys for Defendant Citigroup Global Markets Inc.*

31

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that, pursuant to Judge John G. Koeltl's Individual Practice No. II.D and the Stipulation and Order, dated July 30, 2020 (ECF No. 52), this memorandum of law contains 9899 words and complies with the formatting requirements for Memoranda of Law in Civil Cases set forth in Judge Koeltl's Individual Practices.

Dated: August 24, 2020

_/s/ Andrea G. Hood_
Andrea G. Hood