## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LEON BROWN, individually and on behalf of all others similarly situated,

               Plaintiffs,

      v.

OPERA LIMITED, YAHUI ZHOU, FRODE JACOBSEN, HONGYI ZHOU, and HAN FANG,

               Defendants.

Case No. 1:20-cv-00674-JGK

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Nicholas I. Porritt
Adam M. Apton
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, N.Y. 10006
(212) 363-7500
(212) 363-7171 (fax)

*Attorneys for Lead Plaintiff Lilian Lau,*
*Plaintiff Leon Brown and Lead Counsel for*
*the Class*

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 3

      A.   Opera Shifts from Web Browsing to Fintech in 2017 Prior to the IPO. ................. 3

      B.   Defendants Sell Opera Shares Without Disclosing Fintech Operations. ............... 4

      C.   Instead of Providing Fintech Information, the Prospectus Bills Opera as an
           Established Web Browser Software Company. ....................................................... 4

      D.   Plaintiffs Unknowingly Invested in a Company with a Materially Different
           Business Strategy and Heightened Risk Profile. ..................................................... 6

      E.   Hindenburg Research Publishes Report Revealing Evidence of Declining
           Market Share and Loan Compliance Violations ..................................................... 8

III.  LEGAL STANDARD ....................................................................................... 9

IV.   ARGUMENT ..................................................................................................... 9

      A.   Plaintiffs Adequately Plead a Claim Pursuant to Section 11 of the
           Securities Act. ........................................................................................................ 9

           1.   Opera Failed to Disclose Its Fintech Operations in Violation of
                Regulation S-K. .......................................................................................... 10

           2.   Opera Misrepresented Its Market Share Trends. ..................................... 14

           3.   Defendants' Statute of Limitations Defense Fails. .................................. 17

           4.   Plaintiffs Leon Brown and Lilian Lau Have Standing to Sue Under
                Section 11 ................................................................................................... 19

           5.   Defendants' "Negative Loss Causation" Argument Fails ........................ 20

      B.   Plaintiffs Sufficiently Allege that Defendants Violated Section 10(b) of
           the Exchange Act and Rule 10b-5. ........................................................................ 21

           1.   Opera's Fintech and Market Share Statements Were Materially
                Misleading. ................................................................................................. 21

           2.   Plaintiffs Adequately Pleads Scienter for Section 10(b) Claims ............. 22

           3.   Plaintiffs Adequately Plead Loss Causation ............................................ 25

V.    CONCLUSION ................................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    615 F. App'x 44 (2d Cir. 2015) ................................................................................. 24

*Akerman v. Oryx Commc'ns, Inc.*,
    810 F.2d 336 (2d Cir. 1987) ...................................................................................... 20

*In re Alstom SA Sec. Litig.*,
    454 F. Supp. 2d 187 (S.D.N.Y. 2006) ....................................................................... 12

*Amorosa v. AOL Time Warner Inc.*,
    409 Fed. App'x 412 (2d Cir. 2011) ............................................................................ 20

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) .................................................................................... 16

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .......................................................................................... 9

*In re Authentidate Holding Corp.*,
    2006 WL 2034644 (S.D.N.Y. July 14, 2006) ............................................................ 19

*In re Bank of America AIG Disclosure Securities Litigation*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) ....................................................................... 14

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .................................................................................................... 10

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) ....................................................................... 18

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ................................................................................................. 9

*Blackmoss Investments v. ACA Capital Holdings, Inc.*,
    2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .............................................................. 20

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002) ....................................................................................... 10

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) ....................................................................................... 25

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
    543 Fed. App'x 72 (2d Cir. 2013) .............................................................................. 26

*In re Chicago Bridge & Iron Company NV Sec. Litig.*,
    2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .................................................... 26, 27

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020) ....................................................................... 13

*City of Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011) ....................................................................................... 18

ii

*Colbert v. Rio Tinto PLC*,
    392 F. Supp. 3d 329 (S.D.N.Y. 2019)................................................................ 17

*In re Cosi Securities Litigation*,
    379 F. Supp. 2d. 580 (S.D.N.Y. 2005)............................................................. 12

*Employees' Ret. Sys. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015).............................................................. 9, 15, 24

*In re Fairway Group Holding Corp. Secs. Litig.*,
    2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ..................................................... 25

*FDIC v. Credit Suisse First Boston Mortg. Secs. Corp.*,
    414 F. Supp. 3d 407 (S.D.N.Y. 2019)............................................................... 18

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)................................................................................ 18

*Freedman v. Weatherford Int'l Ltd.*,
    2013 WL 52991376 (S.D.N.Y. Sep. 19, 2013)................................................. 24

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)............................................................... 22

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................ 9, 10, 16, 25

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985)............................................................................ 10

*Gormley v. Magicjack Vocaltec Ltd.*,
    220 F. Supp. 3d 510 (S.D.N.Y. 2016)............................................................... 25

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)......................................................................... 13, 14

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)................................................. 11, 12, 13, 14

*Hutchison v. Deutsche Bank Secur., Inc.*,
    647 F.3d 479 (2d Cir. 2011).............................................................................. 13

*In re IAC/InterActiveCorp Sec. Litig.*,
    695 F. Supp. 2d 109 (S.D.N.Y. 2010)............................................................... 17

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
    970 F.2d 1030 (2d Cir.1992)............................................................................. 19

*Kronfeld v. Trans World Airlines, Inc.*,
    832 F.2d 726 (2d Cir. 1987).............................................................................. 17

*LC Capital Partners v. Frontier Ins. Grp.*,
    318 F.3d 148 (2d Cir.2003)............................................................................... 19

*Litwin v. Blackstone Grp.*,
    634 F.3d 706 (2d Cir. 2011)................................................................................. 9

iii

*Liu v. Intercept Pharm., Inc.*,
  2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) .................................................................. 13, 16

*In re Longtop Fin. Technologies Ltd. Sec. Litig.*,
  910 F. Supp. 2d 561 (S.D.N.Y. 2012) .............................................................................. 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ...................................................................................... 25, 27

*In re Magnum Hunter Resources Corporation Securities Litigation*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014) ............................................................................... 19

*Merck & Co., Inc. v. Reynolds*,
  559 U.S. 633 (2010) ........................................................................................................ 18

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ...................................................................................... 10, 15

*Monroe Cnty. Emps. Ret. Syst. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014) ............................................................................... 17

*Newman v. Warnaco Group, Inc.*,
  335 F.3d 187 (2d Cir. 2003) ............................................................................................ 18

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .............................................................................. 22, 23, 24

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................................................. 14, 15

*In re Omnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ............................................................................................ 26

*Pani v. Empire Blue Cross Blue Shield*,
  152 F.3d 67 (2d Cir. 1998) .............................................................................................. 20

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
  681 F.3d 114 (2d Cir. 2012) .............................................................................................. 9

*Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) .......................................................................................... 26

*In re Qudian Sec. Litig.*,
  2019 WL 4735376 (S.D.N.Y. Sep. 27, 2019) .................................................................. 11

*Richman v. Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012) ............................................................................. 21

*Rubenstein v. Credit Suisse Grp. AG*,
  2020 WL 2036850 (S.D.N.Y. Apr. 28, 2020) .................................................................. 17

*S.E.C. v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011) .............................................................................................. 15

*In re Salix Pharm., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ............................................................. 23, 24

*In re Scholastic Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)................................................................................ 24

*In re Signet Jewelers Ltd. Secs. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) .................................................... 26, 27

