**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**LILIAN LAU and LEON M. BROWN,**

                        **Plaintiffs,**                     **20-cv-674 (JGK)**

        **- against -**                               **MEMORANDUM OPINION AND**
                                                      **ORDER**
**OPERA LIMTIED, ET AL.,**

                        **Defendants.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    The plaintiffs, Lilian Lau and Leon M. Brown, bring this
putative class action against Opera Limited ("Opera"), its
individual directors, and the financial institutions that
underwrote Opera's Initial Public Offering ("IPO") for alleged
material misstatements and omissions.  The plaintiffs bring
claims for violations of: (1) Section 10(b) of the Securities
Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b)
and Rule 10b-5, 17 C.F.R. § 240.10b-5; (2) Section 11 of the
Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k;
(3) Section 15 of the Securities Act, 15 U.S.C. § 77o; and
(4) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.  The
alleged misstatements and omissions concern Opera's market share
with respect to web browser services and its entry into the
financial technology ("fintech") market.  The defendants move to
dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).
For the following reasons, the motion to dismiss is **granted.**

1

## I.

The following facts are drawn from allegations in the Amended Complaint and are accepted as true for purposes of this motion to dismiss.

Opera is a limited liability holding company headquartered in Norway and incorporated in the Cayman Islands.  Am. Compl. ¶¶ 7, 48.  Defendant Yahui Zhou ("Y. Zhou") is the Chairman of the Board and the Chief Executive Officer ("CEO") of Opera.  Am. Compl. ¶ 49.  Defendant Hongyi Zhou ("H. Zhou"), not related to Y. Zhou, was a Director of Opera at the time of the IPO and signed or authorized the signing of the Registration Statement filed with the Securities and Exchange Commission (the "SEC").  Am. Compl. ¶ 51.  Defendant Frode Jacobsen has served as Opera's Chief Financial Officer during all relevant times.  Am. Compl. ¶ 50.  Defendant Han Fang served as a Director of Opera at the time of Opera's IPO.  Am. Compl. ¶ 52. Defendants Lori Wheeler Naess and Trond Riiber Knudsen were Directors of Opera at the time of the IPO.  Am. Compl. ¶¶ 53-54.  Derrick Nueman was Opera's Vice President and head of Investor Relations since March 11, 2019.  Am. Compl. ¶ 113.  Lin Song was Opera's Chief Operating Officer at all relevant times.  Am. Compl. ¶ 112. Defendants China International Capital Corporation Hong Kong Securities Limited, Citigroup Global Markets Inc., and Carnegie AS are investment banks that underwrote the IPO, helped draft

and disseminate the Registration Statement and Prospectus to the IPO (together, the "Offering Documents"), and shared more than $9 million in underwriting fees.  Am. Compl. ¶ 57.  The plaintiffs are Opera investors who purchased American Depository Shares ("ADSs") of Opera.  Am. Compl. ¶ 47.

On August 9, 2018, Opera completed its IPO.  Am. Compl. ¶ 10.  The Registration Statement and Prospectus for the IPO were submitted to the SEC in June and July 2018 respectively. Am. Compl. ¶¶ 8-9.  In its IPO, Opera issued 9.6 million ADSs priced at $12.00 per share, raising approximately $115.2 million.  Am. Compl. ¶ 10.

According to its Prospectus, Opera was "one of the world's leading browser providers."  Am. Compl. ¶ 11.  The Prospectus provided that the number of its browser users, in terms of monthly active users ("MAUs"), had been increasing year after year.  Am. Compl. ¶ 12.  Specifically, the Prospectus stated:

> Our mobile browsers, with a global user base of 264.3 million average MAUs in the three months ended March 31, 2018, of which 182.0 million were smartphone users, compared to 160.0 million smartphone users in the same period in 2017, are among the market leaders in high growth regions such as South Asia, Southeast Asia and Africa in terms of market share, according to StatCounter.

Am. Compl. ¶ 60.  The Prospectus also stated:

> Our smartphone user base followed a positive growth trend across 2016, 2017 and the three months ended March 31, 2018, adding 40.7 million MAUs over the period with

seasonally highest growth in the third and fourth quarters.

Id. (together, the "IPO Prospectus Market Share Statements").

The plaintiffs allege that various fillings and statements that Opera made were misleading because they failed to state that Opera's market share was decreasing. According to StatCounter, an independent web analytics company, in August 2015, Opera's user base represented 6.57% of the worldwide market, but at the time of the IPO, Opera's worldwide market share was 3.46%. Am. Compl. ¶ 14. StatCounter reported that between August 2015 and July 2018, Opera's Africa market share declined from approximately 40% to about 15.37%. Am. Compl. ¶ 16. Likewise, StatCounter reported that between August 2015 and July 2018, Opera's Asia market share dropped from 8.12% to 4.11%. Am. Compl. ¶ 18.

According to the Prospectus, about 53% of Opera's overall revenue came from browser revenue. Am. Compl. ¶ 20. The Prospectus also noted that the market for internet and mobile users, including where Opera competed in Southeast Asia, South Asia, and Africa, was expected to experience substantial growth. Hood Decl. Ex. B, Prospectus at 87. Opera's reported revenue increased over the relevant period. From 2018 to 2019, Opera's overall revenue increased from about $172 million to about $335 million, and its revenue from its "Browser & News" business

increased from about $138 million to about $155 million.  Hood

Decl. Ex. I, Press Release at 1, 9.  From 2018 to 2019, Opera

also experienced about a 65% increase in net income.  Hood Decl.

Ex. J, 2019 Annual Report at 49, 54.

Opera stated in its 2018 Annual Report, published on April

17, 2019, as follows:

> Our mobile browsers, with a global user base of 326.7
> million average MAUs in 2018, of which 192.6 million
> were smartphone users, compared to 168.1 million
> smartphone users in 2017, are among the market leaders
> in high growth regions such as South Asia, Southeast
> Asia and Africa in terms of market share, according to
> StatCounter. Our PC browsers, available for both Windows
> and macOS platforms, also had a substantial user base of
> 58.5 million average MAUs in 2018, compared to 48.1
> million in 2017.

and

> Our smartphone browser user base followed a positive
> growth trend across 2016, 2017 and 2018, adding 47.2
> million MAUs over that period with seasonally highest
> growth in the third and fourth quarters.  As we oriented
> our marketing and distribution efforts around the new
> dedicated Opera News app during 2018, our overall
> smartphone user base grew faster than the browser
> subset, adding a total of 27.6 million in 2018 alone.