*Silberstein v. Aetna, Inc.*,
  2015 WL 1424058 (S.D.N.Y. Mar. 26, 2015) ........................................................ 18

*Stadnick v. Vivint Solar, Inc.*,
  861 F.3d 31 (2d Cir. 2017)................................................................................ 15, 16

*Staehr v. Hartford Fin. Servs. Grp.*,
  547 F.3d 406 (2d Cir. 2008)................................................................................ 18

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)................................................................................ 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................ 23

*In re Time Warner Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ................................................................................ 22

*United Paperworkers Intern. Union v. International Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993)................................................................................ 17

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ........................................................ 25

*In re Wachovia Equity Securities Litigation*,
  753 F Supp. 2d 326 (S.D.N.Y. 2011)........................................................................ 19

*Wm. Passalacqua Builders v. Resnick Developers S.*,
  933 F.2d 131 (2d Cir. 1991)................................................................................ 12

*Youngers v. Virtus Inv. Partners Inc.*,
  228 F. Supp. 3d 295 (S.D.N.Y. 2017)........................................................................ 25

**Statutes**

15 U.S.C. §77m.......................................................................................... 17

**Regulations**

17 C.F.R. §229.101 .......................................................................................... 10

17 C.F.R. §229.105 .......................................................................................... 13

17 C.F.R. §229.303 .......................................................................................... 15

## I.  <u>INTRODUCTION</u>

Plaintiffs invested in Opera Limited thinking they were purchasing shares in a company devoted to developing and marketing internet web browsing software. According to its Prospectus, Opera had successfully become one of the "market leaders . . . in terms of market share" in "high growth regions such as South Asia, Southeast Asia and Africa" thanks to software and technology that it had been building and refining for more than 20 years. This was not true. Unbeknownst to the public, Opera was in the midst of a dynamic transition away from its traditional business model into something far riskier: microlending in emerging countries. Thus, when Plaintiffs purchased shares in Opera's initial public offering, they received something materially different than they bargained for. Plaintiffs bring this lawsuit to recover the damages they sustained as a result.

Plaintiffs allege that Defendants violated the Securities Act of 1933 and Securities Exchange Act of 1934 for misrepresenting Opera's business operations during the initial public offering and the class period that followed. Congress designed the Securities Act as a form of consumer protection "to assure compliance with the disclosure provisions . . . by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-82 (1983). The Securities Act purposefully replaces the rule of *caveat emptor* with a strict duty on the part of the issuer, its board of directors, and its advisors to accurately disclose relevant financial and operational information as required under applicable U.S. Securities and Exchange Commission regulations. Importantly, there is no requirement for a plaintiff to either allege or prove at trial that any defendant acted with a particular state of mind. Where a registration statement contains a misrepresentation or omits required information, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id*. Accordingly, claims under the Securities Act are very different from fraud claims made pursuant to the Exchange Act and, as the Supreme Court has observed, pleading Securities Act claims "places a relatively minimal burden on a plaintiff." *Id*. Plaintiffs have satisfied this minimal burden.

Opera's Prospectus, which formed a part of its Registration Statement, disclosed nothing to investors about its fintech (microlending) business. By the date of Opera's initial public offering on July 27, 2018, Opera already had over 12% of its fulltime employees devoted to microlending operations, owned 20% of an online payment service provider in Africa, and launched a mobile application providing short-term loans to users in Kenya. By year-end, 20% of Opera's fulltime employees were devoted to the fintech business, which ultimately generated 35% of its net income for the year. There can be no question that Opera's microlending operations were a material component of its overall operations, prior to, during, and after the IPO. Pursuant to the Securities Act and Regulation S-K promulgated thereunder, Opera should have provided investors with a description of its fintech operations in its Registration Statement. It failed to do so.

Opera's Registration Statement also contained misleading statements about the business operations it did disclose. While claiming that Opera's mobile browsers "are among the market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share, according to StatCounter" and that its "smartphone user base followed a positive growth trend across 2016, 2017 and the three months ended March 31, 2018," in reality its market share had been steadily declining for years. As a matter of fact, Opera's worldwide market share in August 2015 was 6.57%. By the time of the IPO, it had declined to 3.46%. The same trend existed within its key geographic markets, including in particular Asia and Africa. Opera did not disclose this trend in its Registration Statement. This, too, was in violation the Securities Act and Regulation S-K.

Plaintiffs also adequately state claims for relief under Section 10(b) of the Exchange Act. These claims similarly focus on Opera's failure to disclose its fintech operations and misrepresentations about its market share in key geographic regions, but include allegations of scienter and motive. Defendant Yahui Zhou controlled Opera and the companies comprising its fintech operations. By concealing this information from investors, Zhou was able to successfully raise more than $120 million for his own personal gain from Opera's IPO and secondary offering in September 2019.

Contrary to Defendants' assertions, the truth about Opera's market share was not public information. While Opera management had access to its market share data through StatCounter, a private, subscription data service, this data was not widely available to investors or the market. The substantial and material decline in Opera's stock price when the truth about its declining market share was revealed shows that this information was unknown and not already reflected in Opera's market price.

For the reasons set forth below, Defendants' motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Opera Shifts from Web Browsing to Fintech in 2017 Prior to the IPO.

Between 2015 and 2018, Opera's web browser market share was declining, worldwide and in key geographic regions. ¶¶14-20. Given the decreasing market share of its main product line, Opera began refocusing its effort and resources on fintech operations. ¶21.

On November 1, 2017, Opera entered into a services agreement with Opay Digital Services Limited (HK) ("Opay"). ¶22. Opay was an online payment service provider targeting African users. ¶22. Zhou controlled Opay. ¶22 (through company named Balder Investment Inc.); Prospectus at F-68. As of December 31, 2017, Opera held a 19.9% ownership share of Opay. ¶22.

On March 12, 2018, Opera furthered its fintech operations with the launch of "OKash" in Kenya. ¶23. OKash was a stand-alone application downloadable from Google Play that allowed consumers to obtain short-term loans. ¶23. Like OPay, OKash was also controlled by Zhou. ¶171 (through company named TenSpot Pesa Limited); Prospectus at F-68.

By March 31, 2018, fintech was a material component of Opera's operations. Opera employed 410 full-time employees. ¶24. Of these 410 full-time employees, 51 worked for Opay. *Id*. In other words, 12% of Opera's workforce was dedicated to Opera's foray into microlending before the IPO. ¶24.

In July 2018, Opay launched an "agent-centric" money services product in Nigeria. ¶25.

**B.**    **<u>Defendants Sell Opera Shares Without Disclosing Fintech Operations.</u>**

On July 27, 2018, Opera filed the Prospectus. Absent from the Prospectus was any discussion of Opera's burgeoning fintech operations. This was misleading and in violation of Regulation S-K, especially in light of the fact that 12% of Opera's workforce was already devoted to fintech operations and it was actively building a portfolio of fintech operations contemporaneous with its preparation for the IPO. ¶¶21-25. Indeed, by the end of 2018, Opera's microlending employees increased by 75% (from 51 to 89) and went from 12% of Opera's total workforce to nearly 20% (¶¶ 24, 26). Furthermore, Opay recruited 3,000 agents and December's average daily transaction volume was in excess of $1 million, with peak days exceeding $1.5 million, placing Opay among the top-tier mobile money providers in Nigeria less than one year after launch (¶25). In addition, OKash (which Opera acquired on December 19, 2018 for $9.5 million) generated $1.7 million of revenue from 280,000 microloans, and held active licenses to provide similar microfinance products in four other countries (¶23).