Am. Compl. ¶ 138 (together, the "2018 Annual Report Market Share

Statements").

In addition to allegedly misleading statements regarding

market share, the plaintiffs allege that the defendants omitted

from its Offering Documents material information concerning

Opera's entry into the fintech market.  The plaintiffs allege

that prior to the IPO, Opera began shifting its focus to fintech

operations in developing countries, but failed to disclose this
shift in the Offering Documents.  Am. Compl. ¶ 21.  On November
1, 2017, Opera entered into a services agreement with Opay
Digital Services Limited (HK) ("Opay").  Am. Compl. ¶ 22.  Opay
was an online payment service provider operating in Africa and
controlled by Y. Zhou, the CEO of Opera.  Id.  As of December
31, 2017, Opera had a 19.9% ownership share of Opay.  Id.
Beginning on March 12, 2018, Opay launched a microlending app in
Kenya called OKash.  Am. Compl. ¶ 23.  As of March 31, 2018,
Opera had 410 full-time employees, 51 of whom did work for Opay
pursuant to a services agreement between Opera and Opay.  Am.
Compl. ¶ 24.  On December 19, 2018, Opera acquired OKash from
Opay.  Am. Compl. ¶ 23.  As of December 31, 2018, Opera employed
464 full-time employees, 89 of whom were dedicated to Opera's
microlending programs.  Am. Compl. ¶ 26.  In 2018, Opera derived
1.0% of its total revenue from its fintech operations, and by
2019, Opera derived 38.3% of its total revenue from its fintech
operations.  Am. Compl. ¶ 27.  The plaintiffs allege that as of
the date of the IPO, Opera was already focused on developing its
microlending operations into a significant source of revenue.
Am. Compl. ¶ 71.  In the Prospectus, the defendants disclosed
that Opera held a 19.9% ownership interest in Opay, had provided
certain loans to Opay, and that in 2017 and 2018, Opera entered
into an agreement with Opay to provide it professional services.

Hood Decl. Ex B, Prospectus at 116, F-48; see also Hood Decl.

Ex. A, Registration Statement at Exhibit 10.7.

Specifically, Opera's Prospectus made the following

disclosure regarding Opay:

> Opay Digital Services Limited (HK), or Opay, is our
> equity investee which our chief executive officer and
> chairman controls through Balder Investment Inc., where
> certain of our other officers also have financial
> interests but no voting rights. Opay is an online payment
> service provider targeting African users. In 2017, we
> provided a loan of US$5.6 million to Opay in relation to
> its business expansion in Nigeria. In 2018, we provided
> a loan of US$0.4 million to Opay in relation to its
> business expansion in Kenya. Both loans are interest-
> free for the first 60 days and are due and payable upon
> notice. We also provided professional services to Opay
> and recorded operating revenue of US$2.8 million in
> 2017. As of March 31, 2018, we had US$5.5 million of
> trade receivable and US$1.0 million loan receivable, due
> from Opay. Our investment in and relevant transactions
> with Opay are in line with our business growth strategy
> and we expect to continue investing in Opay as its
> business develops.

Am. Compl. ¶ 76 (the "IPO Prospectus Opay Statement").

Opera's microlending, primarily OKash, was conducted

through apps available for download on Google Play and other

platforms.  Am. Compl. ¶ 29.  As of December 2019, Google's

Android platform held over 84% of the market share for app

platforms in Kenya, over 94% market share in India, and over 79%

of the market share in Nigeria, which were the three geographic

regions where Opera operated its microlending businesses.  Id.

Since 2011, Google Play has implemented certain policies

prohibiting predatory lending practices for apps using its

Android platform.  Am. Compl. ¶ 30.  In July 2016, Google Play
banned ads for payday loans "where repayment is due within 60
days of the date of issue."  Am. Compl. ¶ 31.  On August 21,
2019, Google Play banned short-term loan apps.  Am. Compl. ¶ 32.
The plaintiffs allege that Opera continued to operate its
microlending apps in violation of Google Play's policy, but
failed to disclose that fact.  Am. Compl. ¶ 36.

On September 20, 2019, Opera completed a Secondary Public
Offering ("SPO").  Am. Compl. ¶ 140.  In the Prospectus to the
SPO, Opera disclosed its entry into the fintech business through
its acquisition of OKash.  Hood Decl. Ex. F, SPO Prospectus
Supplement, at S-20.  Opera also disclosed generic risk factors
associated with its entry into the fintech business, including
credit risks, the risk of payment collection, new and evolving
regulatory regimes, and others.  Id. at S-26. Moreover, Opera
made the following statement regarding market share:

> We have a massive user base of over 350 million monthly
> active users in the quarter ended June 30, 2019 that we
> believe provides us with the scale and global reach
> necessary to capitalize on market opportunities and
> expand our offerings. Our global smartphone user base
> was 227 million MAUs, on average, in the quarter ended
> June 30, 2019, compared to 182 million MAUs in the second
> quarter of 2018. Our mobile browser user base reached
> 256 million average MAU in 2018, of which 181 million
> were smartphone users. Opera is among the market leaders
> in high growth mobile-first regions such as Africa and
> Asia in terms of market share, according to web traffic
> analyst StatCounter. Our PC products also had a
> substantial user base of 65 million average MAUs in the

> quarter ended June 30, 2019, compared to 57 million in
> the second quarter of 2018.

Am. Compl. ¶ 141 (the "SPO Prospectus Market Share Statement").

The defendants also disclosed its entry into the fintech
business in the SPO Prospectus.  Specifically, the SPO
Prospectus stated:

> [W]e entered the fintech business with the acquisition
> of OKash. . . .  [A]dding new products and services
> subjects us to additional competition and new
> competitors."

Hood Decl., Ex. F, SPO Prospectus Supplement, at S-20 (the "SPO
Prospectus Fintech Statement").