The same day that Opera filed the Prospectus, Opera's ADSs began publicly trading on the NASDAQ Global Select Market at the IPO price of $12.00 per ADS. ¶9. In total, Opera raised approximately $115.2 million in proceeds before underwriting discounts and commissions, and other expenses. ¶10.

**C.**    **<u>Instead of Providing Fintech Information, the Prospectus Bills Opera as an Established Web Browser Software Company.</u>**

Opera portrayed itself to investors in the Prospectus as an established and leading player in the web-browser application industry. ¶2. Boasting software and technology that it had been developing since 1996, Opera represented that it had managed to become one of the "market leaders . . . in terms of market share" in "high growth regions such as South Asia, Southeast Asia and Africa." ¶2. Opera's browser revenue as of December 31, 2017 represented 53% of its overall revenue. ¶11. Investors who purchased Opera's ADSs in the IPO did so on the belief that they were investing in a mature, established internet technology company and not, as was the case, a burgeoning fintech operation. ¶2.

Moreover, what Opera disclosed about its web browser operations was misleading. It claimed that it was one of the "market leaders . . . in terms of market share" in "high growth regions such as South Asia, Southeast Asia and Africa" and that its browser users had increased year-over-year. ¶2. Opera also emphasized the market demand for its browser in certain key regions, stating that "[Opera's] mobile browsers, with a global user base of 264.3 million average MAUs in the three months ended March 31, 2018, of which 182.0 million were smartphone users, compared to 160.0 million smartphone users in the same period in 2017, *are among the market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share*," implying that Opera also had high growth in those regions. ¶13.

On the contrary, Opera's browser market share had declined over the past three years. In August 2015, Opera's user-base represented 6.57% of the market share worldwide. ¶14. By the time of the IPO, Opera's worldwide market share had declined to 3.46%. ¶14. In other words, while Opera's MAUs may have been increasing, they were increasing at a rate that was unable to preserve or protect Opera's share of the market. ¶14. The decline of Opera's market share was especially significant in Africa, one of the key markets highlighted in the Prospectus, where Opera's market share had fallen from 40% in August 2015 to 15.37% in July 2018. ¶16. The same decline had occurred in Asia, the other key market highlighted in the Prospectus, where Opera's market share fell from 8.12% in August 2015 to 4.11% in July 2018. ¶18. Opera's decline in browser market share posed a significant problem maintaining company-wide revenue growth, as browser revenue represented 53% of Opera's overall revenue as of December 31, 2017. ¶19. Given Opera's historical reliance on browser revenue and position as an established web browser software company, this decline in market share was material.[1]

---

[1] Defendants misplace reliance on Opera's year-over-year revenue growth. Def. Br. at 6. Plaintiffs do not challenge the falsity of the revenue growth figures, nor do they refer/incorporate the documents cited by defendants. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)(document incorporated into a complaint only when plaintiff relies on the terms and effect of the document when pleading its claim); *see also Khoja v. Orexigen Therapeutics,*

**D.      Plaintiffs Unknowingly Invested in a Company with a Materially Different Business Strategy and Heightened Risk Profile.**

Opera's fintech operations generate revenue primarily from origination fees and interest fees. ¶27. These fees accounted for 1.0% of Opera's total revenue in 2018, jumping to 38.3% of its total revenue in 2019 (*i.e.*, $1.7 million in 2018 to $128.4 million in 2019). ¶27. According to Opera's annual report for fiscal 2019, the increase in revenue was "primarily driven by the launch and subsequent scaling of our microlending offerings in Kenya in the fourth quarter of 2018 and India in the second quarter of 2019. ¶27.

As Opera scaled its microlending business, its expenses also increased significantly. ¶28. Opera's cost of revenue increased to $74 million in 2019 from $20 million in 2018, primarily due to an increase in the costs of its microlending business from $0.4 million in 2018 to $29.8 million in 2019. ¶28. Opera's cash flow also came under pressure due to the increase in its loan operations, reducing cash by $90 million in 2019 as Opera grew its microlending businesses. ¶28.

With Opera's shift in business strategy, it also became subject to a variety of different operating risks, namely loss of capital from non-performing loans. ¶78. Opera acknowledged these risks belatedly in its annual report for fiscal 2018 dated April 17, 2019, disclosing in pertinent part that it was now subject to "significant risks and uncertainties, including insufficient revenues from such investments to offset any new liabilities assumed and expenses associated with these new investments, inadequate return of capital on our investments, distraction of management from current operations . . . ." ¶86. Opera's annual report further explained that "The delinquency rate of the loans we extend may increase in a manner that surpasses the benefits we derive, putting a significant portion of the funds that we lend at risk, which may adversely affect our financial position and results of operations." ¶86; *see also* ¶79 (analyst highlighting "repayment risks related to micro-lending business" after Opera disclosed microlending operations). This cautionary

---

*Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (holding that the incorporation of a document merely mentioned by a complaint is improper). !

language did not appear in Opera's prospectus, even though the company was actively growing its fintech operations. ¶87; *see also* ¶89 (S&P Capital IQ report dated September 6, 2018 entirely omitted any information relating to Opera's microlending business).

Opera also became acutely vulnerable to regulatory risks, including those stemming from noncompliance with Google Play user policies. This is because Google Play held a dominant share of the online application market in Opera's key operating territories. ¶29 (Google Play's market share in Kenya, India, and Nigeria was 84%, 94%, and 79%, respectively). *Id*. Google Play, in pertinent part, prohibited the promotion and sale of predatory lending products, which it defined as "payday loans" requiring repayment "within 60 days." ¶¶30, 31. In August 2019, Google Play reiterated this prohibition and expanded it to include bans, for example, against applications that did not fully disclose interest percentage rates. ¶¶32-34. Google Play individually sent emails to all fintech businesses informing them of its new policy banning short-term loans. ¶33. All applications offering loans with durations of 60 days or less were in violation of Google Play policies and subject to a ban from Google Play's platform. ¶35. Google Play's policy banning short-term loans sought "to [further] protect users from deceptive and exploitative personal loan terms." ¶35.

Opera's microloans required payment within less than 60 days, as confirmed repeatedly by Opera and its representatives. ¶88. On August 22, 2019, during Opera's second quarter conference call, Jacobsen confirmed that Opera's loans were "never more than 30 days." ¶36. On September 5, 2019, during the Citi Global Technology Conference, Jacobsen said Opera's loans were "super-short duration, never more than 30 days." ¶36. On November 14, 2019, during an investor conference call, Jacobsen further confirmed that the company's average loan duration was "about 2 weeks." ¶36. Nueman, during the UBS Global TMT Conference presentation on December 9, 2019, stated that Opera's loans "typically have a 2-week duration." ¶36. And then again on January 15, 2020 during the Needham Growth Conference presentation when Nueman said "[Opera's] typical loan duration is 2 weeks." ¶36. Despite Google Play's restrictions against short-term loans, Opera's microloans required payment within less than 60 days. ¶88.