On December 9, 2019, Opera participated in the UBS Global
TMT Conference.  Am. Compl. ¶ 145.  On that call, Derrick
Nueman, Opera's Vice President and head of Investor Relations,
made the following statement concerning market growth:

> Unidentified Analyst:
>
> Yes, yes. No, that makes sense. Well, look, you've
> touched on the supply of the platform. Give us a sense
> of the health of the user base. What is the type of user
> base? What are they looking for? And I imagine that it's
> going to be pretty different between different parts of
> the world.
>
> Derrick L. Nueman - Opera Limited - VP of IR:
>
> Very, very different on geographies. Our overall user
> base grew 10% year-over-year in Q3, and that was driven
> by growth across all products. I mean, news was the
> fastest-growing product. But as I said earlier, browser
> grew as well. Seeing growth in all regions. Europe tends
> to be a higher-end consumer, somebody who's pretty tech-
> savvy, who opt into our browser again because they wanted
> privacy and security or they like our gaming browser.

> . . .
> I mean, look, Africa by far is our best region. Our brand
> is everywhere. We have big market share in some of these
> countries. Like a place, for example, like Nigeria, we
> have close to 50% browser market share. We have multiple
> products, you see Opera everywhere. And many Internet
> users haven't used anything other than Opera. They view
> Opera as the Internet. Versus in Europe, we have a ton
> of users, but there's also a ton of Google users, a ton
> of Facebook users. And our brand isn't as strong, but we
> still have opportunities. And a place like Asia is super
> competitive. And we tend to say we're going to compete
> more organically versus, say, marketing and
> distribution.

Am. Compl. ¶ 146.

Opera also participated in the Needham Growth Conference,
on January 15, 2020, during which Nueman made the following
statement:

> I want to go back here to some of the stats that I
> referenced earlier. You can see that we've grown both on
> mobile and PC. Interesting enough, mobile, we're very
> strong in emerging markets, Africa and Asia. And PC,
> we're very strong in Europe. Obviously, in a place like
> Africa and Asia, there aren't a lot of PC users given
> some of the bandwidth constraints. We have very good
> brand awareness in a couple of key markets in Africa. As
> an example, in Nigeria, we have close to 50% market
> share. And that's important as we launch new products.

Am. Compl. ¶¶ 149-50 (together with the December 9, 2019
statements, the "Analyst Calls Market Share Statements").

On January 16, 2020, Hindenburg Research, a research firm
that publishes reports regarding publicly-traded companies,
published a report concluding that Opera's browser market share
was declining, and that Opera was involved in predatory short-
term loans in Africa and India, deploying deceptive tactics,

10

charging interest rates between 365% and 876%.  Am. Compl. ¶ 37.
The report also asserted that the apps were in violation of
Google Play's terms and conditions.  Id.  According to the
Report, by January 2020, Opera's browser market share was down
about 30% since its IPO.  Am. Compl. ¶ 38.  The day before the
Hindenburg report was published, on January 15, 2020, Opera's
ADS closing price was $9.02 per ADS.  Am. Compl. ¶ 42.  The day
of the report, at the close of January 16, 2020, the price fell
to $7.33, and at the close of January 17, 2020, the price fell
to $7.06.  Id.

## II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiffs' favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007).[1]  The Court's function on a motion to dismiss is "not to
weigh the evidence that might be presented at a trial but merely
to determine whether the complaint itself is legally
sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.
1985).  The Court should not dismiss the complaint if the
plaintiffs have stated "enough facts to state a claim to relief
that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all
alterations, citations, footnotes, emphasis, and internal quotation marks in
quoted text.

U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  A securities fraud complaint based on misstatements must "(1) specify the statements that the plaintiff[s] contend[ ] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

While the Court should construe the factual allegations in the light most favorable to the plaintiffs, "the tenet that a

court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.  When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law."  Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015); Silsby v. Icahn, 17 F. Supp.3d 348, 353-54 (S.D.N.Y. 2014), aff'd sub nom., Lucas v. Icahn, 616 F. App'x 448 (2d Cir. 2015).

**III.**

The plaintiffs bring claims for violations of: (1) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5; (2) Section 11 of the Securities Act, 15 U.S.C. § 77k; (3) Section 15 of the Securities Act, 15 U.S.C.

§ 77o; and (4) Section 20(a) of the Exchange Act, 15 U.S.C.
§ 78t.

## A. Alleged Misstatements and Omissions

Claims brought pursuant to Section 11 of the Securities Act
and Section 10(b) of the Exchange Act require the plaintiff to
plead a material misstatement or omission.  See In re Morgan
Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir.
2010); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d
Cir. 2007).  A misrepresentation or omission is material if
there is a substantial likelihood that a reasonably prudent
investor would consider it important in making a decision.  See
Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988); TSC Indus.,
Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) ("[T]here must
be a substantial likelihood that the disclosure of the omitted
fact would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made
available."); Feinman v. Dean Witter Reynolds, Inc., 84 F.3d
539, 540-41 (2d Cir. 1996).

Generally, materiality is a mixed question of law and fact
ordinarily left to the finder of fact to determine.  TSC, 426
U.S. at 450.  The question of materiality may be decided as a
matter of law on a motion to dismiss if the alleged misstatement
or omission is "so obviously unimportant to a reasonable
investor that reasonable minds could not differ on the question

14

of [its] importance." Feinman, 84 F.3d at 540-41.  "The central

inquiry in determining whether a prospectus is materially

misleading . . . is therefore whether defendants'

misrepresentations, taken together and in context, would have

[misled] a reasonable investor about the nature of the

investment."  I. Meyer Pincus & Assocs., P.C. v. Oppenheimer &

Co., 936 F.2d 759, 761 (2d Cir. 1991).

    "A[n] omission is actionable under federal securities laws

only when the [defendant] is subject to a duty to disclose the

omitted facts."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259,

267 (2d Cir. 1993).  While in some circumstances, parties have

no duty to disclose information, once a party chooses to speak,

it has a "duty to be both accurate and complete."  Caiola v.

Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002).  "[A]n

entirely truthful statement may provide a basis for liability if

material omissions related to the content of the statement make

it . . . materially misleading."  In re Bristol Myers Squibb Co.

Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008); see also

City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.,

814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011).  However, corporations

are "not required to disclose a fact merely because a reasonable

investor would very much like to know that fact."  In re Time

Warner, 9 F.3d at 267; see also In re Vivendi, S.A. Sec. Litig.,

838 F.3d 223, 239-40 (2d Cir. 2016); In re Bank of Am. AIG

Disclosure Sec. Litig., 980 F. Supp. 2d 564, 575 (S.D.N.Y.
2013), aff'd, 566 F. App'x 93 (2d Cir. 2014).

      The statements at issue in this case are the IPO Prospectus
Market Share Statements, the IPO Prospectus Opay Statement, the
2018 Annual Report Market Share Statements, the SPO Prospectus
Market Share Statement, the SPO Prospectus Fintech Statement,
and the Market Share Statements in the Analyst Calls.  The
plaintiffs assert two general types of claims:  (1) certain
statements are materially misleading because they allegedly
misrepresent Opera's market share and growth; and (2) certain
statements omit material information about Opera's entry into
the fintech market.  The plaintiffs contend that only the
Analyst Calls Market Share Statements contain factually
inaccurate information, and that the basis for liability for the
remaining statements stems from omissions rendering the
statements materially misleading.

      The plaintiffs first contend that Opera's market share was
declining, and that the decline was likely to affect annual
revenue.  According to the plaintiffs, the defendants had a duty
to disclose the decline in market share pursuant Item 303 of
Regulation S-K.  This is especially true, the plaintiffs argue,
because Opera's prospectuses identified Opera as a market
leader.  Item 303 of Regulation S-K, in part, requires the
defendants to disclose "known trends or uncertainties that have

had or that the registrant reasonably expects will have a
material favorable or unfavorable impact on net sales or
revenues or income from continuing operations."  17 C.F.R.
§ 229.303(a)(3)(ii).  Item 303 "imposes a disclosure duty where
a trend, demand, commitment, event or uncertainty is both
(1) presently known to management and (2) reasonably likely to
have material effects on the registrant's financial condition or
results of operations."  Panther Partners Inc. v. Ikanos
Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012).

In this case, Opera's reported annual "Browser & News
revenue" increased from 2018 to 2019.  Hood Decl. Ex. J, 2019
Annual Report at 49; Ex. I, February 25, 2020 Press Release, at
2.  The plaintiffs do not contest Opera's reported annual
revenue figures.  As the defendants point out, loss of market
share does not necessarily imply a loss of revenue when the
market is rapidly growing.  The defendants disclosed that the
markets where they were competing were expanding rapidly, and
therefore the decrease in market share does not imply that it
would be reasonably likely that Opera would suffer a decrease in
revenue.  And the plaintiffs do not contend that Opera's
statement that it added 40.7 million MAUs was false.  In fact,
Opera's reported revenue and net income increased while its
share of the total browser market share was declining.  See
Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 39 (2d Cir. 2017)

17

(no obligation under Item 303 to disclose decline of market
share in a particular region where there was no evidence of a
decline in revenues).

Moreover, the statements at issue concerned mobile user
statistics, but the plaintiffs object that the defendants did
not disclose Opera's declining market share of the total browser
user base, which includes mobile users and PC users.  However,
the defendants did not make any representations in the Offering
Documents that it was a market leader in terms of market share
for the total user base; the defendants cabined the statements
to market share of mobile users.  Therefore, the fact that Opera
experienced a decline in market share for the total user base is
even more tenuously related to the statements in the Offering
Papers and the 2018 Annual Report, and the plaintiffs have not
shown that the decrease in market share of the total browser
market would have been likely to negatively affect revenue.
Accordingly, the plaintiffs cannot show an Item 303 violation
because they have failed to plead adequately that Opera suffered
or would have been likely to suffer a decline in revenue.  See,
e.g., Holbrook v. Trivago, N.V., 2019 WL 948809, at *12-14
(S.D.N.Y. Feb. 26, 2019), aff'd sub nom., Shetty v. Trivago
N.V., 796 F. App'x 31 (2d Cir. 2019).

Furthermore, as the defendants contend, the defendants'
statements about Opera's market share could not be material

18

because the "truth" was publicly available.  See White v. H&R
Block, Inc., 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004)
(noting that courts in this Circuit recognize the "truth-on-the-
market" defense).  Alleged misstatements are not material where
the truth was fully disclosed or concerned a matter of public
knowledge.  See, e.g., id.; Rubenstein v. Credit Suisse Grp. AG,
No. 19-cv-1069 2020 WL 2036850, at *6 (S.D.N.Y. Apr. 28, 2020);
Colbert v. Rio Tinto PLC, 392 F. Supp. 3d 329, 339-40 (S.D.N.Y.
2019); Monroe Cnty. Emps. Ret. Syst. v. YPF Sociedad Anonima, 15
F. Supp. 3d 336, 355-56 (S.D.N.Y. 2014); In re
IAC/InterActiveCorp Sec. Litig., 695 F. Supp. 2d 109, 118, 122
(S.D.N.Y. 2010).  "Although the underlying philosophy of federal
securities regulation is that of full disclosure, there is no
duty to disclose information to one who reasonably should be
aware of it."  Seibert v. Sperry Rand Corp., 586 F.2d 949, 952
(2d Cir. 1978).  "Where allegedly undisclosed material
information is in fact readily accessible in the public
domain, . . . a defendant may not be held liable for failing to
disclose this information."  In re KeySpan Corp. Sec. Litig.,
383 F.Supp.2d 358, 377 (E.D.N.Y. 2003); see also In re Merrill
Lynch & Co., Inc. Research Reports Sec. Litig., 272 F.Supp.2d
243, 249-250 (S.D.N.Y. 2003) ("[T]he Defendants cannot be held
liable for failing to disclose . . . publicly available
information.").

The plaintiffs allege that, according to the information on
StatCounter, the defendants' statements were false or
misleading.  However, in its public statements, the defendants
directed readers to StatCounter for more complete information.
Therefore, the statements cannot be misleading when the
defendants directed readers to the complete statistics available
on StatCounter.  Moreover, the defendants contested, and the
plaintiffs do not dispute, that the information was publicly
available free of charge.  The plaintiffs cite to <u>Staehr v.
Hartford Financial Services</u> for the proposition that the
plaintiffs cannot be charged with the knowledge or duty to
investigate Opera's market share from obscure or minimally
reported sources.  <u>See</u> 547 F.3d 406, 427-28 (2d Cir. 2008).  In
this case, the very statements that the plaintiffs contend are
misleading directed investors to StatCounter.  For each alleged
misstatement about market share, a diligent investor would have
seen the data as reported by StatCounter, undercutting the
plaintiffs' argument that the alleged misstatements were
material.