7

### E.      Hindenburg Research Publishes Report Revealing Evidence of Declining Market Share and Loan Compliance Violations

Hindenburg Research is a well-known research firm that routinely publishes detailed reports exposing fraud at publicly-traded companies. Its research reports are often the impetus behind larger exposés by mainstream news outlets and regulatory authorities. It is not, as Defendants claim, Def. Br. at 8, a shadowy anonymous blog, but instead a legitimate forensic financial research firm founded by Nate Anderson, CFA, CAIA.[2]

On January 16, 2020, Hindenburg Research published a report about Opera. It demonstrated that Opera's web browser market share was declining and that it faced major compliance risks over predatory loan compliance issues. ¶¶37-41, 153-55. A complete copy of the 48-page report is filed herewith (as opposed to the several pages Defendants attached as an excerpt). Apton Decl., Ex. A.

Hindenburg Research's report included non-public information. StatCounter, for example, was the database that it used to track Opera's market share. StatCounter is a subscription service that provides market share data behind a paywall. StatCounter's website presents visitors with pleas to "Try it for FREE," and "Log In" rather than ready access to the data cited by the Hindenburg Report, as shown by the screenshots of StatCounter's website filed herewith. Apton Decl., Ex. B.

The research report also incorporated non-public evidence of predatory loan compliance violations, including private correspondence with Opera's fintech subsidiaries inquiring about loan terms, loan statements featuring disbursement and repayment details, and online messages confirming short-term repayment deadlines. Apton Decl., Ex. A at, *e.g.*, 10-11, 13-16, 21-23, 29.

---

[2] Hindenburg Research most recently reported on the developing scandal at Nikola. Its report, published on September 10, 2020, has led the SEC and the DOJ to inquiry into the report's accusations. Kasper Viita, *Nikola, Slumps as U.S. Justice Department Said to Make Inquiries*, BLOOMBERG, September 16, 2020 (available at: https://www.bloomberg.com/news/articles/2020-09-16/nikola-slumps-as-u-s-justice-department-said-to-make-inquiries).

The market rapidly reevaluated Opera in response to the Hindenburg Research report, deciding that the investment was substantially riskier than initially perceived. In response to the information in the report, Opera's ADS price fell sharply from $9.02 per ADS on January 15, 2020 to $7.33 per ADS on January 16, 2020, a decline of 18.74%. ¶42. Opera's ADS price fell an additional $0.32 per ADS over the next few days, closing at $7.01 per ADS on January 21, 2020. ¶42. To date, Opera's ADS price has not recovered, and remains well below its IPO price of $12.00 per ADS. ¶¶6, 10

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (internal quotations omitted). When evaluating the complaint, the court must "draw[] all reasonable inferences in the plaintiff's favor." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). The allegations in the complaint, along with the inferences drawn therefrom, need only "'raise a right to relief above the speculative level.'" *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. (applying plausibility standard to securities fraud claim).

## IV.    ARGUMENT

### A.    Plaintiffs Adequately Plead a Claim Pursuant to Section 11 of the Securities Act.

Section 11 of the Securities Act require a plaintiff to plead the element of "falsity." Under the Securities Act, Section 11 imposes strict liability on a security's issuer or underwriter when the registration statement or prospectus for that security contains "a material omission in contravention of an affirmative legal disclosure obligation." *Litwin v. Blackstone Grp.*, 634 F.3d 706, 715 (2d Cir. 2011); *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (holding that omission of disclosure required by Item 303 of Regulation S-K

violates Section 11 of the Securities Act); *see also Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (Section 11 "imposes liability for a material misstatement of fact or an omission to state a fact that renders a statement made materially misleading"). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id*. at 250 (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)).

A misstatement or omission is material if "a reasonable investor would have considered [it] significant in making investment decisions." *Ganino*, 228 F.3d at 161-62 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). "'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Id*. at 162 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

### 1. Opera Failed to Disclose Its Fintech Operations in Violation of Regulation S-K.

Defendants failed to disclose Opera's ongoing transition into a fintech and microlending business at the time of the IPO, in violation of the requirements of Regulation S-K. Item 101(a) of Regulation S-K requires that a registrant "[d]escribe the general development of the business of the registrant [and] its subsidiaries . . . during the past five years" and "[i]n describing developments, information shall be given as to matters such as . . . ***any material changes in the mode of conducting business***." 17 C.F.R. §229.101(a) (emphasis added). Furthermore, Item 101(c)(1) of Regulation S-K requires that a registrant provide a detailed description of the material aspects of the registrant's business including the "business done and ***intended to be done***" and "to the extent material to an understanding of the registrant's business taken as a whole, the description of each such segment shall include the information specified in paragraphs (c)(1)(i) through (x) of this section." 17 C.F.R. §229.101(c)(1) (emphasis added).

Courts have repeatedly held that the failure to disclose changes to a company's business, as required under Item 101, are sufficient to state a claim under Section 11. *In re Qudian Sec.*

*Litig.*, 2019 WL 4735376, at *9 (S.D.N.Y. Sep. 27, 2019) (finding that "if Qudian knew or should have known at the time of the IPO that it was launching Dabai Auto and would be using a substantial portion of the IPO proceeds to do so, a factfinder could presumably find that Qudian's offering materials were misleading"). In *Qudian*, the company in question had commenced its IPO on October 18, 2017, and then proceeded to use one-eighth of its IPO proceeds to fund the opening of a new loan business only months later. *Id.*, at *9.

Similarly, in *Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.*, 422 F. Supp. 3d 821 (S.D.N.Y. 2019), AMC had recently acquired a European theater chain as a separate business segment, but failed to disclose the seasonality of this segment in violation of Item 101(c)(1). *Id*. at 841. The court found that on a motion to dismiss, plaintiffs had adequately plead that the omission was material and in violation of Section 11 because of the size of AMC's international business, and the obligation to disclose seasonality under Item101(c)(1). *Id*. at 841-42 ("since a material omission can also occur when material information is omitted 'in contravention of an affirmative legal disclosure obligation.'").

Plaintiffs have pleaded facts that, like the facts alleged in *Quidian*, demonstrate Opera's involvement in fintech (or, at the very least, plans to imminently engage in fintech) at the time of the IPO, ¶¶21-28. Opera entered into a services agreement with a party controlled by Opera's controlling stockholder, Opay, on November 1, 2017. ¶22. By the end of 2017, Opera itself owned 19.9% of Opay. ¶21. Opay launched "OKash" in Kenya on March 12, 2018. ¶22. Opera's investment in Opay was not simply financial during this launch, as the services agreement meant that a full 12% of Opera's employees worked for Opay by March 31, 2018. ¶24. Indeed, as of July 2018, Opera had already: invested $6 million in its microlending operations through a loan to Opay, which amounted to over 90% of Opera's net income from the previous year 2017. ¶72. And by the end of 2018, only five months after the IPO, Opera had acquired OKash and had nearly 20% of its employees dedicated to microlending. ¶26. Opera's fintech segment results for the 2018 year further demonstrate that it was highly focused on developing its microlending business at the

time of the IPO, as the revenue generated by OKash and Opay for the year amounted to approximately 35% of its fiscal net income. ¶73.

Contrary to Defendants' argument, these facts show that Opera was engaged in fintech at the time of the IPO. Defs. Br. at 15-16 (arguing that Opera entered fintech only after IPO and not before). Their legal support does not change the outcome on this point. Specifically, the plaintiffs in *In re Cosi Securities Litigation*, 379 F. Supp. 2d. 580, 586-88 (S.D.N.Y. 2005), alleged that Cosi had merely researched the possibility of franchising for two months before the Prospectus was issued, and did not allege that a franchising plan had been submitted to or approved by the board, or that any affirmative steps had been taken to implement a franchising plan. Opera's financial and personnel investment in Opay represent significantly more than research or minor affirmative steps into the business. ¶¶21-28. And unlike in *Cosi*, where the franchise of restaurants was a foreseeable extension of the company's main business, a foray into fintech and microlending is a complete departure from Opera's previous operations. ¶75.