Moreover, to the extent that the plaintiffs complain about
statements concerning being a market leader, courts have long
understood such statements to constitute corporate puffery.
Such statements are "no more than puffery which [do] not give
rise to securities violations," because they are "too general to

20

cause a reasonable investor to rely upon them." ECA & Local 134
IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553
F.3d 187, 205-06 (2d Cir. 2009).  Statements are general puffery
when they are "too general to cause a reasonable investor to
rely upon them" or "merely generalizations regarding [a
company]'s business practices." Id. at 206.  The statements
about Opera's growth and being a market leader are corporate
optimism more appropriately described as puffery.  See, e.g., In
re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364,
395-97 (S.D.N.Y. 2006) (holding that optimistic statements about
growth were puffery).  To the extent that the statements gave
more specific assertions, those statements directed investors to
StatCounter, where the investors could find the complete
information.  Therefore, apart from the Analyst Calls Market
Share Statements, which include specific data about Opera's
market share in Nigeria without referring investors to
StatCounter, Opera's statements relating to market share are not
materially misleading.[2]

    The plaintiffs next contend that Opera's Offering Documents
in connection with the IPO were misleading because they failed
to disclose Opera's entry into the fintech market.  Item 101 of
Regulation S-K requires the defendants to disclose "the general

---

[2] As described below, the plaintiffs still fail to state a Section 10(b) claim
with respect to the Analyst Calls Market Share Statements because they fail
to plead any facts giving rise to an inference of scienter.

development of the business of the registrant, its subsidiaries, and any predecessor(s)" including "any material changes in the mode of conducting the business." 17 C.F.R. § 229.101. Item 105 of Regulation S-K requires the defendants to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. When the omitted information concerns a contingent or speculative event, "the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001); see also In re Alliance Pharmaceutical Corp. Sec. Litig., 279 F. Supp. 2d 171, 196 (S.D.N.Y. 2003). Future plans need to be disclosed when they "are under active and serious consideration." In re Time Warner, 9 F.3d at 268; see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris, Co., Inc., 75 F.3d 801, 810-11 (2d Cir. 1996); Bratusov v. Comscore, Inc., No. 19-cv-3210, 2020 WL 3447989, at *10-11 (S.D.N.Y. June 24, 2020); In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 587 (S.D.N.Y. 2005).

The plaintiffs have failed to allege adequately a violation of Item 101 because the plaintiffs do not allege adequately that Opay was a subsidiary of Opera or that Opera itself entered into

the fintech market at the time Opera published its Offering
Documents or completed its IPO.  Item 101 only requires
disclosure for the "registrant, its subsidiaries, and any
predecessor(s)."  17 C.F.R. § 229.101.  Opera disclosed that it
held a minority interest in Opay, that Opay was controlled by
Opera's Chairman and Chief Executive Officer, that Opay
conducted microlending, that Opera provided services to Opay
pursuant to a services agreement, and that Opera provided loans
to Opay.  While Opera did have a minority share in Opay, Opera
would need a controlling interest of Opay for it to be
considered a subsidiary of Opera.  See 17 C.F.R. § 240.12b-2
(Exchange Act Rule 12b-2 defines "subsidiary" as "an affiliate
controlled by such person directly, or indirectly through one or
more intermediaries"); Subsidiary Corporation, Black's Law
Dictionary (11th ed. 2019) ("A corporation in which a parent
corporation has a controlling share.").  While an entity could
be considered a "subsidiary" where the parent entity has a
controlling interest with less than a 50% ownership share, the
plaintiffs have not pleaded enough facts in the operative
complaint to make a plausible allegation that Opay was a
subsidiary of Opera.  Because the plaintiffs have failed to
plead adequately that Opay was Opera's subsidiary, the
defendants did not have an obligation, pursuant to Item 101, to
disclose the general business development of Opay.  Therefore,

the fact that the defendants did not disclose the specific details about Opay's lending business cannot constitute a material omission because Opera had no duty to disclose that information.

The plaintiffs contend that Opera itself entered into the fintech market by virtue of its relationship with Opay, or at least should have disclosed its plans to engage in fintech imminently.  Item 101 requires a corporation to "[d]escribe the business done and intended to be done by the registrant and its subsidiaries, focusing upon the registrant's dominant segment or each reportable segment about which financial information is presented in the financial statements."  17 C.F.R. § 229.101(c)(1).  However, the plaintiffs have failed to allege adequately that Opera entered the fintech business before it acquired OKash in December 2018, after Opera's IPO in August 2018, or had plans to enter the fintech market imminently.  The plaintiffs' allegations are insufficient to show that the defendants had a duty to disclose its future entry into the fintech market at the time of the IPO.  See, e.g., In re Centerline Holding Co., 380 F. App'x 91, 94 (2d Cir. 2010) (affirming dismissal of securities claims where the defendants did not have a duty to disclose future plans); In re Cosi, 379 F. Supp. 2d at 586-88 (dismissing securities claims where the defendants did not have a duty to disclose future business

24

plans).[3]  While Opera had a minority interest in Opay, a services agreement with Opay, and provided loans to Opay, those allegations are insufficient to show that Opera was going to engage imminently in the fintech market.  The extent of the relationship between Opera and Opay, as it existed at the time, was disclosed in Opera's Offering Documents.  And to the extent that the plaintiffs rely on events occurring after Opera's IPO, the defendants plainly had no obligation or ability to disclose those events in the Offering Documents.  See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that the defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").  Additionally, the defendants did disclose that Opera intended to continue investing in and working with Opay.  Specifically, the IPO Prospectus Opay Statement provided that Opera "expect[ed] to continue investing in Opay as its business develops."  Am. Compl. ¶ 76.  Accordingly, the defendants did disclose Opera's intention to continue working with Opay as Opay developed its fintech business, and the plaintiffs have failed to plead adequately a material omission with respect to Opera's entry into the fintech market.