Defendants understate Opera's involvement in fintech by attempting to distance Opera from Opay. Defs. Br. at 7-8, 13-15 (arguing that Opera was distinct entity from Opay). The fact of the matter was that Opera had been and was investing significant resources into microlending at the time of the IPO. As of March 31, 2018, 12% of Opera's employees focused on Opay's operations, doubling to 25% by the end of the year. This constituted a material portion of Opera's labor and revenue. *See AMC Entertainment*, 422 F. Supp. 3d at 842 (finding a business segment that would constitute 23% of a company's revenue in the future was a material segment, and noting that precedent suggests materiality could begin at a mere 5%). Further, while Defendants argue that Opay was not a "subsidiary" of Opera at the time of the IPO, it was nonetheless controlled by Zhou and acted at his behest as part of Opera's overall operations. ¶22; *see Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131, 139 (2d Cir. 1991) (companies liable for acts committed by alter egos where *inter alia* companies controlled by same individuals); *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 215-16 (S.D.N.Y. 2006) (plaintiffs' allegations were sufficient to pierce corporate veil under Rule 8 and hold defendants liable for one another's actions).

Disclosure about fintech operations was material information to investors, ¶75. This is in part because fintech presented unique, different risks to investors. ¶¶83-88; *see Liu v. Intercept Pharm., Inc.*, No. 17-cv-7371 (LAK), 2020 WL 1489831, at *12 (S.D.N.Y. Mar. 26, 2020) ("the key question when evaluating cautionary language in securities offerings is whether a 'reasonable investor could have been mislead about the nature of the risk when he invested.'") (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). Opera's few fleeting mentions of fintech in the related party transactions section of the prospectus (¶¶76-82) do not satisfy its obligation to disclose "the most significant factors that make an investment in the registrant or offering speculative or risky" under Regulation S-K, Item 105. 17 C.F.R. §229.105. The risk warnings Defendants presently rely on in their brief, that "investments may involve 'significant risks and uncertainties,' including 'insufficient revenues from such investments to offset any new liabilities,' and 'unidentified issues not discovered in our due diligence . . . that could cause us to . . . incur unanticipated liabilities.'", are also plainly inadequate as they fail to address the specific risks associated with fintech. Defs. Br. at 16 n.4; *see  Hutchison v. Deutsche Bank Secur., Inc.*, 647 F.3d 479, 488 (2d Cir. 2011) ("If a particular product or product-line, or division or segment of a company's business, has independent significance for investors, then even a matter material to less than all of the company's business may be material for purposes of the securities laws."); *AMC Entertainment*, 422 F. Supp. 3d at 842 (holding that the generic warning of "the impact of regional or country-specific business cycles" was insufficient to warn investors about a particular regional weakness). While Opera disclosed its reliance on third-party channel providers like Google Play, this disclosure only pertained to the applications known at the time to Opera ADS holders, like Opera's mobile web browser, and ***not*** the OKash application in potential violation of Google Play's rules. As such, these boilerplate cautionary warnings fail to "bespeak caution" to investors regarding Opera's fintech business. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) ("'[C]autionary language [that] did not expressly warn of or did not directly relate to the risk that brought about

13

plaintiffs' loss' is insufficient.") (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).[3]

### 2. Opera Misrepresented Its Market Share Trends.

Opera represented in the Prospectus that its mobile browsers "are among the market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share, according to StatCounter" and that its "smartphone user base followed a ***positive growth trend across 2016, 2017 and the three months ended March 31, 2018***, adding 40.7 million MAUs over the period with seasonally highest growth in the third and fourth quarters." ¶60. Given Defendants' apparent access and reliance upon StatCounter, they knew that the "positive growth trends" did not hold for market share. ¶62. Thus, the inclusion of positive MAU growth, without disclosure of the decrease in market share, materially misrepresented the state of affairs known to Defendants at the time of the IPO. *See Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) ("[I]f a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11[ ] ... creates liability."). As such, these statements regarding market share were materially false. *Id*.

Defendants are wrong when they say that Plaintiff provides "no factual basis" for their allegations. Defs. Br. at 12. Plaintiffs support their allegation that the above statements were false and misleading with specific market share numbers demonstrating that Opera's market share had decreased worldwide, as well as within the African and Asian markets. ¶62. Defendants cannot (and do not) challenge these numbers at the pleading stage where Plaintiffs' allegations are to be

---

[3] Defendants downplay the importance of Google Play's advertising policy rules with respect to short-term loans by concentrating on the 2019 policy change banning such lending applications. Defs. Br. at 17. Unlike the potential lawsuit in *In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d 564, 580 (S.D.N.Y. 2013), these policies were in place when Defendants filed the Prospectus. The restrictions on advertisements for Opera's future microlending products was thus a material risk that Opera had a duty to disclose. *See AMC Entertainment*, 422 F. Supp. 3d at 841.

accepted as true for the purposes of the motion. *Blanford*, 794 F.3d at 304 (allegations accepted as true at pleading stage).

Instead, Defendants attempt to reframe Plaintiffs' allegations to only concern MAUs rather than market share, but Plaintiffs' key point is that Defendants misled investors by highlighting the growth in the number of MAUs and its leadership in market share while omitting the steadily downward market trend. *Omnicare*, 575 U.S. at 189; *Jinkosolar Holdings Co., Ltd.*, 761 F.3d at 250 ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no existing independent duty to disclose [such] information" in the first place); *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. S.E.C.*, 568 U.S. 442, 133 S.Ct. 1216, 185 L.Ed.2d 297 (2013) ("The law is well settled ... that so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." (internal quotation marks omitted)).

Defendants also wrongly argue that "Plaintiffs offer no requirement that an issuer characterize its change in market share when it discloses its actual number of users." Defs. Br. at 11. Plaintiffs allege, in particular, that Opera was obligated to disclose this information pursuant to Item 303 of Regulation S-K. ¶¶64-65. If, as Defendants argue, "Opera could be and was a 'market leader' in terms of high-growth areas while at the same time experiencing a decline in its overall market share" (Defs. Br. at 11), then that fact is plainly a "known trend or uncertainty" that needed to be disclosed. 17 C.F.R. § 229.303(a)(3)(ii)(requiring issuers "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."). The rule's instructions state, in pertinent part, that its purpose is to "enhance a reader's understanding of [the issuer's] financial condition, changes in financial condition, and results of operations." *Id*. The disclosure requirements are not limited to only those scenarios in which revenue is likely to decline, as Defendants contend. Defs. Br. at 12-13.

Defendants also misplace reliance on *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31 (2d Cir. 2017), when arguing that the "decline in market share was not a 'known trend.'" Defs. Br. at 13.