---

[3] The defendants did disclose Opera's entry into the fintech market in the SPO Prospectus Fintech Statement.

Similarly, Opera could not have disclosed the risk from Google Play's policy regarding predatory lending in its Offering Documents because Google Play implemented that policy after the IPO.  When Google Play had changed its policies, Opera disclosed those risks at that time.  Specifically, in the SPO Prospectus, Opera stated as follows:

> If any of these third-party channel providers [including Google Play] delivers unsatisfactory services, engages in fraudulent action, or is unable or refuses to continue to provide its services to us and our users for any reason, it may materially and adversely affect our business, financial condition and results of operations.

Hood Decl. Ex. E, SPO Prospectus, at S-26.

Therefore, the plaintiffs' argument that Opera's failure to disclose the risks of the fintech business constituted a violation of Item 105 is unavailing.  The defendants did disclose certain risks in Opera's investment in Opay, and when Opera did enter into the fintech market, the defendants disclosed that fact in the SPO Prospectus Fintech Statement. Moreover, the defendants disclosed the risks of its entry into the fintech market in its Prospectus to the SPO based on "new and evolving" regulatory regimes, as well as other risks associated with its entry into the fintech market, including the risk that Google Play would cease providing its services to Opera.  Accordingly, the plaintiffs have failed to allege adequately that the defendants violated a duty to disclose

26

Opera's entry into the fintech market pursuant to Items 101 and 105.

Therefore, the plaintiffs have failed to state adequately, pursuant to the plaintiffs' Section 10(b) and Section 11 claims, that the defendants made material misstatements or omissions in the IPO Market Share Statements, the IPO Opay Statement, the 2018 Annual Report Statements, the SPO Prospectus Market Share Statement, and the SPO Prospectus Fintech Statement.

## B.  Section 10(b)

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs.  Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also City of Roseville, 814 F. Supp. 2d at 409.  With the possible exception of statements with respect to market share that Nueman made in the Analyst Calls, the Section 10(b) claims fail because the

27

plaintiffs have failed to plead that Opera made any false or misleading statements.  The Section 10(b) claims also fail because the plaintiffs have failed to plead adequately scienter and loss causation.

### 1.  Scienter

The defendants argue that the plaintiffs have failed to plead a strong inference of scienter for any of the Section 10(b) claims.  The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996).  The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A "strong inference" of scienter can arise from (1) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (2) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI, 493 F.3d at 99; see also City of Roseville, 814 F. Supp. 2d at 418-19 (same).  In order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to each defendant.  See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010).  "[I]n

determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges a strong inference of scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010); Silsby, 17 F. Supp. 3d at 364-65. Courts conduct the scienter analysis holistically to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, Inc., 551 U.S. at 322-23.

The plaintiffs first assert that the defendants knew or deliberately disregarded market share data in making statements about Opera's being a market leader. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information" to support an inference of scienter. Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008). Moreover, the information contained in those reports must be non-public. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001); see also In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432,

452 (S.D.N.Y. 2005) ("Cases in this Circuit assume that the contradictory information in question must be non-public.").

In this case, the defendants specifically referred investors to StatCounter.  As such, the plaintiffs cannot allege adequately that the defendants had access to facts contrary to what they stated, namely data from StatCounter, because the very statements in question referred to the information on StatCounter.  Moreover, the plaintiffs cannot assert that the defendants disregarded that information, because the allegedly misleading statements refer to StatCounter.  Further, it would not be plausible that the defendants deliberately attempted to mislead investors by referring them to the very sources that would allegedly disclose the misleading nature of the statements.  And while the plaintiffs contend that Opera's market share of the total user base was declining, the statements at issue in this case concern Opera's market share of mobile users.  The plaintiffs have failed to allege adequately that the statements were misleading when viewed in the context of the mobile market, and the plaintiffs' argument that the defendants should have nonetheless included that their market share of the total user base was declining is unavailing. Accordingly, the plaintiffs have failed to plead adequately an inference of scienter with respect to the IPO Prospectus Market

30

Share Statements, the 2018 Annual Report Market Share Statements, and the SPO Prospectus Market Share Statement.

The plaintiffs also assert that Nueman made two misstatements during analyst calls with respect to Opera's market share in Nigeria.  However, the plaintiffs have failed to allege any facts leading to an inference of scienter with respect to the Analyst Calls Market Share Statements.[4]  It is not plausible, much less indicative of a strong inference of scienter, that Nueman would consciously or recklessly misstate market share statistics that were publicly available on StatCounter when Opera repeatedly referred the public to StatCounter for the statistics on market share.  When plaintiffs fail to allege facts giving rise to an inference of scienter, the plaintiffs' Section 10(b) claims must be dismissed.  See, e.g., Wilson v. Dalene, 699 F. Supp. 2d 534, 559 (E.D.N.Y. 2010); In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009).  Because the plaintiffs failed to allege any facts sufficient to infer scienter with respect to

---

[4] The plaintiffs contend that the Analyst Calls Market Share Statements were factually inaccurate because the statements that Opera had close to a 50% market share in Nigeria appeared to refer to market share of total user base. The defendants contend that the 50% market share claim was related to market share of mobile users, and were an accurate description of market share in that market.  This is a factual issue that cannot be decided on a motion to dismiss.  In any event, the Analyst Market Share Statements are not actionable as pleaded because the plaintiffs have failed to allege a strong inference of scienter.

the Analyst Calls Market Share Statements, the Section 10(b)
claims with respect to those statements must be dismissed.

The plaintiffs also fail to plead scienter sufficiently
with respect to the alleged omissions in the IPO Prospectus Opay
Statement regarding Opera's entry into the fintech market at the
time of Opera's IPO.  First, the plaintiffs fail to point to any
specific reports or contrary information that the defendants
failed to disclose, beyond speculation about mere abstract plans
that Opera was considering entering the fintech market which are
not specifically identified.  Second, the defendants did
disclose that Opera had provided Opay loans, that Opera executed
a services agreement Opay, and that Opera held a minority
interest in Opay.  The plaintiffs have not alleged that there
was anything more concrete to disclose at the time of the IPO,
apart from what the defendants in fact disclosed.  The extent of
the disclosures in the IPO Prospectus undercuts the plaintiffs'
arguments that the defendants failed to disclose any information
with fraudulent intent.