15

Importantly, the plaintiff in *Vivint* failed to allege that the "actual number of installations in Hawaii decreased or even increased at a slower pace," thus eliminating the need for any disclosure above and beyond what already appeared in the defendant's prospectus. *Vivint Solar*, 861 F.3d at 39. Here, Plaintiffs allege precisely what was missing in *Vivint*. Opera's market share worldwide and in key geographic regions was declining at the time of the IPO, and thus not confined to a small corner of Opera's overall operations. ¶62 (between August 2015 and IPO in July 2018, market share worldwide and in Africa and Asia had declined by 50%). Further, unlike *Vivint*, Opera's flagging market share caused a dramatic slow-down in revenue within the "Browser and News" segment. Between 2017 and 2018, the segment's contribution to overall revenue dropped from 84.7% to 46.3%.[4]

Alternatively, Defendants argue that they could not have misled anyone with respect to their market share because the "truth" was "publicly available" through "StatCounter." Defs. Br. at 17-18. Evaluating this "truth-on-the-market" defense is intensely fact specific, and is inappropriate for a motion to dismiss. *See Ganino*, 228 F.3d at 167 (finding that the truth-on-the-market defense is intensely fact specific and rarely appropriate in dismissing securities litigation). Putting aside the fact-intensive nature of this defense, it is apparent that the StatCounter information was not equally available to both parties or "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements" *Id*. at 167 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). Upon visiting the StatCounter website, one is confronted with links labeled "Try it for FREE!" or "Log In" or "Pricing." Apton Decl., Ex. B. The fact that the data is stuck in a database behind an evident paywall means that any investor is unlikely to have access to the data that contradicts the claims of Defendants. *See Liu*, 2020 WL 1489831, at *6 n.70 (rejecting truth-on-the-market defense where the corrective information was accessible in FDA

---

[4] *See* 2018 Annual Report at p. 56 and 2019 Annual Report at p. 49. Opera's 2018 Annual Report provides its revenue for "Search" and "Advertising," which the 2019 Annual Report combines under the "Browser and News" segment.

online database); *see also United Paperworkers Intern. Union v. International Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (finding sporadic media reports "should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials" when determining materiality of omission); *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 736 (2d Cir. 1987) ("There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a prospectus on the basis that the information is public knowledge and otherwise available to them.").

The cases cited by defendants regarding publicly available information do not concern information hidden behind paywalls or obscured webpages. Instead, they turned on previous disclosures by the issuer, widely published news articles, or well-known market trends. *See Rubenstein v. Credit Suisse Grp. AG*, 2020 WL 2036850, at *6 (S.D.N.Y. Apr. 28, 2020) (finding the information concerning the risk of volatility ETNs was well-known in the market); *Colbert v. Rio Tinto PLC*, 392 F. Supp. 3d 329, 339–40 (S.D.N.Y. 2019) (alleged corrective disclosure made weeks after the company had already disclosed the same fact); *Monroe Cnty. Emps. Ret. Syst. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 355-56 (S.D.N.Y. 2014) (finding that the facts revealed by the corrective disclosures were "disclosed in public filings throughout the class period"); *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010) ("[t]he omission of publicly available information about general market trends is not material"). Because StatCounter self-interestedly protects its proprietary data, the market share data cited in the Hindenburg report was not "publicly available" or "widely known."

### 3. Defendants' Statute of Limitations Defense Fails.

Defendants also argue that Plaintiffs' Section 11 claims are time-barred. Defs. Br. at 20-21. Claims under Section 11 of the Securities Act must be brought within one year "after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. §77m. A securities-law violation is discovered when the plaintiff learns "sufficient information about [the violation] to . . . plead it in a complaint"

"adequately," *i.e.*, with enough "detail and particularity to survive a [Rule] 12(b)(6) motion to dismiss." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (rejecting §11 statute of limitations defense), citing *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650-53 (2010) (limitations period begins not when reasonable investor would have begun investigating, but when such investor conducting an investigation would have uncovered sufficient facts constituting the violation to adequately plead such facts and survive a motion to dismiss); *see also City of Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174-75 (2d Cir. 2011) (vacating dismissal) (same; amount of "detail a plaintiff must know before having 'discovered' the fact will depend on the nature of the fact").

"'Whether sufficient facts existed at [a particular] time is, by definition, a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage.'" *FDIC v. Credit Suisse First Boston Mortg. Secs. Corp.*, 414 F. Supp. 3d 407, 411 (S.D.N.Y. 2019) (quoting *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012)); *see also Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 412 (2d Cir. 2008) (rejecting defense because such inquiries "often inappropriate for resolution on a motion to dismiss"). Accordingly, a motion to dismiss will only be granted where "uncontroverted evidence irrefutably demonstrates [that the] plaintiff discovered or should have discovered facts sufficient to adequately plead a claim." *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (citation omitted). Defendants do not meet this standard and, as such, the Court should reject their argument.

Similar to their truth-on-the-market defense to falsity, Defendants argue that Plaintiffs' claims regarding the state of Opera's market share are time-barred because the truth about Opera's market share was "publicly available" through StatCounter. Defs. Br. at 20-21. Plaintiffs cannot be charged with knowledge of or a duty to investigate misrepresentations concerning Opera's market share. *See Hartford Financial Services Group, Inc.*, 547 F.3d at 432 (vacating dismissal where truthful information was only available through niche specialty publications); *Silberstein v. Aetna, Inc.*, No. 13-cv-8759 (AJN), 2015 WL 1424058, at *8 (S.D.N.Y. Mar. 26, 2015) ("The fact that a shareholder with infinite time and an inclination to undertake fishing expeditions might have

18

discovered the violation does not put any reasonable shareholder on notice."). The release of the Hindenburg Report started the clock and plaintiff filed suit within one year thereof, making the filing of this action on January 24, 2020 timely.

As for the omissions pertaining to its ongoing and growing fintech strategy, Opera's release of its annual report for 2018 fiscal year on February 21, 2019 would have been the first notice of the extent and significance of Opera's fintech operations. This lawsuit was filed within one year of the release of that annual report and within the statute of limitations. *LC Capital Partners v. Frontier Ins. Grp.,* 318 F.3d 148, 154 (2d Cir.2003) (holding that the one-year period begins to run when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.") (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992)).

### 4.  Plaintiffs Leon Brown and Lilian Lau Have Standing to Sue Under Section 11.

In this jurisdiction, plaintiffs who purchased shares traceable to an IPO have standing for a Section 11 claim. *See Evoqua*, 450 F. Supp. 3d at 403 ("To establish standing under § 11 at the motion-to-dismiss stage, therefore, Plaintiffs need only assert that they purchased shares "issued pursuant to, or traceable to the public offerings."); *In re Wachovia Equity Securities Litigation*, 753 F Supp. 2d 326, 372-73 (S.D.N.Y. 2011) (same); *see also In re Authentidate Holding Corp.*, 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) (holding that Section 11 plaintiffs "are not required to explain how their shares can be traced"). Plaintiffs "purchased Opera ADSs pursuant and/or traceable to the IPO." ¶174(e). Defendants disregard this District's lenient pleading standard, arguing that Plaintiffs need to show something more at the pleading stage with respect to Lau. Defs. Br. at 21-22. They provide no factual support, however, when claiming that Lau did not purchase shares traceable to the IPO. Defs. Br. at 21-22. And unlike in *In re Magnum Hunter Resources Corporation Securities Litigation*, 26 F. Supp. 3d 278, 303 (S.D.N.Y. 2014), where the initial plaintiff had not purchased shares traceable to the IPO and the statute of limitations had run on the only plaintiff that had done so, Defendants make no challenge to the standing of Plaintiff

19

Brown the original plaintiff in this Action who purchased ADSs on the date of the IPO and, thus, unequivocally bought ADSs registered in the IPO given the fact that there were no other shares trading at the time. Thus, even if the Court dismisses Lau, the Section 11 claims will survive based on Plaintiff Brown's standing.