To show scienter with respect to the alleged omissions
concerning Opera's entry into the fintech market, the plaintiffs
point to the existence of other litigation.  Opera's CEO, Y.
Zhou, was a director of Qudian, a company not affiliated with
Opera.  Qudian shareholders sued Y. Zhou and others alleging a
failure to disclose that Qudian entered a materially different

business line.  See Am. Compl. ¶¶ 165-69; see also In re Qudian Inc. Sec. Litig., 17-cv-9741, ECF No. 134, Consolidated Second Amended Complaint, (S.D.N.Y. July 27, 2018).  The plaintiffs allege that because the allegations in the Qudian case and in this case both amount to a failure of the defendants to disclose an entry into a new line of business, the Qudian litigation provides support for the scienter allegation in this case.  In the Qudian litigation, however, there has not been an adjudication on the merits and unproven allegations in another case provide no support for an inference of scienter in this case.  See, e.g., RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), aff'd, 387 F. App'x 72 (2d Cir. 2010).  Indeed, many of the plaintiffs' claims in Qudian were dismissed, See In re Qudian Inc. Sec. Litig., 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019), and the case is in the process of being settled without an adjudication on the merits.  See In re Qudian Inc. Sec. Litig., 17-cv-9741, ECF No. 228, Preliminary Approval Order, (S.D.N.Y. Nov. 16, 2020).

The plaintiffs have also failed to plead that there was a motive for the allegedly false statements.  The plaintiffs assert an inference of scienter with respect to all statements because, as alleged by the plaintiffs, a portion of the IPO and SPO proceeds were used by Opera in transactions with entities that were controlled by Y. Zhou and H. Zhou.  See Am. Compl.

¶¶ 170-73.  Based on this, the plaintiffs assert that the defendants had a motive to deceive Opera's investors.  An inference of scienter is supported based on the motive theory when the plaintiffs allege that the defendants "benefitted in some concrete and personal way from the purported fraud." Novak, 216 F.3d at 311.  "[T]he particular fraud alleged must specifically enable the schemes or business plans plaintiffs contend conferred concrete and personal benefits on the defendants."  Glaser v. The9 Ltd., 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011).  Alleging related-party transactions, without any unique connection between alleged fraud and the transactions, is insufficient for an inference of scienter.  Id. at 592.

In this case, the plaintiffs have failed to allege a unique connection between the alleged fraud and the related-party transactions.  While the plaintiffs assert that the defendants raised money from the IPO and SPO that was later used in related-party transactions, some of the transactions that occurred were disclosed in the IPO Prospectus and occurred before the IPO.  See Hood Decl. Ex. B, Prospectus at 115-16. With respect to the transactions that occurred after the public offerings, the plaintiffs do not allege that the terms of the related-party transactions were unfavorable to Opera or Opera's shareholders.  The plaintiffs have failed to allege how Y. Zhou

and H. Zhou enriched themselves at the expense of Opera and
Opera's shareholders.  Merely noting that the defendants raised
capital from the public offerings, and then used that capital in
future related-party transactions, is insufficient, without
more, to allege a strong inference of scienter.  Therefore, the
related-party transactions, as alleged in the Amended Complaint,
are insufficient to support a strong inference of scienter.

The plaintiffs' allegations taken together fail to support
a strong inference of scienter with respect to any of the
alleged misstatements and omissions, and therefore, all of the
plaintiffs' Section 10(b) claims must be dismissed.

### 2.  Loss Causation

The defendants argue that the plaintiffs have failed to
plead that the alleged misrepresentations and omissions caused
the plaintiff's loss.  To allege loss causation under Section
10(b) and Rule 10b-5, the plaintiffs must provide in the
complaint "notice of what the relevant economic loss might be
and what the causal connection might be between that loss and
the misrepresentation."  Dura Pharms., Inc. v. Broudo, 544 U.S.
336, 347 (2005).  The plaintiffs must allege that the
misrepresentation or omission proximately caused the plaintiffs'
economic loss.  Id. at 346.  To provide the requisite notice,
the plaintiffs must plead economic loss and either "that the
loss was foreseeable and caused by the materialization of the

35

risk concealed by the fraudulent statement," ATSI, 493 F.3d at 107, or "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005); see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232-33 (2d Cir. 2014); In re New Oriental Educ. & Tech. Grp. Sec. Litig., 988 F. Supp. 2d 406, 428 (S.D.N.Y. 2013). "[P]artial disclosures can satisfy the loss causation requirement." Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

To show loss causation, a corrective disclosure must "purport[] to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." See In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 511 (2d Cir. 2010). Already-public information cannot constitute a corrective disclosure for purposes of alleging loss causation. See id. at 511-12; see also Fila v. Pingtan Marine Enter. Ltd., 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016) (holding that the plaintiffs could not allege loss causation "based solely on public information").

In this case, the alleged corrective disclosure at issue is the Hindenburg report. However, that report contained an analysis of publicly available information. The Hindenburg report cited market share data obtained from StatCounter.

Opera's disclosures referred investors to that same data in the Prospectus to the IPO, the 2018 Annual Report, and the Prospectus to the SPO.  Therefore, the Hindenburg report cannot constitute a corrective disclosure sufficient to allege loss causation because it merely analyzed the public data to which the defendants directed investors.  See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp., 543 F. App'x 72, 74-75 (2d Cir. 2013) ("[T]he cited third-party articles and reports [that] expressed negative opinions about [the defendant's] solvency based on information that was already publicly available . . . are not corrective for the purpose of pleading loss causation.").  Accordingly, the plaintiffs have failed to allege adequately loss causation with respect to the statements concerning Opera's market share.  For the same reasons, the Hindenburg report cannot serve as a corrective disclosure for Opera's entry into the fintech market.  In February 2019, Opera disclosed its acquisition of OKash in a press release.  That disclosure came almost a year before the Hindenburg report was published in January 2020, and the plaintiffs have not alleged that the Hindenburg report relied on any non-public information with respect to Opera's participation in the fintech market.

**C. Section 11**

In addition to the fact that the Section 11 claims fail because the plaintiffs have failed to show a material misstatement in the Offering documents, the Section 11 claims also fail because the claims are untimely and the defendants have shown that the alleged misstatements did not cause the plaintiffs' alleged loss.