### 5.  Defendants' "Negative Loss Causation" Argument Fails

With regard to Defendants' attack on Plaintiffs' Section 11 claims, loss causation is ***not*** an element of Section 11. Defs. Br. at 30. *Blackmoss Investments v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at \*11 (S.D.N.Y. Jan. 14, 2010) ("a plaintiff pursuing a Securities Act claim is not required to affirmatively plead causation"). Further, Defendants cannot establish negative loss causation at the pleading stage unless it is obvious from the face of the complaint. *Amorosa v. AOL Time Warner Inc.*, 409 Fed. App'x 412, 417 (2d Cir. 2011) (*citing Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)). Even at summary judgment, negative loss causation places a "heavy burden" on Section 11 defendants which "reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases." *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987).

When this case was filed, the price of Opera stock traded at a price below the IPO price, giving rise to damages pursuant to 15 USC 77k(e) for the misrepresentations of the Prospectus. When Opera filed its 2018 annual report in April 2019, its ADS price was also below the IPO price. While Defendants argue that Opera ADS traded above the IPO price for two days in May and between August 22 through September 17, 2019, these moves were temporary and occurred before the release of the Hindenburg Report.  The court in *Blackmoss* found that defendants had adequately raised a defense of negative loss causation because the stock had always traded above the IPO price, even after the company had made additional disclosures that the plaintiffs alleged corrected misleading statements in the prospectus. *See Blackmoss*, 2010 WL 148617, at \*11. Here, Opera's ADS price dropped below its IPO price for roughly a year, rebounded for a matter of days, and then promptly fell below the IPO price yet again. Because Plaintiffs have adequately plead a loss, Defendants cannot establish negative causation at this stage of the litigation.

**B.**     **Plaintiffs Sufficiently Allege that Defendants Violated Section 10(b) of the Exchange Act and Rule 10b-5.**

**1. Opera's Fintech and Market Share Statements Were Materially Misleading.**

Plaintiffs have adequately alleged the falsity of each misrepresentation and omission under Section 10(b). Each of the alleged misrepresentations and omissions made in the Prospectus alleged to violate the Securities Act and Regulation S-K also violate Section 10(b) and Rule 10b-5. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102-03 (2d Cir. 2015) (holding that a material violation of Regulation S-K, particularly Item 303, gives rise to liability under Section 10(b)).

In addition to Defendants' violations of Section 10(b) in the Prospectus, Plaintiffs identify several subsequent false statements made regarding Opera's market share by its Chief Operating Officer, Neuman. For example, on December 9, 2019, Neuman represented that Opera had "close to 50% browser market share" in "Nigeria." ¶146. That was false. At the time of the statement, Opera's browser market share in Nigeria was 31.4%. ¶147. Similarly, on January 15, 2020, Neuman said, "in Nigeria, we have close to 50% market share." ¶150. They did not. As alleged, Opera's market share at that time was 29.6%. ¶151. These statements are just as false and misleading as the ones that appeared in the Prospectus, as discussed above. *See* Section IV.A.2., *supra*.[5]

Plaintiffs also highlight the materiality of these omissions by explaining that these statements related to Opera's key geographic regions of operation and that Defendants repeatedly made these misleading statements. ¶63; *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279 (S.D.N.Y. 2012) ("repeated assertions" were not mere puffery). Thus, these statements

---

[5] As set forth above, information regarding Opera's declining market share that was misrepresented in Opera's Registration Statement as well as its 2018 Annual Report (¶138), Prospectus (¶141), and conference calls on December 9, 2019 (¶146) and January 15, 2020 (¶150) was not publicly available at the time those statements were made as StatCounter data is not generally available to a reasonable investor.

cannot be considered mere "puffery," contrary to Defendants' argument otherwise. Defs. Br. at 19-20. Further, the statements alleged as misleading by Plaintiffs were not generic, generalizations, or a "hopeful outlook." Defs. Br. at 19-20 (collecting cases finding puffery). These statements, that Opera had "[c]lose to 50%" market share, were materially false statements about its actual current market share that future events could not make true. ¶146-51. Puffery is not the sort of statement about present circumstances that "might require later correction." *In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (holding that defendants offered more than just rosy predictions when they "stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (finding specific references to the "popularity of [their] auto refinance program" and "early success with the rollout" was not puffery).

Defendants are also misguided in their attempt to demonstrate that their statements about "market share" were not false. Defs. Br. at 18 n.6. While they claim in their motion that the "market share" statements referred to market share among "mobile users," their public statements contained no such limiting language. Notably, the examples of such limiting language referenced by Defendants are not contained within the statements referenced by Plaintiffs. On December 9, 2019, Neuman made absolutely no reference to "mobile users," stating broadly and without qualification that "Our brand is everywhere. We have big market share in some of these countries. Like a place, for example, like Nigeria, *we have close to 50% browser market share*." ¶146. He similarly made no limiting qualification on January 15, 2020, when he repeated that "*in Nigeria, we have close to 50% market share*." ¶150. Contrary to these claims, Opera's market share in Nigeria at this time was 30%. ¶¶147, 151.

### 2. Plaintiffs Adequately Pleads Scienter for Section 10(b) Claims

To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 315. Courts must conduct the scienter analysis "holistically" to determine "whether *all* of the facts alleged,

taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences," but must merely be "cogent and at least as compelling as any opposing inference[.]" *Id.* at 324.

Scienter alleged where defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311. To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must "specifically identify the reports or statements containing this information." *In re Longtop Fin. Technologies Ltd. Sec. Litig.,* 910 F. Supp. 2d 561, 574–75 (S.D.N.Y. 2012). Unlike Plaintiffs, Defendants had access to StatCounter and relied upon it for their internal market share figures, as evidenced by the citing of StatCounter in their filings with the SEC. ¶¶118, 138, 141, 163. StatCounter showed that Opera's market share was less than represented and had been declining. ¶164. In repeatedly misstating Opera's actual market share status, while knowing, or having access to, contradictory StatCounter data, Defendants engaged in deliberately fraudulent behavior. *Novak,* 216 F.3d at 311-12 ("despite knowledge of the true reasons for rising inventory levels, the defendants made repeated statements to the investment community either offering false reassurances that inventory was under control or giving false explanations for its growth"). Thus, pursuant to *Novak*, Defendants acted with scienter. *Id.*; *In re Salix Pharm., Ltd.,* No. 14-CV-8925 (KMW), 2016 WL 1629341, at *17 (S.D.N.Y. Apr. 22, 2016) (upholding complaint where allegations of scienter demonstrated contemporaneous knowledge of contradictory information).[6]

The same analysis applies to the allegations regarding Opera's transition to fintech operations. Defendants knew of Opera's ongoing operations, and by the filing of the Prospectus, 12% of the Opera's employees was focused on Opay and the microlending business. ¶24. Zhou controlled Opera as well as the companies that comprised its fintech arm, Opay and Okash. ¶¶22-

---

[6] Defendants attempt to rebut Plaintiffs' allegations of scienter by, once again, claiming that the StatCounter information was easily available to the investing public. Defs. Br. at 23-24. As explained previously, it was not.