Section 11(a) of the Securities Act provides that any signatory to a Registration Statement, director of the issuer of securities, or underwriter with respect to such securities, among others, may be held liable to purchasers of registered securities if the Registration Statement contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a). Section 11 imposes "a stringent standard of liability on the parties who play a direct role in a registered offering." Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983); see also In re Flag Telecom Holdings, Ltd. Secs. Litig., 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009).  To establish a prima facie claim under Section 11, "[a] plaintiff need only plead a material misstatement or omission in the registration statement."  In re Flag Telecom Holdings, Ltd. Secs. Litig., 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), abrogated on other

grounds, 574 F.3d 29 (2d Cir. 2009).  Under Section 11,

"[l]iability against the issuer of a security is virtually

absolute, even for innocent misstatements," while "[o]ther

defendants bear the burden of demonstrating due diligence."

Herman & MacLean, 459 U.S. at 382.

### 1. Statute of Limitations

Section 11 requires that claims be brought "within one year

after the discovery of the untrue statement or the omission, or

after such discovery should have been made by the exercise of

reasonable diligence . . . ."  15 U.S.C. § 77m.  "A securities-

law violation is discovered when the plaintiff learns sufficient

information about the violation to plead it in a complaint with

enough detail and particularity to survive a Federal Rule of

Civil Procedure 12(b)(6) motion to dismiss" and a plaintiff is

"charged with knowledge of any fact that a reasonably diligent

plaintiff would have discovered."  Fed. Hous. Fin. Agency for

Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d

85, 119 (2d Cir. 2017).

In this case, the plaintiffs allege that the statements

regarding Opera's market share and number of MAUs were false or

misleading according to data from StatCounter.  However, the

allegedly misleading statements specifically referred to

StatCounter.  Based on the explicit reference to StatCounter, a

reasonably diligent plaintiff would have discovered the alleged

39

misstatement when it was made, or immediately thereafter.   The
allegedly misleading statements with the reference to
StatCounter were made in July 2018.  This case was not filed
until January 2020.

The allegedly misleading omissions regarding Opera's entry
into the fintech market suffer the same defect.  The plaintiffs
allege that at the time of the IPO, Opera had either already
entered the fintech market or had imminent plans to do so.  The
support from the plaintiffs' allegations comes from other
statements the defendants disclosed in June and July 2018 in
Opera's Registration Statement and Prospectus, namely the
services agreement between Opera and Opay, the loan from Opera
to Opay, and that Opera owned a minority interest in Opay.  To
the extent that it could be said that those statements omitted
material information, the plaintiffs filed this suit over a year
after discovery of the alleged omission should have been made.

Accordingly, the plaintiffs' Section 11 claims are untimely
with respect to the statements made in the Offering Documents of
the IPO.

### 2.  Standing

The defendants argue that plaintiff Lilian Lau lacks
standing to pursue her Section 11 claims.  "To establish
standing under § 11 at the motion-to-dismiss stage, . . .
Plaintiffs need only assert that they purchased shares issued

pursuant to, or traceable to the public offerings." City of
Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450
F. Supp. 3d 379, 403 (S.D.N.Y. 2020); see also DeMaria v.
Andersen, 318 F.3d 170, 176 (2d Cir. 2003) (holding that
"aftermarket purchasers" can have standing under Section 11 if
they can trace their shares to the allegedly defective
registration statement).  Lau did not purchase any shares of
Opera until November 12, 2019, which was after the IPO in July
2018 and SPO in September 2019.  Lau has failed to allege how
the stocks she purchased were traceable to the stocks issued in
the public offerings.  Therefore, Lau lacks standing to bring
the Section 11 claims asserted in this case.  There is no
dispute that plaintiff Leon Brown has standing.  Accordingly,
plaintiff Lau has no standing to pursue her Section 11 claims.
This conclusion does not affect Leon Brown's standing.

### 3. Negative Loss Causation

The defendants allege that the plaintiffs' Section 11
claims fail because the alleged truth of the defendants'
statements was publicly available, and therefore any alleged
misrepresentations or omissions could not have caused the
plaintiffs' loss.  Courts have recognized that the negative loss
causation affirmative defense in the Section 11 context and the
loss causation element of Section 10(b) claims are "mirror
images."  In re Worldcom, Inc. Sec. Litig., No. 02-cv-3288, 2005

41

WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005).  As described above,
the plaintiffs have failed to allege adequately loss causation
in the Section 10(b) context.  For the same reasons, the Section
11 claims should be dismissed.  See, e.g., Amorosa v. AOL Time
Warner Inc., 409 F. App'x 412, 416–17 (2d Cir. 2011).  Because
the allegedly corrective information was already publicly known
and referred to in the allegedly misleading statements, those
statements could not have caused the plaintiffs' loss.
Accordingly, the plaintiffs' Section 11 claims must be
dismissed.

### D. Sections 15 and 20(a)

The plaintiffs cannot establish control person liability.
The plaintiffs' claims under Section 15 of the Securities Act
and Section 20(a) of the Exchange Act fail because the
plaintiffs have failed to allege adequately a primary violation.
Section 15 of the Securities Act provides for liability for
individuals who "control[] any person liable under" provisions
including Section 11.  15 U.S.C. § 77o(a).  Section 20(a) of the
Exchange Act provides for liability for anyone who "controls any
person liable under" provisions including Section 10(b).  15
U.S.C. § 78t.

"To establish a prima facie case of control person
liability, a plaintiff must show (1) a primary violation by the
controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108; see also In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 25 (S.D.N.Y. 2016). Because the plaintiffs' claims under Section 10(b) of the Exchange Act and Section 11 of the Securities Act fail, the plaintiff cannot establish control person liability under Section 15 of the Securities Act or Section 20(a) of the Exchange Act. Accordingly, the plaintiffs' claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act must be dismissed.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not discussed above, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to dismiss is **granted.** The plaintiffs may file a Second Amended Complaint by **April 16, 2021.** The Clerk is directed to close Docket No. 56.

**SO ORDERED.**

Dated:    **New York, New York**
          **March 13, 2021**            /s/ John G. Koeltl
                                   _____
                                         **John G. Koeltl**
                               **United States District Judge**