27. Thus, Zhou and Opera "knew facts or had access to information" regarding these trends and strategies within Opera. *Novak*, 216 F.3d at 311. Failing to disclose the information required by Regulation S-K with full knowledge of its importance to Opera demonstrates scienter on the part of Zhou and Opera. *In re Salix Pharm., Ltd.,* 2016 WL 1629341, at *16 (finding stronger allegations of scienter where the topic was a core operation of the issuer).[7]

Plaintiffs also demonstrate the motive of Zhou by alleging in detail the financial proceeds he siphoned from Opera's public offerings. *Blanford*, 794 F.3d at 308-09 (finding scienter where defendant financially benefitted through misrepresentations). The IPO and Secondary Offering raised a combined $190 million in net proceeds. ¶170. Through their control of Opera, the two Defendants were able to steer $63.5 million of the IPO's proceeds to their other companies and a total of $121.2 million of the Secondary Offering, or 57% and 70% respectively. ¶¶171-72. Defendants assert that some of the transactions occurred before the IPO and were disclosed in the Prospectus, Defs. Br. at 26, but preparations for the IPO were well underway by the beginning of 2018 and the disclosure of the transactions does not diminish Zhou's motive. These personal benefits clearly flowed from the cash raised in Opera's public offerings, as Opera otherwise would have lacked the cash necessary to enter into these related-party transactions. ¶173; *see Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015) (holding that personal gain from fraudulent scheme helped establish motive). *Cf. In re Scholastic Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001) (finding motive where defendant personally benefitted from omission of material facts).

---

[7] Zhou's alleged wrongdoing in relation to Quidian's initial public offering strongly resembles the wrongdoing that occurred in connection with Opera's IPO. ¶¶167-69. Thus, his repeated violations give rise to the strong inference that they were intentional and in furtherance of a scheme that he had executed previously. *See, e.g.*, *Freedman v. Weatherford Int'l Ltd.*, 2013 WL 52991376 (S.D.N.Y. Sep. 19, 2013) (finding that previous restatement of financial statements placed defendants on notice of accounting violation, raising an inference of scienter for the second violation).

### 3.    Plaintiffs Adequately Plead Loss Causation

Courts in the Second Circuit consistently hold that "[a]llegations of loss causation, are evaluated under the notice pleading standard in Federal Rule of Civil Procedure Rule 8." *See In re Fairway Group Holding Corp. Secs. Litig.*, 2015 WL 249508, at *16 (S.D.N.Y. Jan. 20, 2015); *see also Gormley v. Magicjack Vocaltec Ltd*., 220 F. Supp. 3d 510, 517 (S.D.N.Y. 2016) ("Pleading loss causation with particularity is not required…"). Thus, Plaintiff's burden of pleading loss causation is "not a heavy one," and the complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). At the pleading stage, Plaintiff need only allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Youngers v. Virtus Inv. Partners Inc*., 228 F. Supp. 3d 295, 299 (S.D.N.Y. 2017) (citation omitted).

Once again, defendants claim that the public already had access to the declining market share numbers before the corrective disclosure. Defs. Br. at 28-29. As argued previously, this truth-on-the-market defense is not suitable for a motion to dismiss, because the public availability of the disclosed information is a fact-intensive inquiry. Further, Defendants' premise for this argument is belied by the fact that Opera's stock declined materially in response to the Hindenburg Report. ¶156. A decline in the price of a stock in response to news constitutes prima facie evidence that the news was previously unknown to the market. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233-34 (2d Cir. 2014) (where plaintiffs alleged that settlement agreements revealed misrepresentations about the company's financial condition, and that "the market reacted negatively to the . . . corrective disclosure by a significant (12%) decline in [defendant's] stock"); *Ganino*, 228 F.3d at 167-68 (finding that the movement of stock in response to corrective disclosure demonstrates materiality of new information); *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539-GHW, 2017 WL 1102666, at *27 (S.D.N.Y. Mar. 23, 2017) (where "disclosure

25

to the market . . . revealed new information directly contrary to Defendants' statements," and the disclosure was followed by a "decline in the price" of the company's securities). The corrective disclosures in this case presented new information not widely available to investors.

The Hindenburg Report did not merely simply reprint data available to the market but analyzed how and why Opera's browser business was weaker than Defendants represented and the motivation for its shift to fintech. Apton Decl., Ex. A at 4-7; *see In re Chicago Bridge & Iron Company NV Sec. Litig.*, 2020 WL 1329354, at *7-8 (S.D.N.Y. Mar. 23, 2020) (finding that a third-party's analysis of already public financial information can be a corrective disclosure); *see also In re Signet Jewelers Ltd. Secs. Litig.*, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) ("[An analyst report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant company's] underlying business was weaker than most people realized [and therefore qualified as corrective].");  *Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (finding that a WSJ article analyzing publicly available Medicare records could plausibly constitute a corrective, and not merely confirmatory, disclosure). The analysis presented by Hindenburg was not simply a negative opinion of Opera. The report presented a thorough explanation of how the weakness of the Opera's web browser market business had led Opera to transition to uniquely risky sector of fintech, and the actual risks that Defendants had failed to make clear to the its investors.

The cases cited by Defendants for the public nature of the corrective disclosures are inapplicable. Defs. Br. at 27-28. In the cases cited by Defendants, the alleged corrective disclosures concerned facts that had been previously disclosed by the company or were the subject of news reports well before the supposed corrective disclosure. *See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (noting that the public knew of the questionable nature of the transaction a year before the corrective article); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. App'x 72, 75 (2d Cir. 2013) (finding that news reports merely expressed negative opinions about the company based on facts previously disclosed by the company). Investors did not have immediate access to the StatCounter data presented in the

26

Complaint, and no entity had disseminated the relevant trend data to investors until Hindenburg released its report. In fact, by repeatedly misrepresenting the market share of Opera alongside references to StatCounter, Defendants gave their statements a veil of reliability that enhanced the fraud. *E.g.*, ¶56.

Defendants also argue that the Hindenburg Report could not have caused Plaintiffs' losses with regard to Opera's fintech business because "Opera's entry into the microlending business was disclosed at least as early as February 2019, when Opera disclosed its acquisition of the OKash business in a press release with its financial results for the fourth quarter of 2018 and fiscal year 2018." Defs. Br. at 29. But Opera's February 2019 disclosures did not alert investors to the fact that it was at risk of violating Google Play restrictions against short-term loans. ¶¶153-56. It was not until the release of the Hindenburg Report that the investing public knew of these acute, particular risks inherent in Opera's transition into a fintech company. *See Chicago Bridge & Iron Company*, 2020 WL 1329354, at *7-8 (finding that a third-party's analysis of already public financial information can be a corrective disclosure); *Signet Jewelers*, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) ("[An analyst report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant company's] underlying business was weaker than most people realized [and therefore qualified as corrective].").

## V.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.[8]

---

[8] In the event that the Court is inclined grant Defendants' motion, Plaintiffs respectfully request leave to file an amended complaint to address any deficiencies in the allegations identified by the Court. *See Loreley*, 797 F.3d at 191.

Dated: October 8, 2020                    LEVI & KORSINSKY, LLP


                                          s/ Adam M. Apton
                                          Nicholas I. Porritt
                                          Adam M. Apton
                                          55 Broadway, 10th Floor
                                          New York, N.Y. 10006
                                          Tel.: (212) 363-7500
                                          Fax: (212) 363-7171
                                          nporritt@zlk.com
                                          aapton@zlk.com

                                          *Attorneys for Lead Plaintiff Lilian Lau, Lead Plaintiff Leon Brown, and Lead Counsel for the Class*


28